**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**Portland Division**

TIFFANY CASTANEDA and RANDY CASTANEDA,
as guardians ad litem for S.C., a minor,
ADAM CARPENTER and REBECCA CARPENTER,
as guardians ad litem for S.N.C., a minor, and
MADELYN EISCHEN,

     *Plaintiffs*,

     v.

OREGON DEPARTMENT OF EDUCATION,
OREGON SCHOOL ACTIVITIES ASSOCIATION,
GOVERNOR TINA KOTEK, in her official capacity
as Superintendent of Public Instruction,
FOREST GROVE SCHOOL DISTRICT NO.15,
NEWBERG SCHOOL DISTRICT NO. 29J,
PORTLAND SCHOOL DISTRICT NO. 1J

     *Defendants*.

Case No. _____

**Complaint for Declaratory and**
**Injunctive Relief and Damages**
20 U.S.C. §1681(a), *et seq*;
42 U.S.C. § 1981

**Jury Trial Demanded (Damages)**

---

## I.      INTRODUCTION

1.      This is an action under Title IX of the Education Amendments of 1972, (Pub L.

88-352), codified at 20 U.S.C. Section 1681(a) ("Title IX"), to remedy sex discrimination against

three Plaintiffs—female athletes—and others similarly situated who have competed and intend to

compete in the next academic year in girl's high school track and field in the State of Oregon.

2.      Like many young female athletes nationwide, Plaintiffs have trained diligently for

years striving to improve their performance season after season in pursuit of personal

satisfaction, opportunities for advancement to district and state meets, college recruitment, and

athletic scholarships.  Plaintiffs have participated in female-only track and field events because

they also provide significant subjective benefits—comradery, personal development,

empowerment, pride and self-fulfillment.

3.      Oregon has had a significant impact on track and field competitions, both nationally and internationally, as many of the top world performers in track and field have graduated from high schools in the State. The University of Oregon's program has also produced world-class athletes and legendary coaches. Hayward Field is a major hub, hosting international events, numerous USA Olympic Trials, NCAA Championships, and the Oregon High School State track meets each year. This context underscores the importance of track and field opportunities for Oregon high school athletes.

4.      Unfortunately for Plaintiffs and other high school girls in Oregon, their dreams and goals—opportunities for participation, recognition, and scholarships—are being directly and negatively impacted by the policies and decisions of the Oregon Department of Education (ODE), led by the Governor, Tina Kotek, the Oregon School Activities Association ("OSAA"), and by the defendant school districts that enforce those policies which permit biological males[1] who "identify" as females to compete in girls' athletic competitions.

5.      This discriminatory practice has resulted in biological males displacing biological females on the victory podium in competitive track and field events in Oregon, excluding some girls from competition altogether, and depriving other girls, including Plaintiffs and their peers, from honors, opportunities to compete at higher levels, or public recognition vital for college recruiting and scholarship prospects that rightfully belong to outstanding female-only athletes.

6.      The varsity track season offers a limited number of meets to achieve personal records (PRs) and satisfy district qualifying standards.  At each of the high schools for which

---

[1] Because Title IX focuses on equal opportunities between the <u>sexes</u>, and because Congress contemplated that the definition of "sex" under Title IX encompasses only one's biological sex, the terms "boys" and "men" shall refer to biological males ("males"), and the terms "girls" or "women" shall refer to biological females ("females") throughout this Complaint.  *See, e.g., Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (interpreting "sex" within the meaning of Title IX by looking to the ordinary meaning of the word when enacted in 1972 and finding that "sex" means biological sex, *i.e.* male and female).

Plaintiffs compete, only the top two female athletes in each event advance to the state meet, making every competitive opportunity critical.

7.      As a result, girls competing in interscholastic track and field in Oregon now have materially fewer opportunities to stand on the victory podium, fewer opportunities for post-season competition, fewer opportunities for public recognition as champions, and diminished chances of setting state records compared to boys.

8.      For example, on March 19, 2025, A.G., a biological male high school junior athlete who self-identifies as a female, was permitted to participate in a girls' track and field meet at McDaniel High School, located in Portland, Oregon. The result was that he defeated every female competitor in the 200- and 400-meter runs, both of which were season records. (available at: https://www.athletic.net/athlete/24853874/track-and-field/).

9.      For Plaintiffs, like most young women expecting to compete in a girls-only athletic event, being forced to compete against males leads to a sense of futility and even humiliation. This is due to the incontrovertible reality that males typically outperform women in athletics due to their physiological advantages in muscle mass and strength, height and limb length, bone structure and density, and lung and cardiovascular capacity.

10.      For some young female athletes faced with competing against males, including Plaintiffs, the controversy around such events also attracts unwanted media attention, interfering with their privacy and public image in a uniquely degrading manner that their male student athlete counterparts do not experience. For example, competing against males leads to a Hobson's choice for many girls like Plaintiffs: on the one hand, sitting out a competition in protest often brings harassment and threats against the young woman as a result of media attention in a politically charged environment; on the other, competing against the male is seen as condonement, which has significant implications for students with contrary religious beliefs

and their images in such communities.

11.    This reality constitutes unlawful discrimination against these female athletes, in direct violation of Title IX, which mandates equal opportunity for both sexes in any education program or activity receiving federal funds, including high school athletics. Permitting biological males to compete in girls' sports ignores the physiological advantages men have over women and undermines the very purpose of sex-segregated competition intended to provide equal opportunities for females.

## II.    JURISDICTION AND VENUE

12.    This action, pursuant to Title IX, 20 U.S.C. § 1681, *et seq*. and its interpreting regulations, raises federal questions and seeks redress for deprivation of rights protected by federal law.

13.    This Court has original jurisdiction over the claims asserted in this Complaint under 28 U.S.C. § 1331, which provides jurisdiction for claims raising questions of federal law, and 28 U.S.C. § 1343(a), which provides jurisdiction for claims seeking vindication of civil rights protected by federal law.

14.    This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201 and the authority to award the other relief requested under 28 U.S.C. § 2202.

15.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and all Plaintiffs and Defendants reside or have their principal place of business in Oregon.

## III.    PARTIES

16.    Plaintiff S.C. is a female student athlete. During the 2024-2025 academic year, she was a junior at Newberg High School competing in track. She brings this action through her parents, Randy and Tiffany Castaneda. S.C. resides in Carlton, Oregon, and she intends to

4

continue competing at Newberg High School in track during the 2025-2026 academic year and beyond.

17.    Plaintiff S.N.C. is a female student athlete. During the 2024-2025 academic year, she was a junior, competing in track and field at Newberg High School. She brings this action through her parents and guardians, Adam and Rebecca Carpenter. S.N.C. resides in Newberg, Oregon, and she intends to continue competing at Newberg High School in track and field during the 2025-2026 academic year and beyond.

18.    Plaintiff Madelyn Eischen is a female student athlete. During the 2024-2025 academic year, she was a senior at Forest Grove High School and captain of the track and field team. She resides in Cornelius, Oregon.

19.    Defendant Oregon Department of Education ("ODE") is an executive agency of the state of Oregon and is responsible for the administration and funding of K-12 public education in the State of Oregon, as well as the enforcement of Title IX, 20 U.S.C. §§ 1681-1688 and its implementing regulations at 34 C.F.R. Part 106 for schools under its jurisdiction. All of the ODE's actions complained of herein were conducted under color and pretense of law, including the enactment and enforcement of policies pursuant to Oregon and United States law.

20.    Defendant Oregon School Activities Association ("OSAA") is the governing body for interscholastic athletic activities for public and private schools in Oregon. OSAA establishes policies and standards for member schools regarding student participation in high school athletics. OSAA is based in Wilsonville, Oregon. All of OSAA's actions complained of herein were conducted under color and pretense of law, including the enactment and enforcement of policies pursuant to Oregon and United States law.

21.    Defendant Governor Tina Kotek is the Superintendent of Public Instruction and the highest-ranking official at the Oregon Department of Education. In this capacity, she is the

final policymaker responsible for the operation and management of the ODE, including the issuance of "Guidance for Schools." She is sued in her official capacity only.

22. Upon information and belief, each public high school and school district that is a member of OSAA receives federal financial assistance, primarily through ODE.

23. ODE was expected to receive approximately $1.841 billion in federal funds for the 2024 fiscal year, nearly 95% of which—approximately $1.750 billion—was to be distributed directly to the Oregon school districts. ODE is expected to receive additional federal funding for the 2025 fiscal year.

24. All programs operated by these federally funded school districts, including their athletic programs, are subject to the requirements of Title IX.

25. Defendant Forest Grove School District No. 15 is a public school district located in Forest Grove, Washington County, Oregon. It is organized under the laws of the State of Oregon and is a government entity capable of suing and being sued in all courts, including this Court. All of the District's actions complained of herein were conducted under color and pretense of law, including the enactment and enforcement of policies pursuant to Oregon and United States law.

26. Defendant Newberg School District No. 29J is a public school district located in Newberg, Yamhill County, Oregon. It is organized under the laws of the State of Oregon and is a government entity capable of suing and being sued in all courts, including this Court. All of the District's actions complained of herein were conducted under color and pretense of law, including the enactment and enforcement of policies pursuant to Oregon and United States law.

27. Defendant Portland School District 1J is a public school district located in Portland, Multnomah County, Oregon. It is organized under the laws of the State of Oregon and is a government entity capable of suing and being sued in all courts, including this Court. All of

the District's actions complained of herein were conducted under color and pretense of law, including the enactment and enforcement of policies pursuant to Oregon and United States law.

28.  Upon information and belief, Forest Grove School District No. 15, Newberg School District No. 29J, and Portland School District 1J (together, the "School Districts"), receive federal financial assistance through ODE. All programs at the School Districts are therefore subject to the requirements of Title IX.

29.  OSAA's operations are funded primarily by dues from its member school districts, including the School Districts, along with additional revenue derived from interscholastic championship events and corporate sponsorships.

30.  Because OSAA receives dues from public school members that are recipients of federal financial assistance, OSAA is subject to the obligations of Title IX under 34 C.F.R. § 106.2(i).

31.  OSAA is also subject to Title IX because it is controlled by school districts, including the School Districts, that are themselves subject to Title IX. The OSAA Executive Board is composed of administrators from member schools and school districts. These representatives, acting on behalf of their federally funded institutions, direct and control the policies and regulations of OSAA.

32.  Member schools and districts, including the School Districts, have ceded operational control of Oregon's interscholastic athletic programs to OSAA, granting it exclusive authority to regulate eligibility, competition, and compliance with state and federal athletic standards.

## IV.    FACTUAL BACKGROUND

### A.    The Goals and Requirements of Title IX, and Its Importance to Women's Athletics

33.  In 1972, Congress enacted Title IX, forbidding education programs receiving

federal funds from discriminating based on sex. 20 U.S.C. § 1681(a). Title IX was designed to eliminate discrimination against women in education, including athletics, where programs historically emphasized boys' sports to the exclusion of girls', resulting in vastly fewer girls participating competitively. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999).

34.     According to one of Title IX's primary sponsors, Senator Birch Bayh, Title IX promised women "an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for work." 118 Cong. Rec. 5808 (1972).

35.     Title IX's implementing regulations and guidance confirm that Title IX applies fully to athletic programs and require that if athletic opportunities are separated by sex, recipients must provide "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). This includes effectively accommodating the interests and abilities of girls and providing competitive opportunities that equally reflect their abilities. Girls and women are entitled to equivalent treatment, benefits, and opportunities, including equal opportunities for post-season competition and public recognition, and the right to be free from policies discriminatory in effect. *Id*.

36.     Title IX's implementing regulations and guidance require that, if athletic programs or opportunities subject to Title IX are separated by sex, such separation must be done in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

37.     One aspect of assessing "equal athletic opportunity for members of both sexes" is ascertaining "[w]hether the selection of sports and levels of competition effectively accommodate the interests and *abilities* of both sexes." 34 C.F.R. § 106.41(c)(1) (emphasis

added).

38.     More specifically, covered entities (in this case, the ODE, the OSAA, and each member institution that receives federal financial assistance) must accommodate the physical abilities of girls and women "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." 44 Federal Register at 71,417-418.

39.     As the Title IX regulations enacted soon after the law was passed recognize, due to inherent biological differences, women must be affirmatively protected with sex-separated sports teams, competitions, championships, and locker rooms to achieve equality and equal opportunity.

40.     For example, 34 C.F.R. § 106.41(c) specifies ten (10) non-exclusive factors to consider in evaluating equal athletic opportunity:

> 1. Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of both sexes;
>
> 2. The provision of equipment and supplies;
>
> 3. Scheduling of games and practice times;
>
> 4. Travel and per diem allowance;
>
> 5. Opportunity to receive coaching and academic tutoring;
>
> 6. Assignment and compensation of coaches and tutors;
>
> 7. Provision of locker rooms, practice and competitive facilities;
>
> 8. Provision of medical and training services;
>
> 9. Provision of housing and dining facilities and services; and
>
> 10. Publicity.

41.     These regulations make clear that the two sexes differ in material ways and must

9

be accommodated accordingly to ensure equal opportunity in student athletics. Factor 1 listed above reiterates Title IX's governing principle: that the athletic interests and abilities of male and female students be equally and effectively accommodated. 44 Federal Register 71,413, 71,414 (1979) (the "Policy Interpretation") (emphasis added). More specifically, the institution must accommodate the physical abilities of girls and women "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." Id. at 71,417-418. Implicit in this requirement is the understanding that the two sexes compete at different levels.

42.    In furtherance of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive **equivalent treatment**, benefits and opportunities." Policy Interpretation, 44 Fed. Reg. 71,414 (emphasis added).

43.    Factors two through ten of 34 C.F.R. § 106.41(c) are used to evaluate "equal" teams. The "equal treatment" to which girls and women are entitled includes equal "opportunities to engage in . . . post-season competition," id. at 71,416, equal opportunities for public recognition, and the right to be free of any policies which are "discriminatory in . . . effect" or that have the effect of denying "equality of athletic opportunity." 44 Federal Register at 71,417.

44.    More specifically, the institution must accommodate the physical abilities of girls and women "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." Id. at 71,417-418.

45.    Policies that fail to provide female athletes equal athletic opportunity effectively "deny them the benefits of an education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The following factors are used to determine if a policy complies with Title IX's objectives:

a.      Whether the institution's policies are discriminatory in language or effect;

b.      Whether substantial and unjustified disparities exist in the program as a
        whole between male and female students; or

c.      Whether substantial disparities exist in individual segments between
        opportunities afforded to male and female students.

Policy Interpretation, 44 Fed. Reg. 71,418.

**B.      Defendant ODE's and OSAA's Transgender Policies**

46.     On January 5, 2023, ODE issued its official policy statement pertaining to
transgender students called "Guidance for Schools: Supporting Gender Expansive Students" (the
"Guidance"), which remains in effect as of the filing of this Complaint. (available at:
https://www.oregon.gov/ode/students-and-family/equity/civilrights/Documents/ODE-
Supporting-Gender-Expansive-Students.pdf).

47.     ODE's Guidance claims to "support schools and districts in meeting their
responsibilities for creating safe and affirming school environments for every student, including
gender expansive students." ODE, *Guidance for Schools: Supporting Gender Expansive
Students*, page 5.

48.     The Guidance further states that, "[i]n Oregon, the Oregon School Activities
Association's (OSAA) policies allow gender expansive students to participate in school athletics
and activities in accordance with their consistently asserted gender identity. Not allowing
students to participate in athletics in alignment with their gender identity may violate Oregon
nondiscrimination rules." (web archive available here:
https://web.archive.org/web/20250313011235/https://www.oregon.gov/ode/students-and-
family/equity/civilrights/Documents/ODE-Supporting-Gender-Expansive-Students.pdf).

49.     On March 18, 2025, ODE published a revision of that Guidance regarding its

11

athletic policies, which doubled down on ODE's original transgender policy, now <u>prohibiting</u> school districts from excluding transgender students in sex-segregated athletic programs:

### 1.i.iii. Athletics

In Oregon, state nondiscrimination law prohibits discrimination on the basis of, among other things, gender identity. In accordance with this law, **schools are prohibited from excluding gender expansive students from participating in school athletics and activities that align with their consistently asserted gender identity** if the basis of such exclusion is the student's gender identity. Schools should regularly review their athletics policies to ensure that they do not engage in discrimination against gender expansive students. Questions about individual sports eligibility or protocols should be directed to the applicable governing association.

Nonbinary, intersex, genderfluid, Two Spirit, and **other students who do not consistently identify with the gender binary cannot be prohibited from playing on athletic teams of either gender**, in alignment with Oregon nondiscrimination law. Athletic governing associations may have specific procedures the school should follow. The Oregon School Activities Association's (OSAA) policies state that if a student has tried out or participated in athletics or an activity that is gender-specific or gender-segregated, the student may not participate during that same season on a team of another gender. However, that student may try out for and participate on teams of another gender in subsequent seasons, and may also participate in any school sports or activities open to all students (e.g., football, dance).

ODE Guidance for Schools 1(i)(iii)(emphasis added).

50.     The ODE revision came shortly after, and likely in defiance of, Executive Order number 14201, "Keeping Men Out of Women's Sports," which President Trump signed on February 5, 2025 (the "E.O.") in defense of Title IX's commitment to providing equal opportunities for girls and women in school athletic programs. The E.O. states, in relevant part:

[U]nder Title IX of the Education Amendments Act of 1972 (Title IX), educational institutions receiving Federal funds cannot deny women an equal opportunity to participate in sports. As some Federal courts have recognized, "ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities." *Tennessee v. Cardona*, 24-cv-00072 at 73 (E.D. Ky. 2024). *See also Kansas v. U.S. Dept. of Education*, 24-cv-04041 at 23 (D. Kan. 2024) (highlighting "Congress' goals of protecting biological women in education").

Therefore, it is the policy of the United States to rescind all funds from

educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy. It shall also be the policy of the United States to oppose male competitive participation in women's sports more broadly, as a matter of safety, fairness, dignity, and truth.

E.O. 14201.

51.    OSAA, the organization responsible for administering Oregon school athletic programs, publishes handbooks establishing rules and protocols for school athletic events to conform to ODE policies. To implement ODE's Guidance on Title IX responsibilities, OSAA published newly revised rules and protocols on "Gender Identity Participation" in its 2024-2025 Handbook:

**B. Participation**

2) Subject to section B(1), **once a transgender student has notified the student's school of their gender identity (boy or girl), the student shall consistently participate as that gender for purposes of eligibility for athletics and activities,** provided that if the student has tried out or participated in an activity, the student may not participate during that same season on a team of the other gender.

3) Subject to section B(1), **once a nonbinary or intersex student has notified the student's school of their gender identity, the student shall participate as either gender for purposes of eligibility for athletics and activities that are gender-segregated or gender-specific**, provided that if the student has tried out or participated in athletics or an activity that is gender-specific or gender-segregated, the student may not participate during that same season on a team of the other gender.

1.    Q. If a transgender student is transitioning from one gender to another, what is the procedure for that student to access athletics and activities?
A. When a student or the student's parent or guardian, as appropriate, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, **the OSAA will recognize a school's decision to modify the student's eligibility, consistent with the student's gender identity**, subject to section B(2).

2024-2025 OSAA Handbook, 37(B), *Gender Identity Participation*, at 82 ("OSAA Policy") (emphasis added) (available at: https://www.osaa.org/docs/handbooks/osaahandbook.pdf). The OSAA Policy, together with ODE Guidance, are referred throughout as "Transgender Policies."

52.     Remarkably, in describing the reasons for its newly revised transgender athletic rules and protocols, OSAA **admits** that it has deliberately broken with Title IX's "historical" mandate to separate interscholastic athletics and activities by sex, and that its new policies are no longer in compliance with Title IX:

> **For both historical reasons, as well as reasons related to compliance with Title IX, interscholastic athletics and activities have typically been divided by gender, with a few exceptions.** Formulating new processes to address concerns about participation regardless of a student's gender identity **requires a new approach to eligibility**, an approach reflected in these policies.

*Id.* (emphasis added).

53.     As discussed in more detail, below, the Transgender Policies violate Title IX by permitting biological males to compete in sex-segregated girls' high school track and field events, which operate to deprive Plaintiffs and other female student athletes of equal opportunities in school athletic programs, but not their male counterparts.

**C.      Physiological Advantages of Men Deny Women Equal Opportunities in Title IX Athletics When Males Are Allowed to Compete Against Females in Female-Only Athletic Programs**

54.     Ignoring the physical differences between the sexes in sports makes it impossible to accommodate the abilities of girls and provide athletic opportunities of equal quality, in violation of Title IX.

55.     In September 2023, the American College of Sports Medicine published an expert consensus statement titled, "The Biological Basis of Sex Differences in Athletic Performance: Consensus Statement for the American College of Sports Medicine." Hunter SK, S Angadi S, Bhargava A, Harper J, Hirschberg AL, D Levine B, L Moreau K, J Nokoff N, Stachenfeld NS, Bermon S. Med Sci Sports Exerc. 2023 Dec 1;55(12):2328-2360. doi: 10.1249/MSS.0000000000003300. Epub 2023 Sep 28. PMID: 37772882.("Consensus Statement") (available at: https://pubmed.ncbi.nlm.nih.gov/37772882/).

14

56.    The study highlights consensus in the sports medicine community on the physiological advantages of male athletes over females: "Biological sex is a primary determinant of athletic performance because of fundamental sex differences in anatomy and physiology dictated by sex chromosomes and sex hormones."

> Adult men are typically stronger, more powerful, and faster than women of similar age and training status. Thus, for athletic events and sports relying on endurance, muscle strength, speed, and power, **males typically outperform females by 10%–30%** depending on the requirements of the event. These sex differences in performance **emerge with the onset of puberty** and coincide with the increase in endogenous sex steroid hormones, in particular testosterone in males, which increases 30-fold by adulthood, but remains low in females.

Hunter, SK., et al. (emphasis added).

57.    The Consensus Statement examines the historical records of male and female athletic performances and explains the biological factors responsible for those results. For example:

> [E]ndurance performance such as distance running (distances >3000 m) is predicted by (i) maximal oxygen uptake (V̇ O2max), (ii) the maximal running intensity (or percentage of V̇ O2max) that can be sustained during long time periods and is related to the critical velocity, and (iii) running economy (a surrogate for efficiency because calculations of true mechanical efficiency during running are difficult to achieve). Of these three primary determinants, f**aster distance running speeds of men compared with women are primarily explained by a larger V̇O2max of males** with minimal differences in the relative maximal sustainable running intensity or running economy. Although, even in long-distance races, anaerobic capacity can be decisive for victory in the event of a final acceleration. In contrast, **sports such as weightlifting and jumping performance are determined primarily by lean body mass and muscular power with large sex differences in both.**
>
> ...
>
> **Males have larger, stronger, faster, and more powerful skeletal muscles than females.** Muscle power is the product of strength (force or torque) and contraction velocity, both of which are larger in males than females. Males produce greater maximal limb torque because their muscles have a larger cross-sectional area (and thus force) and they have longer limbs than females.
>
> …

15

Males are taller and heavier than females and also have also greater lean body mass (muscle and bone) and less percentage of fat mass. Adult males (>20 yr) are 8% taller than females with longer upper and lower limbs, allowing them to produce greater torque of the limbs, for example, when throwing, jumping, and swimming. They are also ~17%–18% heavier than adult females because they have greater lean body mass despite less body fat. Female athletes typically have ~5%–10% more body fat than similarly trained males and ~85% the lean body mass as male athletes. **Larger muscle mass is directly associated with greater muscular strength and power; hence, males are stronger and more powerful than females.**

> …

Aerobic power is a primary predictor of athletic endurance performance, for example, during distance running and swimming, road cycling, and cross-country skiing. Superior aerobic performance is associated with a high V̇ O2max. V̇ O2max is the product of the maximal blood volume transported through the heart in a given time (maximal cardiac output, L·min−1 = heart rate stroke volume) and the oxygen utilized in the peripheral tissues (mostly skeletal muscle arteriovenous oxygen difference: a-v 02 diff ). Therefore, V̇ O2max depends on total blood volume, cardiac size/ mass/compliance and stroke volume, and maximal heart rate and in the periphery on the skeletal muscle blood flow, capillary density, and mitochondrial content. **Males, on average, have a higher V̇ O2max than females in trained and untrained adults.**

Hunter, SK, et al. (emphasis added) (internal citations omitted).

58.    The Consensus Statement has been cited in over 40 scholarly articles according to the National Institute of Health's National Library of Medicine database. Articles citing the Consensus affirm its authority.[2]

---

[2] The following excerpts demonstrate the Consensus Statement's authority:

"As explained in the 2023 consensus statement of the American College of Sports Medicine, athletic performance is significantly influenced by biological sex through the inherent variances in anatomy and physiology, regulated by sex chromosomes and hormones; consequently, in sports that emphasize endurance, muscle strength, speed, and power, males typically surpass females by 10%-30%." Bearden SE, van Woerden I. *Pacing and placing in 161-km ultramarathons: Effects of sex and age*. PLoS One. 2025 May 12;20(5):e0322883. doi: 10.1371/journal.pone.0322883. PMID: 40354403; PMCID: PMC12068597. (available at: https://pubmed.ncbi.nlm.nih.gov/40354403/)

"Our data align with our previous observations highlighting a gender gap in team sports and competitive activities." Bearden, Shawn; Woerden, Irene Gorini S, Camajani E, Cava E, Feraco A, Armani A, Amoah I, Filardi T, Wu X, Strollo R, Caprio M, Padua E, Lombardo M. *Gender differences in eating habits and sports preferences across age groups: a cross-sectional study.*. J Transl Med. 2025 Mar 12;23(1):312. doi: 10.1186/s12967-025-06311-x. PMID:

59.    Relating to the sports Plaintiffs have had to participate against biological males in, the Consensus Statement found that the World Record in those events for males are consistently more competitive than females: 19.19(seconds) vs. 21. 34 for the 200 Meter Race; 43.03 vs. 47.60 for the 400 Meter Race, and 2.45(meters) vs. 2.09 for the High Jump.

60.    While boys and girls have comparable athletic capabilities before puberty, hormonal differences observed at puberty "led to a significant increase in body fat percentage among girls and a significant increase in muscle mass among males. These physiological changes are associated with puberty, including the increase in testosterone levels, thereby inducing enlargement and differentiation of muscle fibers in boys compared to what is observed in girls, especially for fast-twitch fibers." Bchini S, Hammami N, Selmi T, Zalleg D, Bouassida A. *Influence of muscle volume on jumping performance in healthy male and female youth and young adults*. BMC Sports Sci Med Rehabil. 2023 Mar 6;15(1):26. doi: 10.1186/s13102-023-00639-x. PMID: 36879286; PMCID: PMC9987144. (available at:

https://bmcsportsscimedrehabil.biomedcentral.com/articles/10.1186/s13102-023-00639-x).

61.    Meanwhile, female puberty brings distinctive changes to females that identifiably and measurably diminish their athletic performance. This includes increased body fat levels which, while healthy and essential to female fertility, create increased weight without providing strength, as well as wider hips and different hip joint orientation that result in decreased hip rotation and running efficiency. *See id*.

62.    Healthy body fat levels and hip width are significant factors to high jump

---

40075461; PMCID: PMC11900493. (available at: https://pubmed.ncbi.nlm.nih.gov/40075461/).

"It is well documented in the literature that female athletes display lower average muscle mass than male athletes do." Fitze DP, Franchi MV, Müller Brusco C, Engeler N, Frey WO, Spörri J. *Hamstrings and quadriceps muscle size and strength in female and male elite competitive alpine skiers*. Front Physiol. 2025 Jan 9;15:1444300. doi: 10.3389/fphys.2024.1444300. PMID: 39850451; PMCID: PMC11754246. (available at: https://pubmed.ncbi.nlm.nih.gov/39850451/).

competitions. High jump contests require competitors to launch into the air and twist their body over a barrier. Wider hips create greater surface area more difficult to navigate around the barrier, and a higher body fat percentage, as compared to lean muscle more prominent in post-pubescent boys as discussed above, prevent girls from achieving greater height potential.

63.     Track and field races, including the 200- and 400- meter race, are also significantly affected by muscle mass and body fat percentages, as well as V˙ O2max—which correlates with aerobic activities. Larger muscles cause more explosive motion, leaner body fat creates less drag, and greater capacity for aerobic exertion allows for greater stamina—all critical elements for competitive running. *See* Hunter, SK, *et al.*

64.     Pre-pubescent boys and girls perform similarly in high jump until around age 12 or 13, when these physiological differences begin to appear and widen the performance gap. These physiological differences are also quantified in the measuring starting heights of the separate male and female categories. At the 2025 OSAA State Championships, for example, the starting height for the male high jump was 6-foot ¼ inches. The starting height for the female category was 4 foot 11 ¾ inches.

65.     While the studies cited above are recent, these basic physiological differences between the sexes—and their impact on athletic performance—were well known at the time Title IX was enacted and implemented by regulation in the 1970s.

66.     In 1975, Dr. Bernice Sandler, a major figure responsible for the passage of Title IX, told the House Subcommittee on Postsecondary Education, while testifying in support of regulations implementing Title IX that, to operate an entirely coed athletic program, ignoring differences in male and female physiology would for many sports "effectively eliminate opportunities for women to participate in organized competitive athletics. For these reasons, such an arrangement would not appear to be in line with the principle of equal opportunity."

Statement of Dr. Bernice Sandler, Director, Project on the Status & Education of Women, Ass'n of American Colleges, June 25, 1975, Hearings on Sex Discrimination Regulations at 343.

67.    The 1975 Hearing was held to ensure the implementing regulations of Title IX are consistent with the law and intent of Congress in enacting the law: to ban sex discrimination in any educational program or activity assisted by the federal government. The physiological differences between men and women—and Title IX's requirement that those differences be accommodated—were well-documented at the time of implementation. *See* Statement of the Eastern Association for Intercollegiate Athletics for Women, June 25, 1975, Hearings on Sex Discrimination Regulations at 534 ("Men on women's teams prevent equality of opportunity due to the physiological differences between the male and female…maximal oxygen uptake is lower in the female than male.").

68.    Permitting biological males to compete in girls' or women's athletic events doesn't merely add a new level of challenge for determined girls and women. Victory over comparably aged, talented, and trained biological male athletes is virtually impossible for girls and women in the vast majority of athletic competitions, because of inherent and biologically dictated differences between the sexes.

69.    These are inescapable biological facts, not stereotypes, "social constructs," or archaic slogans of past discrimination. These facts were known at the time of Title IX's implementing regulations and directly informed such regulations.

70.    These differences are recognized by different standards set for boys and girls in sports (*e.g.*, net height, shot put weight, hurdle height, basketball size). Indeed, OSAA recognizes this disparity in its own qualifying standards.

71.    "Qualifying Standards" for Track and Field, which are determined by an average of third and fourth-place finishers, show that *"Boys" perform stronger in every single track &*

19

*field category than "Girls."* (see table 1 & 2 below).

## TABLE 1

 

**Oregon School Activities Association**
25200 SW Parkway Avenue, Suite 1
Wilsonville, OR 97070
503.682.6722   fax: 503.682.0960   www.osaa.org

### 2025 Track & Field State Championships Qualifying Standards
#### Girls

| | 6A | | 5A | | 4A | | 3A | | 2A | | 1A | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Four-year average of fourth place with the standard | | | | | | Four-year average of fourth place with the standard | | | | | |
| | FAT | | FAT | | FAT | | FAT | | FAT | | FAT | |
| 100 | 12.18 | | 12.63 | | 12.70 | | 13.00 | | 13.10 | | 13.03 | |
| 200 | 24.91 | | 26.13 | | 26.23 | | 26.76 | | 27.25 | | 27.03 | |
| 400 | 57.30 | | 59.66 | | 1:00.43 | | 1:01.24 | | 1:01.69 | | 1:02.54 | |
| 800 | 2:15.39 | | 2:20.35 | | 2:23.95 | | 2:26.39 | | 2:29.07 | | 2:31.92 | |
| 1500 | 4:32.95 | | 4:42.43 | | 4:54.78 | | 5:04.21 | | 5:06.66 | | 5:15.60 | |
| 3000 | 9:54.88 | | 10:27.48 | | 10:43.48 | | 11:13.33 | | 11:21.28 | | 11:45.08 | |
| 100 High Hurdles | 15.25 | | 15.74 | | 16.47 | | 16.80 | | 17.06 | | 17.13 | |
| 300 Int Hurdles | 45.63 | | 47.04 | | 47.86 | | 49.13 | | 49.61 | | 49.38 | |
| | English | Metric | English | Metric | English | Metric | English | Metric | English | Metric | English | Metric |
| Long Jump | 17-9 ½ | 5.42 | 16-7 | 5.05 | 16-7 | 5.05 | 15-11 | 4.85 | 15-8 ¾ | 4.79 | 15-10 | 4.83 |
| Triple Jump | 37-0 ½ | 11.29 | 34-10 ¾ | 10.63 | 34-2 | 10.41 | 33-5 ¼ | 10.19 | 33-1 | 10.08 | 32-9 | 9.98 |
| Shot Put | 37-5 ¾ | 11.42 | 36-5 ¼ | 11.10 | 35-6 ½ | 10.83 | 34-5 ½ | 10.50 | 34-7 | 10.54 | 33-5 | 10.18 |
| Discus | 127-7 | 38.88 | 116-6 | 35.49 | 111-10 | 34.08 | 109-5 | 33.34 | 107-5 | 32.72 | 101-5 | 30.93 |
| Javelin | 124-7 | 37.97 | 122-4 ¾ | 37.30 | 114-7 | 34.91 | 111-7 | 34.00 | 115-6 | 35.21 | 113-4 | 34.56 |
| High Jump | 5-4 ¼ | 1.63 | 5-0 ¾ | 1.54 | 4-11 ½ | 1.51 | 4-11 ½ | 1.51 | 4-10 ½ | 1.48 | 4-10 ½ | 1.48 |
| Pole Vault | 11-4 | 3.45 | 10-1 ¾ | 3.09 | 9-6 ¼ | 2.90 | 9-7 | 2.92 | 8-3 | 2.51 | 8-9 ¼ | 2.67 |
| | (Three-year average of third place) | | | | | | | | | | | |
| 4x100 Relay | 48.51 | | 50.30 | | 50.58 | | 51.44 | | 52.03 | | 52.73 | |
| 4x400 Relay | 3:58.51 | | 4:07.28 | | 4:09.87 | | 4:14.58 | | 4:18.82 | | 4:21.60 | |

Page 2 of 2

**TABLE 2**



Oregon School Activities Association
25200 SW Parkway Avenue, Suite 1
Wilsonville, OR  97070
503.682.6722    fax: 503.682.0960    www.osaa.org



### 2025 Track & Field State Championships Qualifying Standards
#### Boys

| | 6A | | 5A | | 4A | | 3A | | 2A | | 1A | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Four-year average of fourth place with the standard | | | | | | Four-year average of fourth place with the standard year | | | | | |
| | **FAT** | | **FAT** | | **FAT** | | **FAT** | | **FAT** | | **FAT** | |
| 100 | 10.88 | | 11.07 | | 11.26 | | 11.38 | | 11.48 | | 11.58 | |
| 200 | 22.25 | | 22.48 | | 22.73 | | 23.02 | | 23.49 | | 23.39 | |
| 400 | 49.91 | | 50.38 | | 51.34 | | 51.91 | | 52.51 | | 52.57 | |
| 800 | 1:55.19 | | 1:56.60 | | 1:59.20 | | 2:02.06 | | 2:05.32 | | 2:02.04 | |
| 1500 | 3:55.04 | | 3:58.22 | | 4:08.32 | | 4:12.50 | | 4:18.99 | | 4:12.82 | |
| 3000 | 8:24.60 | | 8:33.60 | | 9:00.79 | | 9:14.29 | | 9:20.43 | | 9:17.75 | |
| 110 High Hurdles | 15.10 | | 15.40 | | 16.06 | | 16.32 | | 16.43 | | 16.61 | |
| 300 Int Hurdles | 39.77 | | 40.87 | | 41.43 | | 41.84 | | 42.58 | | 42.66 | |
| | **English** | **Metric** | **English** | **Metric** | **English** | **Metric** | **English** | **Metric** | **English** | **Metric** | **English** | **Metric** |
| Long Jump | 21-8 ¼ | 6.61 | 21-1 ¼ | 6.43 | 20-7 ¼ | 6.28 | 20-1 | 6.12 | 20-1 ¾ | 6.14 | 19-10 | 6.04 |
| Triple Jump | 43-5 ¾ | 13.25 | 43-6 ½ | 13.27 | 42-6 ¾ | 12.97 | 40-10 ¾ | 12.46 | 40-11 | 12.47 | 40-7 ¾ | 12.37 |
| Shot Put | 50-3 ¾ | 15.33 | 48-4 ½ | 14.74 | 48-1 ¾ | 14.67 | 44-5 ¼ | 13.54 | 43-8 ¾ | 13.31 | 44-2 ½ | 13.47 |
| Discus | 146-10 | 44.73 | 143-10 | 43.83 | 143-7 | 43.78 | 131-4 | 40.01 | 129-0 | 39.33 | 132-2 | 40.29 |
| Javelin | 178-5 | 54.36 | 169-8 | 51.71 | 164-1 | 50.00 | 159-9 | 48.70 | 157-4 | 47.95 | 156-2 | 47.61 |
| High Jump | 6-2 ½ | 1.89 | 6-1 | 1.85 | 6-1 | 1.85 | 5-11 ¾ | 1.82 | 5-11 ¾ | 1.82 | 5-10 ½ | 1.79 |
| Pole Vault | 14-4 ½ | 4.38 | 13-6 ¾ | 4.12 | 13-6 | 4.11 | 11-11 ¾ | 3.65 | 11-8 | 3.55 | 12-0 ½ | 3.67 |

#### (Three-year average of third place)

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4x100 Relay | 42.60 | | 43.08 | | 43.92 | | 44.81 | | 45.10 | | 45.26 | |
| 4x400 Relay | 3:22.97 | | 3:27.60 | | 3:29.92 | | 3:30.87 | | 3:37.08 | | 3:35.93 | |

Page 1 of 2

72.    Inherent physiological differences between males and females produce significant disparities in athletic performance. OSAA itself acknowledges this reality by setting different qualifying standards for boys and girls in state championship events. Title IX mandates such distinctions to ensure equal opportunity. Yet the Transgender Policies undermine these protections by allowing biological males to compete in female-only competitions. As a result, girls are systemically denied the full benefit of educational programs and activities covered by Title IX and are subjected to unequal treatment within them.

**D.    The Harmful Impact of Defendants' Discriminatory Policies on Plaintiffs**

73.    Defendant OSAA and its member schools, including the Defendant School

Districts, provide opportunities for interscholastic competition subject to OSAA rules and policies. However, the Transgender Policies permit biological males who identify as female to compete in girls' athletic events, use girls' facilities, and do so without providing any notice to the girls or their parents. As a result, girls are denied equal opportunities and benefits, are subjected to unequal treatment, and endure hostile environments in violation of Title IX.

    a.    **Female Athletes in OSAA Events are Disproportionately Impacted by the Transgender Policies Due to Inherent Physiological Differences with Males**

74.    The Transgender Policies have resulted in substantial disadvantages for female student athletes compared with their male peers. Athletic opportunities protected by Title IX—including spots to compete in tournaments, recognition, and awards—are disproportionately inaccessible to female athletes due to the Transgender Policies.

**TABLE 3**

| Event | Date | Placement | Displacements |
|---|---|---|---|
| 2025 200M PIL-Franklin, Benson at McDaniel | 19-Mar-25 | 1 | 5 |
| 2025 400M PIL-Franklin, Benson at McDaniel | 19-Mar-25 | 1 | 2 |
| 200M OSAA 6A State Championships | 18-May-24 | 1 | 7 |
| 400M OSAA 6A State Championships | 18-May-24 | 2 | 6 |
| 200M OSAA 6A State Championships | 17-May-24 | 3 | 15 |
| 400M OSAA 6A State Championships | 17-May-24 | 2 | 13 |
| 200M 6A-1 Portland Interscholastic | 9-May-24 | 2 | 18 |
| 200M 6A-1 Portland Interscholastic | 9-May-24 | 1 | 8 |
| 400M 6A-1 Portland Interscholastic | 9-May-24 | 1 | 16 |
| 400M 6A-1 Portland Interscholastic | 9-May-24 | 1 | 8 |
| 200M Franklin @ McDaniel | 1-May-24 | 1 | 4 |
| 400M Franklin @ McDaniel | 1-May-24 | 1 | 5 |
| 200M 2024 Dean Nice Invitational | 26-Apr-24 | 1 | 30 |
| 200M 2024 Dean Nice Invitational | 26-Apr-24 | 1 | 12 |
| 400M 2024 Dean Nice Invitational | 26-Apr-24 | 1 | 28 |
| 200M PIL- McDaniel @ Roosevelt | 17-Apr-24 | 1 | 3 |
| 400M PIL - McDaniel @ Roosevelt | 17-Apr-24 | 1 | 2 |
| 200M Sherwood Need for Speed Classic | 13-Apr-24 | 2 | 60 |
| 400M Sherwood Need for Speed Classic | 13-Apr-24 | 2 | 48 |
| 400M McDaniel @ Jefferson | 20-Mar-24 | 1 | 5 |
| | | | |
| | | | |
| | | Total displacements: | 290 |

75.    For example, in high school girls' track, a then-sophomore biological male student athlete attending high school in Portland School District 1J going by the name of A.G. (a minor) consistently dominated his female opponents for the entire spring track season in the 2024 school year. His dominance continued into the spring track season in 2025 when A.G. was

a junior.[3]

76.     Table 3, above. details all OSAA events in which A.G. competed in both the 2024 and 2025 girls track and field seasons and includes the names of the meet, the dates, A.G.'s placement in each event, and the number of girls A.G. "displaced" by placing ahead of them— thereby taking away a position in Oregon athletic records otherwise reserved for females.

77.     In many of these events, A.G. finished well ahead of the next fastest female athlete. For example, in the Women's Varsity 400 Meters race on March 19, 2025, A.G. finished **over 10 seconds faster** than his nearest female competitor (who, in turn, defeated the next closest female competitor by less than three seconds).[4]

78.     A.G. placed first at 14 different events, including placing first in the 200 Meter race in the 2024 State Championship—as a sophomore. A.G. also finished second in another race at the 2024 State Championships, depriving female athletes of recognitions, awards, and fair competitions they would have enjoyed in an all-girls competition.

79.     In addition to losing placements at the finishing podium, female athletes have suffered further downstream disadvantages as a result of the Transgender Policies. For example, throughout the track and field season, A.G. displaced other female high school athletes and their teams from acquiring the necessary "points" as a team to compete in championship events, which impacted annual team rankings for female-only track and field teams. During the time that A.G. has been competing in high school track, his consistently dominant performances at district and state-level track events have deprived a total of at least 290 individual female athletes from placing at the level they otherwise would have if the Transgender Policies did not exist. (*See* Table 3 above).

---

[3] All names, times, and other information provided in this section are taken from public sources, including Oregon high school track records available on AthleticNET.

[4] Publicly available records confirm that A.G. ran in the girls' 200, 400, 4x100 events on March 19, 2025; the girls' 4x100 and SMR 800 on April 2, 2025; and again in the girls' 4x100 and 4x400 on April 9, 2025.

80.     Another biological male student athlete who identifies as a female, L.R., also
performed strongly while competing in girl's high jump during the 2025 spring track season as a
junior. L.R.'s record is displayed in Table 4, below.

**TABLE 4**

| Event | Date | Place | Height | Displaced Girls |
|-------|------|-------|--------|-----------------|
| PIL - Wells @ Grant | 18-Mar-25 | 1 | 4'6" | 5 |
| PIL Varsity Relays | 2-Apr-25 | 1 | 4'8" | 6 |
| PIL - Lincoln @ Wells | 9-Apr-25 | 1 | 4'10" | 3 |
| PI: Jefferson @ Wells | 16-Apr-25 | 1 | 5'2" | 1 |
| Therapeutic Associates Chehalem Classic | 18-Apr-25 | 1 | 5'2" | 17 |
| PIL - Franklin @ Wells | 30-Apr-25 | 1 | 4'10" | 2 |
| Cardinal Varsity Invite | 2-May-25 | 12 | 4'8" | 9 |
| PIL - Roosevelt & Benson @ Wells | 7-May-25 | 1 | 5'0" | 3 |
| 6A-1 Portland Interscholastic League Championships | 23-May-25 | 1 | 1.57 m (5'1.5") | 8 |
| OSAA State Track & Field Championships | 31-May-25 | 5 | 1.57 m (5'1.5") | 7 |
| | | | | |
| | Total Displaced: | | | 61 |

81.     Prior to competing in girls' high jump in 2025, L.R. competed against other males
in boys' high jump during his sophomore year in 2024.  Notably, his performance against other
male athletes was not particularly strong, often either not qualifying or placing far below other
male competitors. Despite performing at the same athletic level in both seasons (L.R. has
consistently performed between 4'8" and 5'2"), by simply switching to the female-only events,
L.R. suddenly became an all-star when competing against girls. *See* Table 5 below.

**TABLE 5**

| Event | Date | Placement | Height |
|-------|------|-----------|--------|
| Ida B. Wells/Clackamas @ Lincoln | 13-Mar-24 | 4 | 4'10" |
| Roosevelt, Benson @ Wells | 20-Mar-24 | NH | N/A |
| PIL JV Classic | 6-Apr-24 | NH | N/A |
| Cleveland @ IDa B. Wells | 10-Apr-24 | 2 | 5'0" |
| Benson Tech Invitational | 20-Apr-24 | DNS | N/A |
| Wells @ Grant | 1-May-24 | 2 | 5'0" |
| PIL JV Champtionships | 8-May-24 | 9 | 5'0" |

82.     Plaintiffs are unaware of *any* male athletes performing in male-only athletic

24

events who were adversely impacted by the Transgender Policies. In fact, there are no reports of biological female athletes competing in boys' high school track and field in Oregon where any male athletes were displaced on the finishing podium or were otherwise deprived of opportunities for advancement or other benefits. This is no surprise given the physiological advantages that males have over females in athletic competition.

83. Simply stated, the Transgender Policies do not deprive males of the benefits and opportunities of school athletics as discussed above. Instead, the Transgender Policies have had and will continue to have a disparate and negative impact only on female student athletes, contrary to the purpose and intent of Title IX.

84. Because female athletes like Plaintiffs were forced to compete against biological male athletes pursuant to the discriminatory Transgender Policies, they placed lower in the Oregon high school statewide rankings and were not recognized for placements they achieved against other female competitors.

85. As a direct result of the dominance of biological male athletes in their athletic competitions, female athletes like Plaintiffs have been and continue to be systematically deprived of fair and equal opportunities to be recognized for their earned podium placements, achieve advancement opportunities to higher level meets, and experience the "thrill of victory." Instead, even the strongest female competitors are often left to watch as otherwise mediocre biological male athletes entering the girls' competition blow past them on the track or relegate them to a consolation prize for coming in second, third, or off the podium entirely.

86. Whether a specific girl loses to a male athlete in a given race, the overall competitive environment fails to afford female athletes the same quality of opportunity provided to their male counterparts. Unlike boys, girls competing in high school athletics in Oregon must compete in a field skewed in favor of their male counterparts as a result of the physiological

advantages that male athletes have. The Transgender Policies promote and exacerbate these disparities, undermining Title IX's core mandate of equal opportunity for girls.

87.    In addition to losing medals, rankings, public accolades, or access to post-season competitions, Oregon high school girls like Plaintiffs are deprived of something more foundational to the spirit of Title IX: the equal opportunity of achieving athletic triumph, which has profound psychological impacts that go well beyond the awards and advantages that come with success in competition. They are denied the right to believe—truthfully and without reservation—that through talent, effort, and training, they too can reach their goals. That belief, essential to the spirit of sport, and ultimately the goal of education, generally, is stripped away when opportunities are denied to students on the basis of sex.

88.    When a biological male lines up in the girls' race, every girl at the starting line is burdened with the unspoken message: "You can't win against a boy." This internalized sense of defeat is not a natural consequence of fair play, but the psychological and stigmatic injury inflicted by the Transgender Policies. The ODE and OSAA have effectively told these young women that their ambitions, discipline, and identity as female athletes do not merit equal recognition or protection.

89.    Time and again, season after season, meet after meet, the Plaintiffs saw their hard-earned athletic achievements invalidated. They trained to close gaps measured in hundredths of a second, only to be overtaken by mid-tier male athletes whose physiological advantages erased the meaning of that effort. The result was more than lost races; it was disillusionment, anxiety, and the erosion of belief in a level playing field. The Transgender Policies violate Title IX's requirement that educational opportunities should provide equal opportunity to succeed and not be denied or limited on the basis of sex.

**b.    Plaintiffs' Experiences Under OSAA Transgender Athlete Policy**

## S.C.

90.     Plaintiff S.C. is a student athlete at Newberg High School and a competitive track and field athlete. She recently completed her junior year. S.C. has competed since the fifth grade and dedicated herself to year-round sprint training, ultimately emerging as one of the top high school runners in the state.

91.     Indeed, S.C. broke the Oregon state record for the fastest 400-meter time ever run by a sophomore girl. Her athletic success has previously earned her recognition and attention from collegiate recruiters.

92.     Midway through the 2024 track and field season, S.C. became aware of a biological male athlete on the girls' track and field roster.

93.     On April 13, 2024, at the Sherwood Need for Speed Classic—a major annual meet—the biological male athlete, A.G., took second place in two high-profile girls' athletic events: the 200- and 400- meter races. A.G. defeated 60 girls in the 200-meter race, and 48 girls in the 400-meter race, disrupting what had been a well-established field of top female runners. Although S.C. did not compete in this event, A.G.'s shocking performance reverberated through the high school girls' track and field community.

94.     As the season progressed, S.C.'s tensions about competing against a dominant biological male rose. She was constantly left wondering whether she would have to compete against a biological male, and if so, what she should do.

95.     Following the Transgender Policies, OSAA and other school officials did not inform her whether she would have to face a biological male at athletic meets. This left S.C. in a constant state of anxiety and uncertainty: uncertain whether to compete, uncertain how competing against a biological male would affect her record, and uncertain what options she had to object to what she believed was unfair competition.

96.     Participating in the event could signal condonement of a policy S.C. believed was unfair, and in other instances across the nation of which S.C. was aware, girls who sat out or otherwise protested athletic events in which biological males were allowed to compete often resulted in virulent public condemnation of the girls. S.C. felt powerless in this situation, giving rise to significant emotional distress.

97.     Despite wrestling with these issues, S.C. qualified for the State Championships in track, which were held on May 18, 2024. The State Championships are the premier competitive event in women's track and field each year. Admission requires consistent, high-level performance.

98.     S.C. competed against A.G. in the 200- and 400- meter races. A.G. ultimately came in first in the 200- meter events, and S.C. came in third. In the 400-meter race, A.G. came in second, and S.C. came in third. This was the third time that S.C. ran against A.G. at the Oregon State Championships, and the third time that she lost to him.

99.     While S.C. navigated the complex, unnerving situation of competing against the same male who defeated her in prior championship events, OSAA gave A.G. special treatment that intimidated and unsettled S.C. and her female competitors, which provided A.G. with a competitive advantage.

100.     Specifically, A.G. was flanked by a police and security escort around the field prior to (and after) the competition and was guarded at his hotel where the competitors stayed throughout the duration of the meet. The police and security presence around A.G. had the effect of intimidating S.C. and her female peers, which had a direct impact on their psychological preparations for the competition.

101.     A.G. also received special treatment as he was permitted by OSAA officials to carry his cell phone around during and after the competition in violation of OSAA rules. S.C.

and her female peers, on the other hand, were prohibited from having their cell phones with them while on the field.

102.    Additionally, OSAA officials allowed A.G. to put clothing on over his racing singlet after the competition, while his female competitors had been instructed by OSAA officials that they could not do so.

103.    After the competition, to the shock and humiliation of S.C. and her female peers, A.G. used his cell phone to look up the official posting of his score just before the awards ceremony and then bragged about his victory in front of his female competitors, including S.C. A.G. boasted about how his victory impacted the national—not just Oregon's—record in girls' track.

104.    Adding insult to injury, A.G. stood on the finishing podium guarded by two police officers, while S.C. and the other female competitors looked on. A.G. was then escorted off the field by the police through a specially gated-off entrance to a private vehicle.

105.    The special privileges OSAA afforded A.G., in addition to his flouting of those privileges, was utterly demoralizing and humiliating to S.C. and her female peers who competed in the State Championships.

106.    As a result of A.G.'s successes at various track events, A.G. received significant media attention, as did S.C., who had the ignominy of being the female who lost to A.G. Photos and clips of S.C. losing races to A.G. were published in articles written about the event and shared on social media.[5]

---

[5] See, for example:

New York Post, *It's time to stop the unfair, unequal madness of trans athletes destroying women's sports*. May 20, 2024. (available at: https://nypost.com/2024/05/20/opinion/its-time-to-stop-the-madness-of-trans-athletes-destroying-womens-sports/).

NBC News, *Transgender teen booed after winning girls' track race at state championship*. May 21, 2024. (available at: https://www.nbcnews.com/nbc-out/out-news/transgender-teen-booed-winning-girls-track-race-state-championship-rcna153383).

107.    Following widespread media coverage and social media activity, S.C. was harassed by supporters of A.G. for declining to celebrate her loss to a biological male in the girls' 400-meter State Championship. The school was aware of the escalating hostility—calling S.C. into the principal's office for a mental health check—and fights broke out among students, placing S.C. at the center of a volatile and harmful environment.

108.    S.C. intends to participate in OSAA track and field events next season as a senior in high school. Despite the enormous controversy and adversities that the Transgender Policies have created for her and her female competitors in track, S.C. has been giving her best efforts to win, however futile those efforts may be in the face of a dominant, biological male competitor.

## S.N.C.

109.    Plaintiff S.N.C. is a female who competes in the high jump and has trained intensively in this event for nearly six years. During the 2024-2025 academic year, S.N.C. competed as a junior in the girls' high jump for Newberg High School in Oregon.

110.    As an NCAA-eligible athlete with aspirations to compete at the collegiate level and earn an athletic scholarship. S.N.C.'s training regimen, discipline, and performance record— including a 7th place finish in girls high jump at the 2024 OSAA 6A State Track and Field Championships—reflect her commitment to competing at the highest levels.

111.    Throughout her training and competition over the years, S.N.C. has demonstrated continued success and improvement in her skills. She secured first place in high jump at the Chehalem Classic in 2024, and she also earned second place in high jump in the Pacific Conference 6A Championship meet in both 2024 and 2025, automatically qualifying her for the OSAA 6A State Championships. Additional accomplishments include placing in the top 6 for female high jumpers at highly competitive meets during the 2025 outdoor season.

112.    S.N.C.'s first three meets during the 2025 outdoor season took place on April 4,

April 8, and April 10. S.N.C. placed 6th, 1st, and 2nd, respectively, in the girls high jump in those meets. When she arrived at her fourth meet of the season, on April 18th, she was surprised to learn that, among the list of athletes entered to compete in the girls high jump, was a biological male.

113.    L.R., a male athlete who identifies as a girl, was permitted by OSAA to compete in the girls' division and began entering meets to compete in the girls' high jump events. By the middle of April 2025, L.R. had won 1st place in girls' high jump at four OSAA-sanctioned meets: March 18, April 2, April 9, and April 16.

114.    Once the entry lists for the April 18, 2025 Chelam Classic meet were published, S.N.C. learned that she would be competing directly against L.R. S.N.C. was the third ranked entrant in the Chelam Classic high jump event, and she had spent considerable time and energy training and preparing for it. Upon confirmation of L.R.'s 4th ranked entry in the same event, confusion, sadness, intense frustration and feelings of despair began to set in for S.N.C., knowing that she would, for the first time in her high jump career, face a physiologically advantaged male competitor who was entering the girls' event.

115.    Upon arriving at the April 18 meet, it became clear to S.N.C. that this event would not be like any other she had participated in before. Meet officials had stationed extra security at the meet, creating an intimidating police presence for the girls, with two police officers and two security guards positioned near the high jump pit.

116.    With a male competitor suddenly entering the event, backed by a police presence, S.N.C. and her peers felt an overwhelming sense of resignation and fear that they were somehow in the wrong and were being bullied by school and OSAA officials.

117.    As the mood around the event deteriorated for S.N.C. and her female peers, S.N.C. grappled with the notion that competing under these circumstances would constitute a

tacit acceptance of an unfair and discriminatory policy against her and her female peers.

118.    S.N.C. was also aware of the hateful commentary directed at other female athletes who had been in this position before her, especially for those female athletes who were critical of competing against a biological male who "identifies" as a female.

119.    For S.N.C., the psychological and emotional weight of that moment became overwhelming—she felt helpless, demoralized, and betrayed by the institutions and adults charged with protecting her equal opportunity for fair play. Ultimately, she realized that she was unable to participate in the high jump that day and withdrew from the event.

120.    Her inability to compete in the high jump on April 18 meant that S.N.C. received a "no height" (NH) designation in the official results, which remains on her permanent athletic record and will likely have a negative impact upon her collegiate prospects for admission and athletic scholarships. L.R., on the other hand, came in first place.

121.    After the April 18th meet, S.N.C. gathered her physical and emotional strength for the next track and field meets. She entered the 2025 Pacific Conference 6A District championship meet, in which she placed second, thereby automatically qualifying to enter the Oregon State Championships scheduled for May 31, 2025. As of the date of the Championships, S.N.C. ranked 8th overall in the State for the girl's high jump event.

122.    On May 31, 2025, S.N.C. traveled to Hayward Field to participate in what she had trained the entire year for: the OSAA State Track & Field Championships. Twenty minutes or so before the female high jumpers had to report in, S.N.C. and her female peers gathered to prepare for the competition and warmed up behind the stadium. OSAA officials then briefed the female competitors on the event rules. L.R. was not present.

123.    When it came time to enter the stadium for the event, S.N.C. was shocked to see L.R. being escorted by a security guard, despite L.R. not having participated either in the event

warm up with the female competitors or in the briefing given by OSAA officials. Unnerved by L.R.'s sudden appearance, S.N.C. nonetheless soldiered on and prepared the best she could for the high jump, knowing that she would be competing against a biological male.

124.    For the high jump event, each athlete has three jumps to make height, jumping one after another. S.N.C was required to jump immediately after L.R., and she completed her jumps to the best of her ability. Despite her best efforts, L.R. defeated S.N.C. by two inches, and she was eliminated from the competition.

125.    After being eliminated, S.N.C was required to remain on the field and observe L.R. further surpass her. She watched while sitting on the bench with a sense of futility, frustration, and defeat.

126.    While S.N.C. entered the State Championship ranked 8th, she left the meet dropping in the rankings as a result of her loss to L.R. If L.R. had not been permitted to compete in girls' high jump, S.N.C would have completed the meet ranked 9th place in the State of Oregon for high jump.

127.    As occurred during the April 18th meet, OSAA provided L.R. with security and police escort during the May 31st Championships. The presence of law enforcement and security personnel around L.R. on the field intimidated S.N.C. and her female peers, interfering with their focus and preparations to compete in the event, giving L.R. an unfair competitive advantage. It also harmed S.N.C.'s right to have an equally satisfying and meaningful experience in athletic activities compared with her male counterparts.

128.    S.N.C.'s injuries are not speculative. They are immediate, ongoing, and cumulative. The Transgender Policies (and Defendants' implementation of them) exposed S.N.C. to unequal, distressing environments in federally funded educational programs.

129.    In response to the above events, S.N.C.'s mother, Rebecca Carpenter, filed a

complaint with the Office for Civil Rights of the Department of Education on April 19, 2024, alleging a violation of Title IX due to the Transgender Policies.

130.    Since receiving the OCR Complaint, Defendants have taken no steps to change the Transgender Policies to bring them in compliance with Title IX. They have not corrected athletic records to give proper credit to girls who would have earned higher placements, medals, and advancements to higher level meets. They have not awarded championship titles to the female athletes who were wrongfully deprived them when they were awarded instead to biological males like L.R. and A.G. And they have not ceased the unlawful practice of permitting biological males to compete against females in track and field.

**Madelyn Eischen**

131.    During the 2024-2025 academic year, Plaintiff Madelyn Eischen was a senior participating at Forest Grove High School and a varsity scholar-athlete who had been competing in track and field for four years, specializing in high jump and triple jump. She has achieved a personal record of 5'0" in high jump and 35'4" in triple jump. She trains rigorously year-round and was a strong contender for district and state qualification. Madelyn also served as the captain of her track and field team at her high school.

132.    In the lead-up to the "Need for Speed" Invitational on April 12, 2025, Madelyn learned informally that a biological male athlete identifying as female would be allowed to compete in girls' jumping events. She also had learned that organizers would adjust the high jump qualifying standard to a 4'10 mark, which would have excluded girls like Madelyn from participating.

133.    Though the biological male athlete, L.R., ultimately did not compete on April 12, the uncertainty surrounding competition against a biological male caused Madelyn significant emotional distress. Madeline spent the week prior in a state of anxiety and confusion, without

34

official communication or guidance from OSAA or meet organizers. The lack of transparency left her and her female peers psychologically burdened and unsupported.

134.    Less than a week later, at the Newberg High School meet on April 18, 2025, L.R. showed up to compete in the girls' high jump. He and his family were surrounded by security and police which was intimidating and created a tense environment for Madelyn and her female peers. Madelyn reported to OSAA officials feeling unsafe and intimidated by the security and police presence.

135.    Despite this, Madelyn gathered herself together and initially completed an opening jump at 4'6". But she then scratched from the event in protest once the male athlete, L.R., entered the competition. Alongside athletes from other schools, including S.N.C., she withdrew from the event as a matter of principle. She could not, in accordance with her conscience, condone the blatant unfairness and discrimination endorsed by Defendants.

136.    The meet environment was emotionally charged and disorienting. Additionally, L.R. was permitted to jump after all the girls had finished, which violated event rules and treated the girls differently, giving L.R. an unfair advantage. Madelyn's place in the state rankings—already on the edge with a PR of 5'0"—was placed in jeopardy as a result.

137.    There was no process for Madelyn to formally object or seek accommodation without forfeiting her competitive standing.

138.    As a result of the Transgender Policies, Madelyn has suffered emotional distress, competitive disadvantage, and the loss of trust in the fairness of opportunity in her sport.

**c.    Transgender Athletes Are Given Special Treatment Over Their Female Competitors.**

139.    OSAA-sanctioned meets involving transgender athletes have departed from standard competition procedures in ways that materially affect fairness and undermine female athletes' trust in the integrity of the event. These rules are enforced consistently at every OSAA

event by event officials. Irregularities confer tangible advantages on biological male athletes and alter the competitive environment for girls in violation of Title IX in events specifically designed to "accommodate" differences between the sexes. 34 C.F.R. § 106.41(c)(1).

140. Rules that have been applied differently for the biological males, A.G. and L.R., including the following:

12. EVENT CALL/CHECK IN PROCEDURES:

**B. Field Events**: All field event athletes must check in at the Clerk of the Course tent immediately upon arrival to Hayward Field where they will be told when to report back to the tent to be escorted to the field. **All field event athletes are required to check in BEFORE they can be escorted to the field.** ABSOLUTELY NO CHECKING IN AT THE FIELD EVENT SITE. All participants must check in at least ONE HOUR (1 hour 15 minutes for vertical jumps) prior to the scheduled start of the event. Field event athletes must be back in the Clerk of the Course tent at their designated report time to be escorted to the field for instructions and warmups.

…

17. EVENT CONDUCT:

A. Participants must be warmed up and ready to go when call is given for an event. All trials must be completed within the time periods prescribed. For safety reasons MP3 players, radios, headphones, **cell phones and any other personal communication devices will not be allowed on the track or on the infield of the track.** One warning will be issued to any coach or athlete if found using any type of personal communication device in an event venue. **Any subsequent violation of this rule may lead to disqualification.**

OSAA 2025 Track & Field Administrative Information. (available at:

https://www.osaa.org/docs/btf/trackadinfo.pdf) (emphasis added).

141. OSAA administrative rules are required to apply to all competitors and ensure equal treatment, fairness, and consistency during competitions. The check-in processes all girls must go through before entering the field ensure all equipment is within official standards (and no prohibited items are introduced to the competition). Having all competitors go through this process publicly fosters trust in the athletic competition. Additionally, the use of cell phones on the track or on field is banned event conduct—competitors are subject to "disqualification" if

they violate the rule.

142.    OSAA's administrative rules have not been applied equally to the transgender, biological male athletes, undermining the competitive spirit of the events, fostering unequal treatment on the basis of sex, and providing male athletes with competitive advantages.

143.    For example, in the high jump events, the biological male, L.R., was allowed to attempt jumps on his own after the girls had completed theirs, rather than advancing height-by-height in a unified field. This practice afforded him a competitive advantage over his female competitors, who were instead required to compete against one another in direct, incremental competition.

144.    Moreover, unlike the female athletes, L.R. was allowed to bypass pre-meet check-in protocols, including shoe spike inspections and rule briefings. At the 2025 State Championships, all female competitors were required to report to designated tents for inspection and procedural guidance. L.R., on the other hand, was permitted to forego these required protocols and instead enter the field separately, accompanied by a security escort. This not only violated event protocols but also sent a demoralizing message to the female competitors that different and special rules applied for their male competitor.

145.    A.G. was also afforded special treatment. In track events, runners are allowed to warm up about an hour before they must check in at the Clerk's Table, usually located in a tent. The competitors are then required to remain in the tent prior to the event.  They are not allowed to leave, and they cannot go to the field or continue warming up. Additionally, once checked in, coaches are not allowed further communication with the athletes and are not allowed in the tent. Only the athletes and an official are permitted in the tent. The athletes' personal belongings including cell phones, clothing, and other items also must be stored in the tent.

146.    Notwithstanding these clear rules, which should have applied to all competitors,

A.G. was allowed to wait outside the tent and was permitted to use his cellphone throughout the competition, while the female competitors—including S.C.—were not.

147.    A.G. also was escorted to the track field through a private entrance by police security, bypassing the check-in queue through which all of the female competitors were required to enter.

148.    The special treatment afforded L.R. and A.G. altered the character and tone of the entire competitions and negatively impacted their female competitors, including Plaintiffs. The presence of heightened security, police officers stationed near the male athlete's families, and increased media attention generated by their participation in female-only competitions created an atmosphere of intimidation, distrust, and stress for the girls. Rather than the celebratory culmination of a season, the Transgender Policies and Defendants' implementation of them transformed these meets into politically charged and emotionally volatile environments for the girls. Plaintiffs and their female peers reported feeling scrutinized, silenced, and unsupported to OSAA officials, but no action was taken to address their concerns.

149.    The security and police presence, the negative media attention due to the presence of the biological male competitors, and the overall special treatment given to the male competitors created a hostile environment for the Plaintiffs and their female peers in violation of Title IX.

**E.    Defendants were given notice of their violations of Title IX and have refused to take corrective action.**

150.    Defendants have been notified of the ways in which the Transgender Policies violate Title IX. They have been informed of the actual impact the Transgender Policies have on the quality and quantity of athletic opportunities provided for Plaintiffs and other female athletes in Oregon.

151.    On April 19, 2024, S.N.C.'s mother, Rebecca Carpenter, individually emailed all

15 OSAA Board members to lodge a complaint about the Board's decision permitting biological

males to compete against young female athletes in violation of Title IX and asked the Board to

change its transgender policy.  Not a single OSAA Board Member responded to her.

152.    On the same date, Ms. Carpenter also filed a formal, written complaint with the

Office for Civil Rights of the Department of Education recalling what had occurred at the April

18th meet, notifying OCR of Defendants' violations of Title IX due to the Transgender Policies.

153.    On May 28, 2025, on behalf of each of the Plaintiffs and all other female student

athletes similarly situated, America First Policy Institute (AFPI) filed a complaint with the U.S.

Department of Education, Office for Civil Rights, detailing the above Title IX violations stating,

in relevant part:

> AFPI has received multiple credible reports from female Oregon high school athletes who are being actively denied the right to compete in a female-only category. During the Spring 2024–2025 semester alone, male athletes have been allowed to participate in a multitude of girls' events, and we have every reason to believe this trend will continue through the end of the school year and beyond. These incidents are not isolated. Nor are they just unfair. They are illegal. Title IX of the Education Amendments of 1972 prohibits sex-based discrimination in any education program or activity receiving federal financial assistance. That includes athletics. Schools are legally required to provide equal athletic opportunities for both sexes. When males are allowed to participate in women's sports, female athletes are denied meaningful opportunities to compete, excluded from events that advance their athletic development, and deprived of pathways to scholarships and higher education, all of which constitute unlawful sex-based discrimination. Under current Oregon state and athletics policies, the safety, dignity, and rights of female student athletes are being systematically undermined. AFPI is conducting its own investigation and intends to pursue legal action. But immediate federal enforcement is needed now. We respectfully urge your office to do the following:
>
> • Open a formal Title IX investigation into the ODE and OSAA.
>
> • Enforce existing federal law to restore sex-based athletic protections for girls.
>
> • Ensure that no female student athlete in Oregon, or anywhere, is forced to forfeit her rights, safety, or opportunity in violation of federal law.

AFPI letter to ODE, **Exhibit A**.

154.    AFPI sent a copy of the OCR complaint to the superintendents of each Defendant

School District. As of the filing of this Complaint, not one of the Defendant School Districts has responded to AFPI or to the Plaintiffs or, upon information and belief, the OCR.

155.    Since receiving notice that the OCR had initiated a formal investigation of Defendants' alleged violations of Title IX, Defendants have taken no steps whatsoever to change the Transgender Policies, correct Plaintiffs' official records, give accurate credit to the girls who would have placed on the finishing podium but for Defendant's violations of Title IX, or otherwise cease their ongoing violations of Title IX by depriving Oregonian female athletes of equal educational opportunities.

## V.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

156.    Plaintiffs S.C. and S.N.C. are rising seniors in their respective school districts in Oregon and will compete at OSAA track and field athletic events this upcoming school year.

157.    Under the current Transgender Policies, biological males will be permitted to compete against the Plaintiffs and other females in competitions intended for females only.

158.    Upon information and belief, at least two biological males, A.G. and L.R., will compete in track and field events during the next academic year in their respective school districts and will face both S.C. and S.N.C.

159.    Requiring S.C. and S.N.C. to compete against biological males in the upcoming track and field season deprives them of their rights to effective accommodation and equal treatment under Title IX.

160.    The harm to S.C. and S.N.C. is irreparable. Each meet, once completed, cannot be redone. Each opportunity lost to set a PR, achieve a higher ranking, or qualify for district or state competition cannot be recovered. There is no adequate remedy at law for the loss of these competitive opportunities, the emotional distress, the violation of sincerely held beliefs, and the chilling effect on expressing concerns.

161.    If A.G., L.R., or any other biological male is permitted to compete in female-only athletic competitions, it is likely that they will deprive another girl of a victory they otherwise would have earned.

162.    Permanent injunctive relief is necessary to prohibit biological males from competing in girls' track and field events to avoid future violations of Title IX that will deprive S.C. and S.N.C. of their rights under Title IX.

163.    With respect to all Plaintiffs, permanent injunctive relief also is necessary to correct public records of their athletic achievements, which are important for recognition, recruitment, and scholarship opportunities. Records impacted by the unlawful inclusion of biological males competing in girls' events deny female athletes like Plaintiffs accurate public recognition. Plaintiffs are entitled to permanent injunctive relief requiring correction of their athletic records to accurately reflect their achievements against other female athletes—not males. Each Plaintiff has had to compete against biological males; each of their athletic records have been skewed.

164.    Additionally, A.G. holds state-wide records in track events, and L.R. also has posted records for competing against female athletes in high jump. These competitions were created for girls and the records held by biological males in such events deprives female athletes of the recognition and opportunities meant for them. No biological male should be permitted to hold the record in any female-only competition.

## COUNT I: TITLE IX

### Sex Discrimination by Failing to Provide Effective Accommodation to the Interests and Abilities of Female Athletes

165.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint.

166.    Defendants are recipients of federal financial assistance and are subject to the

obligations imposed by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and its implementing regulations, including 34 C.F.R. § 106.41.

167.    Defendants have elected to provide sex-separated athletic opportunities in track and field, as permitted under Title IX where competitive skill is involved. As a result, they are required to ensure that female athletes receive athletic opportunities that are equivalent in treatment, benefits, and competitive integrity to those provided to male athletes.

168.    Under 34 C.F.R. § 106.41(c) and its accompanying guidance, Defendants must provide competition levels that accommodate the physical abilities of female athletes and offer opportunities that "equally reflect their abilities." *See* Policy Interpretation, 44 Fed. Reg. 71,417–418.

169.    These obligations include equal access to postseason opportunities, recognition, and advancement. These are core benefits of school athletics. Title IX also provides protection from policies that are discriminatory in either language or effect, or that functionally deny "equality of athletic opportunity."

170.    The Transgender Policies and their implementation disadvantage female athletes by allowing biological males to compete in competitions offered specifically for females.

171.    Medical consensus confirms that, especially following puberty, profound physiological differences between the sexes result in a consistent performance gap between comparably trained males and females in nearly all athletic domains.

172.    As a result of profound physiological differences between the sexes after puberty, the athletic abilities of girls relevant to track and field and the high jump competitions are not equal to those of comparably fit and trained boys.

173.    OSAA itself acknowledges the athletic performance gap between boys and girls by maintaining different qualifying standards for boys' and girls' state championship events.

Those standards reflect the recognition that female athletes require different thresholds to ensure equitable accommodation.

174.    Defendants persist in enforcing and implementing their discriminatory Transgender Policies despite clear performance data showing that, when males compete in competitions meant to accommodate the athletic performance of girls, they dominate.

175.    As a result of this inescapable difference, Defendants violate Title IX by permitting biological males to compete in sex-segregated, girls competitions. Such competitions are required by Title IX to accommodate girls' abilities and provide equal opportunities, yet those opportunities are made unavailable to girls when males are allowed to participate in their events.

176.    Defendants have disadvantaged girls by eliminating female-only competitions and only providing girls athletic competitions in which they were forced to compete against biological males.

177.    Accordingly, Defendants offer proportionally more opportunities to biological males than female athletes.

178.    The Transgender Policies have no meaningful impact on male athletic opportunities.

179.    Defendants have a duty to accommodate female athletes abilities and provide equal opportunities in levels of competition.

180.    All Plaintiffs have been harmed, and S.C. and S.N.C. will be harmed in the forthcoming track and field season by Defendants' failure to provide competitive opportunities that fairly and effectively accommodate the athletic abilities of female athletes.

181.    Such harm includes loss of experience of fair competition, loss of correct placements, loss of victories and the public recognition associated with victories, loss of

opportunities to advance to higher-level competitions, and loss of visibility to college recruiters.

182.    Accordingly, Plaintiffs are entitled to the relief requested herein.

## COUNT II: TITLE IX

### Sex Discrimination by Failing to Provide Equal Treatment, Benefits and Opportunities for Female Athletes

183.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint.

184.    Defendants are recipients of federal financial assistance and are therefore subject to the obligations imposed by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and its implementing regulations, including 34 C.F.R. § 106.41.

185.    Defendants have chosen to offer athletic programs, including track and field, that are separated by sex, as permitted and contemplated under Title IX and its regulations.

186.    As a result, Defendants are obligated to ensure that female athletes receive equal treatment, benefits, and opportunities as compared to male athletes, including equivalent conditions for training, competition, advancement, and recognition.

187.    In implementing the Transgender Policies, OSAA administrative rules governing athletic events are applied unevenly, giving special treatment or not applying at all to biological males, constituting unequal treatment based on sex.

188.    The uneven application of OSAA administrative rules provide biological males an arbitrary edge in athletic competitions designed for girls.

189.    Equivalent treatment and opportunities require also equal opportunities to engage in post-season competition and includes the right to be free of any policies which are "discriminatory in language or effect" or have the effect of denying "equal athletic opportunity."

190.    The Transgender Policies have deprived and continue to deprive female athletes, including Plaintiffs, of equal opportunities to engage in post-season competitions, are

discriminatory in effect, and deny girls equality in athletic opportunities, such as equal opportunity to be recognized for victory.

191.    Title IX regulations prohibit any policy that is "discriminatory in language or effect" or that has the effect of denying girls "equality of athletic opportunity."

192.    Defendants' Transgender Policies have an unbalanced, detrimental effect on girls' opportunities to compete on a level playing field. They have resulted in fewer opportunities for girls to compete, advance, and win awards for their athletic achievements.

193.    By providing competitive opportunities in track and field and failing to offer girls an equal opportunity to participate and advance in their sport based on their abilities, all Defendants have violated their Title IX obligations to extend equal treatment, benefits, and opportunities in athletic competition to girls.

**COUNT III:** TITLE IX

<u>Hostile Environment</u>

194.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint.

195.    Defendants are recipients of federal financial assistance and are subject to the obligations imposed by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and its implementing regulations, including 34 C.F.R. § 106.41.

196.    Defendants have created and enforced a policy that permits biological male athletes to participate in sex-separated girls' athletic competitions.

197.    To accommodate biological male athletes, Defendants have implemented or permitted procedural deviations and special accommodations not extended to female athletes, including separate warm-up areas, private escorts, bypassed check-ins, and policy exceptions concerning uniforms and use of personal devices.

198.    These changes have fundamentally altered the nature of competition for girls by introducing irregular procedures, unpredictable conditions, and emotionally charged environments that do not apply to boys' events. Female athletes are forced to compete under unequal conditions that undermine their opportunity to perform, succeed, and enjoy the full educational benefits of athletic participation.

199.    Plaintiffs and other girls are forced to either compete against biological males with inherent physiological advantages or withdraw in protest, sacrificing their rankings, visibility, and team standing. The psychological toll of training and competing under the Transgender Policies, coupled with the absence of transparency, procedural recourse, or institutional support, has created a climate of fear, alienation, and intimidation. Girls report feeling like second-class athletes, uncertain whether their sex-specific events will remain safe, fair, or meaningful.

200.    Events at which transgender athletes compete often receive large media attention, exposing female athletes, including Plaintiffs, to hateful comments and unwanted publicity, causing emotional distress. The publicity associated with these events is unique to female events in terms of its controversy.

201.    The implementation of the Transgender Policies also have introduced uniquely distressing and abnormal conditions into girls' events—irregular competition formats, unequal enforcement of rules, separate escorts for male competitors, sudden changes to qualification standards, and visible police presence—all of which have intensified the perception that girls' competitions are unstable, unpredictable, politicized, and unsafe.

202.    Police presence at girls sporting events introduces an atmosphere of fear and intimidation that is absent from boys' sporting events. The police presence, specifically escorting and protecting the male athletes, places female athletes on edge and implies retaliation for any

valid protest the girls may have to the unfair circumstances, creating a hostile environment the girls cannot escape from if they wish to attain the benefits of the educational opportunities to which they are entitled.

203.    This is not an environment boys are forced to navigate. Only female athletes must regularly confront the possibility that their events will be impacted at the last minute by the inclusion of male competitors whose participation is framed as righteous. Only girls must question whether their protest will be punished, their concerns dismissed, and their victories delegitimized.

204.    The result is an athletic climate that is discriminatory in effect, silencing and marginalizing female athletes and deterring them from full participation in school athletics. The hostile conditions created and maintained by the Transgender Policies deny girls equal access to the educational benefits of athletic competition in violation of Title IX.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment against Defendants and grant Plaintiffs the following relief:

**(A)** A declaration that Defendants have violated Title IX by failing to provide competitive opportunities that effectively accommodate the abilities of female athletes;

**(B)** A declaration that Defendants have violated Title IX by failing to provide equal treatment, benefits, and opportunities for females in athletic competition;

**(C)** An injunction requiring Defendants to correct all records where Plaintiffs have placed behind or lost to biological male athletes with respect to any record or recognition purporting to record times, victories, rankings, or qualifications for competitions designated for girls or women, and conversely to correctly give credit, rankings, and/or

titles to Plaintiffs who would have received such credit, rankings, and/or titles but for the participation of athletes born male and with male bodies in such competitions;

**(D)** An award of nominal damages and other monetary relief as permitted by law;

**(E)** An award of Plaintiffs' reasonable attorneys' fees and expenses, as authorized by 42 U.S.C. § 1988;

**(F)** Such other and further relief as the Court deems just and appropriate.

With respect to provisions (A) through (F) of the foregoing Prayer for Relief:

1. **Plaintiff S.C.** specifically seeks: Declaratory, temporary and permanent injunctive relief prohibiting all Defendants in interscholastic athletic competitions sponsored, organized, or participated in by the Defendants or any of them, from permitting biological males from participating in events that are designed for females; permanent injunctive and declaratory relief requiring all Defendants to correct any and all athletic records to remove biological male athletes from any record of recognition purporting to record times, victories, or qualifications for competitions in which Plaintiff S.C. competed, and conversely to correctly give credit to Plaintiff S.C. and other female athletes who would have received such credit but for the participation of biological males in such competitions.

2. **Plaintiff S.N.C.** specifically seeks: Declaratory, temporary and permanent injunctive relief prohibiting all Defendants in interscholastic athletic competitions sponsored, organized, or participated in by the Defendants or any of them, from permitting biological males from participating in events that are designed for females; permanent injunctive and declaratory relief requiring all Defendants to correct any and all

athletic records to remove biological male athletes from any record of recognition purporting to record times, victories, or qualifications for competitions in which Plaintiff S.N.C. competed, and conversely to correctly give credit to Plaintiff S.N.C. and other female athletes who would have received such credit but for the participation of biological males in such competitions.

3. **Plaintiff Madelyn Eischen** specifically seeks: Permanent injunctive and declaratory relief requiring all Defendants to correct any and all records to remove biological male athletes from any record of recognition purporting to record times, victories, or qualifications for competitions designed for females, and conversely to correctly give credit to Plaintiff Madelyn Eischen and other female athletes who would have received such credit but for the participation of biological males in such competitions.

Respectfully submitted this 7 day of July, 2025.

## <u>Jury Demand</u>

Plaintiffs hereby demand trial by Jury on all claims so triable.

/s/ *Herbert G. Grey*
Herbert G. Grey, OSB #810250
4800 SW Griffith Drive, Suite 320
Beaverton, OR 97005-8716
Telephone: 503-641-4908
Email: herb@greylaw.org

*Counsel for Plaintiffs*

*Of Counsel:*

Jessica Hart Steinmann
(*pro hac vice application forthcoming*)
Leigh Ann O'Neill
(*pro hac vice application forthcoming*)
Andrew Zimmitti

49

(*pro hac vice application forthcoming*)
Sarah Heath
(*pro hac vice application forthcoming*)
John Casali
(*pro hac vice application forthcoming*)

America First Policy Institute
1455 Pennsylvania Ave N.W., Suite 225
Washington, D.C. 20004
Telephone: 703-755-0944
Email: jsteinmann@americafirstpolicy.com
        LOneill@americafirstpolicy.com
        azimmitti@americafirstpolicy.com
        sheath@americafirstpolicy.com
        jcasali@americafirstpolicy.com