IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SOPHIA CASTANEDA, SOPHIA
CARPENTER, and MADELYN EISCHEN,

Plaintiffs,

v.

OREGON DEPARTMENT OF EDUCATION,
OREGON SCHOOL ACTIVITIES
ASSOCIATION, GOVERNOR TINA KOTEK,
in her official capacity as Superintendent of
Public Instruction, FOREST GROVE SCHOOL
DISTRICT NO. 15, and NEWBERG SCHOOL
DISTRICT NO. 29J,

Defendants.

Case No. 3:25-cv-01170-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, U.S. Magistrate Judge.**

Sophia Castaneda ("Castaneda"), Sophia Carpenter ("Carpenter"), and Madelyn Eischen

("Eischen") (together, "Plaintiffs") are cisgender female athletes who are or were members of

girls' varsity track and field teams at Oregon public high schools.[1] Plaintiffs each identify at least

one instance in which they competed against and finished behind a transgender female athlete at

---

[1] "[T]he term 'cisgender' refers to persons whose gender identity aligns with their sex recorded at birth." *Roe v. Critchfield*, 137 F.4th 912, 920 n.3 (9th Cir. 2025) (citation omitted).

PAGE 1 – FINDINGS AND RECOMMENDATION

an interscholastic athletic event, including the 2024 and 2025 Oregon School Activities Association ("OSAA") Class 6A State Track and Field Championships at the University of Oregon's Hayward Field.[2]

Several years before these events, OSAA, a voluntary organization of public and private schools that governs interscholastic activities, developed a gender identity participation policy in consultation with the Oregon Department of Education ("ODE"). OSAA's policy permitted students to participate in interscholastic athletics and activities based on their consistently asserted gender identity. In a subsequently published update to its statewide guidance document, ODE cited and linked to OSAA's policy and advised that OSAA permitted gender expansive students to participate in school athletics and activities in accordance with their consistently asserted gender identity and that failing to permit students to do so may violate Oregon administrative rules. Near the beginning of the spring 2025 track season, ODE also replaced its provision on students' participation in school athletics and activities. This replacement provision largely tracked its predecessor but rather than warning of a potential violation of Oregon administrative rules, it instead advised that Oregon Revised Statutes ("ORS") § 659.850 prohibited schools from excluding students from athletics or activities based on their gender identity.[3]

---

[2] "The term 'transgender' is an adjective for persons whose gender identity is not aligned with their sex recorded at birth[.]" *Roe*, 137 F.4th at 920 n.3 (citation omitted).

[3] Plaintiffs incorporate these policies by reference into their operative complaint. (Second Am. Compl. ("SAC") ¶¶ 45, 47-51, 53-56, 58-59, ECF No. 50); OR. SCH. ACTIVITIES ASS'N, 2025-2026 HANDBOOK 1, 6-7, 49, 70-71 (Dec. 8, 2025) [hereinafter OSAA HANDBOOK], https://www.osaa.org/docs/handbooks/osaahandbook.pdf [https://perma.cc/BGM7-E2TA]; OR. DEP'T OF EDUC., SUPPORTING GENDER EXPANSIVE STUDENTS: GUIDANCE FOR SCHOOLS 1-48 (Jan. 5, 2023) [hereinafter ODE 2023 GUIDANCE], https://www.oregon.gov/ode/students-and-family/equity/civilrights/Documents/ODE-Supporting-Gender-Expansive-Students.pdf [https://perma.cc/62YV-9NX7]; OR. DEP'T OF EDUC., SECTION 1.i.iii. ATHLETICS 33-34 & nn.112-13 (Jan. 5, 2023) [hereinafter ODE 2023 ATHLETICS PROVISION],

PAGE 2 – FINDINGS AND RECOMMENDATION

Given their experiences competing against transgender female athletes, Plaintiffs allege that OSAA's policy and ODE's statewide guidance resulted in discrimination in Oregon's girls' high school track and field programs and deprived them of, among other things, equal treatment and benefits and opportunities to participate in such programs. Plaintiffs therefore sued ODE, OSAA, Governor Tina Kotek ("Kotek"), Forest Grove School District No. 15 ("FGSD"), and Newberg School District No. 29J ("NSD") (together "Defendants"), alleging violations of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-1688.[4]

Defendants now move under Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss Plaintiffs' operative complaint for failure to state a claim upon which relief can be granted. The District Defendants also move to dismiss for lack of standing under Article III of the Constitution.[5] The Court has federal question jurisdiction over Plaintiffs' Title IX claims under 28 U.S.C. § 1331. For the reasons explained below, the Court recommends that the district

---

https://web.archive.org/web/20230105180812/https://www.oregon.gov/ode/students-and-family/equity/civilrights/Documents/ODE-Supporting-Gender-Expansive-Students.pdf#page=33 [https://perma.cc/NHC7-SPXM]; OR. DEP'T OF EDUC., SECTION 1.i.iii. ATHLETICS 1-2 & nn.1-2 (Mar. 18, 2025) [hereinafter ODE 2025 GUIDANCE], https://www.oregon.gov/ode/students-and-family/equity/civilrights/Documents/ODE-Supporting-Gender-Expansive-Students-1.i.iii.Athletics-revision.pdf [https://perma.cc/Q9QZ-3SG3].

[4] For simplicity, the Court refers to ODE and Governor Kotek together as the "State Defendants" and FGSD and NSD together as the "District Defendants."

[5] The District Defendants move to dismiss under Rule 12(b)(6) for lack of Article III standing. (Sch. Dist. Defs.' Mot. Dismiss ("Dist. Defs.' Mot.") at 2, 4, 8, ECF No. 41.) Given that Article III "standing pertain[s] to a federal court's subject-matter jurisdiction . . . , [it is] properly raised in a motion to dismiss under [Rule] 12(b)(1), not Rule 12(b)(6)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (simplified). The District Defendants' standing motion "should have been brought" under Rule 12(b)(1), but their reliance on Rule 12(b)(6) "does not materially affect" the Court's resolution of the parties' motions and recommendation that the district judge deny their standing motion. *See Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1001 (9th Cir. 2015) (stating as much with respect to a parties' "reliance on Rule 12(b)(1)").

PAGE 3 – FINDINGS AND RECOMMENDATION

judge deny the District Defendants' motion to dismiss for lack of standing and grant Defendants' Rule 12(b)(6) motions.

## BACKGROUND[6]

### I.     FACTS

#### A.     Parties

During the track meets at issue, Castaneda and Carpenter were sophomore and junior members of the varsity track and field team at Newberg High School, and Eischen was a senior captain of the varsity track and field team at Forest Grove High School. (*See* SAC ¶¶ 6, 16-18, 25-26, 97-100, 104-05, 114-16, 122-34, 138-44, citing Castaneda's postseason races in 2024 and Carpenter and Eischen's high jump events in 2025). Castaneda competes in the 200- and 400-meter races, Carpenter competes in the high jump, and Eischen competes in the high jump and triple jump. (*Id.* ¶¶ 98, 100, 105, 116-17, 138.) Castaneda and Carpenter intend to compete at Newberg High School during the current spring 2026 track season and the collegiate level. (*Id.* ¶¶ 16-17.)

The District Defendants are public school districts in Washington and Yamhill Counties, Oregon. (*Id.* ¶¶ 25-26.) The District Defendants receive federal financial assistance from ODE and enforce ODE's guidance and OSAA's gender identity participation policy. (*Id.* ¶¶ 4, 24, 27.)

ODE is an Oregon agency responsible for administering and funding kindergarten through twelfth grade public education and enforcing Title IX and its implementing regulations.

---

[6] Unless otherwise noted, the Court draws these facts from Plaintiffs' operative second amended complaint. *See Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1013 (9th Cir. 2020). "In the present posture, [courts] treat the complaint's [non-conclusory] allegations as true and construe them in the light most favorable to the plaintiff." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020); *see also Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1114 (9th Cir. 2023) ("[O]ur recitation of the facts assumes that the non-conclusory allegations . . . are true.").

(*Id.* ¶ 19.) Governor Kotek, whom Plaintiffs sue only in her official capacity, serves as the Superintendent of Public Instruction and ODE's highest-ranking official. (*Id.* ¶ 21.) As such, Governor Kotek is the final policymaker responsible for the operation and management of ODE, including, as relevant here, ODE's issuance of its statewide guidance on transgender students. (*Id.*)

OSAA is an Oregon-based organization that public and private high schools "voluntarily agreed to form" for the purposes of, among other things, organizing, developing, directing, and regulating interscholastic activities, formulating and making related policies, and "foster[ing] uniform[] . . . standards in interscholastic activity competition[.]" (*Id.* ¶ 20); OSAA HANDBOOK, *supra* note 1, at 1. OSAA's member schools and districts, including the District Defendants, pay annual dues and fees that along with "revenue derived from interscholastic championship events and corporate sponsorships" fund OSAA's operations and regulation of athletic programs. (SAC ¶¶ 24, 28-29, 45); OSAA HANDBOOK, *supra* note 1, at 1-3, 19.

OSAA's Executive Board, which is composed of administrators from member schools and districts, manages OSAA's "business and affairs." (SAC ¶¶ 24, 28-29, 45-51); OSAA HANDBOOK, *supra* note 1, at 5-8. Under the OSAA Constitution, the Executive Board's authority includes the power to (1) "[e]stablish operational guidelines," (2) "[e]xercise control over all OSAA-sponsored activities and contests between schools that are members," including "all state championships," (3) "[m]ake rulings applicable to eligibility requirements," (4) administer OSAA's regulations, "which shall govern each student who represents their school in any interscholastic activity," (5) adopt or amend policies, and (6) "[t]ake any action it deems necessary to comply with federal or state law[.]" (SAC ¶¶ 30-31, 45-51); OSAA HANDBOOK, *supra* note 1, at 6-7.

PAGE 5 – FINDINGS AND RECOMMENDATION

**B.    OSAA's Policy**

In the winter of 2019, OSAA's Executive Board exercised its authority under Article 5.3 of the OSAA Constitution to adopt a "Gender Identity Participation" policy, which OSAA developed in consultation with ODE. (SAC ¶¶ 58-59); OSAA HANDBOOK, *supra* note 1, at 6-7, 49, 70-71.

In the policy, OSAA advised that it "endeavors to allow students to participate [in] the athletic or activity program of their consistently asserted gender identity while providing a fair and safe environment for all students," and such rules "promote[] harmony and fair competition among member schools by maintaining equality of eligibility and increase the number of students who will have an opportunity to participate in interscholastic activities." OSAA HANDBOOK, *supra* note 1, at 70. OSAA added that it plans to review the policy on a "regular basis based on improved understanding of gender identity and expression, evolving law, and societal norms." *Id.* Immediately after its "Definitions" section, OSAA described its "new approach to eligibility" and transgender students' participation in interscholastic athletics and activities:

> For both historical reasons, as well as reasons related to compliance with Title IX, interscholastic athletics and activities have typically been divided by gender, with a few exceptions. Formulating new processes to address concerns about participation regardless of a student's gender identity requires a new approach to eligibility, an approach reflected in these policies. In interpreting these policies, the OSAA recognizes the value of activities and sports for all students and the potential for inclusion to reduce harassment, bullying and barriers faced by certain students.
>
> 1.    As is true with all eligibility determinations, the student's member school will be the first point of contact for determining the student's eligibility. When a student registers for athletics or activities the student shall indicate the student's gender during that registration process, consistent with other school enrollment procedures. Athletics and activities personnel should refer to member school processes for registration/enrollment information. Disputes regarding these gender identity determinations will be

PAGE 6 – FINDINGS AND RECOMMENDATION

resolved solely at the member school level; because of the diversity of private and public school rules that may bear on such determinations, and gender identity issues being particularly sensitive, the OSAA will not hear any appeal of a member school's determination made under this section.

2.      Subject to section B(1), once a transgender student has notified the student's school of their gender identity (boy or girl), the student shall consistently participate as that gender for purposes of eligibility for athletics and activities, provided that if the student has tried out or participated in an activity, the student may not participate during that same season on a team of the other gender.

3.      Subject to section B(1), once a nonbinary or intersex student has notified the student's school of their gender identity, the student shall participate as either gender for purposes of eligibility for athletics and activities that are gender-segregated or gender-specific, provided that [i]f the student has tried out or participated in athletics or an activity that is gender-specific or gender-segregated, the student may not participate during that same season on a team of the other gender.

*Id.* at 70-71.

C.      **ODE's Guidance**

On January 5, 2023, ODE updated its statewide guidance document titled "Supporting Gender Expansive Students: Guidance for Schools." (SAC ¶¶ 53-54); ODE 2023 GUIDANCE, *supra* note 1, at 4.

In its updated guidance document, ODE noted that its initial 2016 publication was "one of the first statewide guidance documents in the nation to help [kindergarten through twelfth grade] schools synthesize state law, federal law, and best practice in order to support transgender students." ODE 2023 GUIDANCE, *supra* note 1, at 4. ODE also observed that its updated 2023 "guidance clarifie[d] new and evolving laws and policies in order to address the diverse needs of a broad range of gender expansive students and the school districts who serve them," and stemmed from requests that it received from "students and their families, educators and school

PAGE 7 – FINDINGS AND RECOMMENDATION

staff, school district leaders, school boards, healthcare providers, and community partners across Oregon." *Id.*

Furthermore, ODE explained that "[a]s an organization, [it] value[s] equity for every student," "[e]ducational equity requires an educational environment that is safe and free from discrimination and harassment as well as one that ensures every student has equitable access to educational programs and activities," and its "guidance [was] designed to support schools and districts in meeting their responsibilities for creating safe and affirming school environments for every student, including gender expansive students." *Id.* at 5. Relatedly, ODE emphasized that (1) "[g]ender identity is a protected class under both federal and state civil rights law," (2) "any public elementary or secondary school that receives state funding is prohibited from engaging in gender identity discrimination," (3) Oregon law defines gender identity "generally as 'an individual's gender-related identity, appearance, expression or behavior, regardless of whether the identity, appearance, expression or behavior differs from that associated with the gender assigned to the individual at birth,'" (4) "Title IX prohibits sex discrimination in any federally-funded education program, which includes discrimination based on gender identity," (5) "all students are entitled to equal protection under the law," and (6) "[s]tudents need the same benefits, opportunities, and services in schools regardless of their gender identity." *Id.* (citations omitted).

Additionally, and with respect to students' participation in school athletics and activities, ODE highlighted that OSAA's policies permitted "gender expansive students to participate in school athletics and activities in accordance with their consistently asserted gender identity." (SAC ¶ 55); ODE 2023 ATHLETICS PROVISION, *supra* note 1, at 33. ODE explained that a school's failure to permit "students to participate in athletics in alignment with their gender

PAGE 8 – FINDINGS AND RECOMMENDATION

identity may violate Oregon nondiscrimination rules," that the U.S Department of Education ("DOE") "may also consider [such an] exclusion . . . to violate Title IX," and that "[s]chools should regularly review their athletics policies to ensure that they do not engage in discrimination against gender expansive students." ODE 2023 ATHLETICS PROVISION, *supra* note 1, at 33.

More than two years later, on March 18, 2025, ODE released an "individual section update[]" on gender expansive students' eligibility to participate in school athletics and activities, which "replace[d] the previously released 1.i.iii section of [ODE's] 2023 Supporting Gender Expansive Students: Guidance for Schools." ODE 2025 GUIDANCE, *supra* note 1, at 1 (simplified). ODE's updated section cited ORS § 659.850,[7] OSAA's gender identity participation policy, and the National Federation of State High School Associations' uniform rules, and stated the following:

1.      because Oregon "state nondiscrimination law prohibits discrimination on the basis of, among other things, gender identity[,] . . . schools are prohibited from excluding gender expansive students from participating in school athletics and activities that align with their consistently asserted gender identity if the basis of such exclusion is the student's gender identity,"

///

---

[7] ORS § 659.850, which defines "'[d]iscrimination' [as] any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on . . . gender identity," provides that "[a] person may not be subjected to discrimination in any public elementary, secondary or community college education program or service, school or interschool activity . . . financed in whole or in part by moneys appropriated by the Legislative Assembly." OR. REV. STAT. § 659.850(1)(a)(A), (2).

2. "[s]chools should regularly review their athletics policies to ensure that they do not engage in discrimination against gender expansive students,"

3. "[q]uestions about individual sports eligibility or protocols should be directed to the applicable governing association,"

4. "[n]onbinary, intersex, genderfluid, Two Spirit, and other students who do not consistently identify with the gender binary cannot be prohibited from playing on athletic teams of either gender, in alignment with Oregon nondiscrimination law,"

5. "[a]thletic governing associations may have specific procedures the school should follow,"

6. although OSAA's "policies state that . . . a student [who] has tried out or participated in athletics or an activity that is gender-specific or gender-segregated . . . may not participate during that same season on a team of another gender," such a "student may try out for and participate on teams of another gender in subsequent seasons, and may also participate in any school sports or activities open to all students (e.g., football, dance),"

7. students' "[a]thletic participation may require school-specific uniforms for each sport" and although "these uniforms are [often] designed based on historical practices containing assumptions about gender or anatomy (e.g., swimwear styles, athletic short length, etc.)," schools "should develop any athletic uniform policies with consideration of the needs of gender expansive students,"

///

PAGE 10 – FINDINGS AND RECOMMENDATION

8.     "[i]t is best practice for formal or informal athletic uniform policies to address the needs of gender expansive students and allow for flexibility related to student comfort and safety needs, while adhering to organizational and sport safety regulations," and

9.     "[s]chools may wish to consult with legal counsel or the appropriate governing association about individual student concerns."

*Id.* at 1 & nn.1-2.

### D.     Plaintiffs' Experiences

#### 1.     Castaneda

Castaneda is a senior on the girls' varsity track and field team at Newberg High School. (SAC ¶¶ 16, 97-115.) Castaneda competes in the 200- and 400-meter races and intends to participate in OSAA track and field events during the 2025-2026 school year. (*Id.* ¶¶ 1, 100, 105, 115, 163.)

During the 2023-2024 school year, Castaneda "broke the Oregon state record for the fastest 400-meter time ever run by a sophomore girl" and began drawing "attention from collegiate recruiters." (*Id.* ¶ 98.) Midway through the 2024 track season, Castaneda also learned that a transgender female athlete placed second in the 200- and 400-meter races at an annual meet called the "Sherwood Need for Speed Classic." (*Id.* ¶¶ 81-83, 100.) Afterward, Castaneda was anxious and uncertain about whether she may have to compete against a transgender female athlete in "what she believed was unfair competition" and whether the outcome may "affect her record." (*Id.* ¶ 102.) Castaneda felt "powerless" and experienced emotional distress because her participation could "signal condonement" of "unfair" policy, and she knew that female athletes who opposed such competitions were on the receiving end of "virulent public condemnation." (*Id.* ¶ 103.)

PAGE 11 – FINDINGS AND RECOMMENDATION

Later that season, Castaneda qualified for the 2024 OSAA Class 6A State Track and Field Championships, which were held at the University of Oregon's Hayward Field in mid-May 2024. (*Id.* ¶¶ 3, 104, 117-18, 147, 153.) On three separate occasions at the 2024 state championships, Castaneda competed against and finished behind the transgender female athlete whose performance at the Sherwood event had "reverberated through the high school girls' track and field community."[8] (*Id.* ¶¶ 81-83, 100, 105.) Specifically, after finishing ahead of Castaneda in the 400-meter prelims, the transgender female athlete and Castaneda respectively placed first and third in the 200-meter final and second and third in the 400-meter state finals. (*Id.* ¶¶ 81-83, 105, 114.)

In addition to feeling demoralized and humiliated, Castaneda felt unnerved and intimidated by the "special treatment" and "competitive advantage" that the transgender female athlete received before and after their competitions. (*Id.* ¶¶ 106-14.) For example, unlike Castaneda and other cisgender female qualifiers, the transgender female athlete received personal security at the athletes' hotel and on the podium and security escorts before and after the races and to and from a "specially gated-off entrance to a private vehicle." (*Id.* ¶¶ 107, 111.) OSAA

---

[8] The Court takes judicial notice of the state championship records upon which Plaintiffs rely and incorporate by reference. (*See* SAC ¶¶ 97-145, 177-211); *cf. Thomas v. Regents of Univ. of Cal.*, No. 19-cv-06463-SI, 2020 WL 1139595, at *3 (N.D. Cal. Mar. 9, 2020) (taking judicial notice of a women's college soccer team's records "reflecting the historical record and performance"); FED. R. EVID. 201(c)-(e) (providing that a district court "may take judicial notice on its own . . . at any stage of the proceeding"). These records reflect that Castaneda and Castaneda's transgender female competitor ran in different heats and wind conditions and respectively qualified second and third for the 200-meter final at the 2024 state championships. OSAA 2024 STATE TRACK & FIELD CHAMPIONSHIPS 37-38 (Hayward Field, Univ. of Or., May 16-18, 2024), https://www.osaa.org/docs/btf/records/2024.htm [https://perma.cc/27JY-KXN3]. The 2025 state championship records, which do not appear to reference the transgender female athlete, reflect that Castaneda won the 400-meter state title and finished second in the 200-meter. OSAA 2025 STATE TRACK & FIELD CHAMPIONSHIPS 81-82, 84-85, 88 (Hayward Field, Univ. of Or., May 29-31, 2025), https://www.osaa.org/docs/btf/records/2025.pdf [https://perma.cc/VW7J-MXJ3].

PAGE 12 – FINDINGS AND RECOMMENDATION

also permitted the transgender female athlete to violate its rules against wearing clothing over a racing singlet after competitions and carrying a personal cell phone during and after the competition. (*Id.* ¶¶ 108-10, 111.)

Immediately thereafter, there was widespread media coverage, social media activity, and circulation of photographs depicting the transgender female athlete defeating Castaneda and others at the state championships. (*Id.* ¶¶ 113-14.) The transgender female athlete's supporters subjected Castaneda to escalating harassment and hostility because she "declin[ed] to celebrate her loss" in the 400-meter final. (*Id.* ¶ 114.) Castaneda was also at the "center of a volatile and harmful environment" when fights broke out among her classmates at Newberg High School, and at one point, Castaneda's principal called her to the office for a "mental health check." (*Id.*)

### 2.    Carpenter

Like Castaneda, Carpenter is currently a senior on the girls' varsity track and field team at Newberg High School. (SAC ¶¶ 17, 116-37.) Carpenter specializes in the high jump event, intends to participate in OSAA track and field events during the 2025-2026 school year, and aspires to earn an athletic scholarship to compete at the collegiate level. (*Id.* ¶¶ 1, 116-22, 127-34, 163.)

During the 2023-2024 school year, Carpenter, a sophomore at the time, won the Chehalem Classic's girls' high jump event and placed second and seventh at the district and state championships. (*Id.* ¶¶ 116-18, 126.) The following year, she placed sixth, first, and second in the high jump during the season's first three meets held on April 4, April 8, and April 10, 2025. (*Id.* ¶ 119.)

Carpenter's fourth meet of the season was the Chehalem Classic held on April 18, 2025. (*Id.* ¶¶ 87, 119, 121.) Carpenter was the event's third ranked entrant and "surprised to learn" that she would be "competing directly" against a transgender female athlete, who was the fourth

PAGE 13 – FINDINGS AND RECOMMENDATION

ranked entrant and winner of four previous OSAA-sanctioned high jump events that season. (*Id.* ¶¶ 87, 97, 119-21.) Carpenter felt confused and struggled with feelings of sadness, frustration, and despair as she contemplated facing a competitor who was "physiologically advantaged." (*Id.* ¶¶ 119-21.) She was also intimidated and overwhelmed by a "sense of resignation and fear" because unlike any past events at which she participated, officials stationed "extra security at the meet" and "two police officers and two security guards . . . near the high jump pit," and the transgender female athlete "suddenly enter[ed] the event, backed by a police presence." (*Id.* ¶¶ 122-24.)

Carpenter was "unable to participate in the high jump that day and withdrew from the event." (*Id.* ¶ 126.) Carpenter was aware of past instances in which others directed "hateful commentary" at cisgender athletes who responded in comparable ways, but she believed that her participation amounted to "a tacit acceptance of an unfair and discriminatory policy" and felt overwhelmed by the "psychological and emotional weight of th[e] moment" and "betrayed by the institutions and adults charged with protecting her equal opportunity [to] fair play." (*Id.* ¶¶ 123-26.) The transgender female athlete won the high jump event at the 2025 Chehalem Classic. (*Id.* ¶ 127.) Carpenter's official result for the Chehalem Classic was a "no height" or "NH" designation, which remains on her "permanent athletic record" and she believes "will likely have a negative impact [on] her collegiate prospects for admission and athletic scholarships." (*Id.*)

Later that season, Carpenter qualified for the 2025 OSAA Class 6A State Track and Field Championships by placing second at her district championship. (*Id.* ¶¶ 128-29.) Carpenter was the eighth ranked high jumper when she arrived to compete at the state championships in late May 2025. (*Id.* ¶ 128.) As the "time to enter the stadium for the event" approached, and after

PAGE 14 – FINDINGS AND RECOMMENDATION

warming up with other cisgender female competitors and receiving OSAA officials' briefing on the "event rules," Carpenter was "shocked to see" that the transgender female who won the Chehalem Classic's high jump event was "being escorted by a security guard" to the same area. (*Id.* ¶¶ 129-30.) Carpenter felt unnerved by the transgender female athlete's "sudden appearance" after warm-ups and OSAA's officials' briefing, but she "prepared the best she could for the high jump." (*Id.*)

During the event, Carpenter and her competitors each received three successive opportunities to jump and "make height," and Carpenter completed her jumps immediately after the transgender female athlete, who beat Carpenter by "two inches." (*Id.* ¶ 131.) Carpenter was "eliminated from the competition" and dropped to ninth in the post-state championship rankings. (*Id.* ¶ 131.) Like Castaneda, Carpenter believed that the on field "presence of law enforcement and security personnel," which intimidated and interfered with her focus and preparations, provided her transgender female competitor with an "unfair competitive advantage." (*Id.* ¶ 134.) Carpenter also believed that she did not receive an "equally satisfying and meaningful experience in athletic events compared with her male counterparts" who competed in high school track and field. (*Id.*)

### 3. Eischen

During the 2024-2025 school year, Eischen was a scholar athlete and senior captain of the girls' varsity track and field team at Forest Grove High School. (*Id.* ¶¶ 18, 138-45.) Eischen specialized in the high jump and triple jump but only competed against the same transgender female athlete as Carpenter in the high jump and did so at the 2025 Chehalem Classic. (*Id.* ¶¶ 87, 139-43.)

As discussed, Carpenter withdrew from this event and the transgender female high jumper placed first, with a height of five-feet, two-inches. (*Id.* ¶¶ 87, 126-27, 143.) Eischen

PAGE 15 – FINDINGS AND RECOMMENDATION

opened with a jump of four-feet, six-inches and "then scratched from the event in protest[.]" (*Id.* ¶ 142.) Eischen elected to scratch in protest after the transgender female athlete "entered the competition" and as a "matter of principle" because she "could not, in accordance with her conscience, condone the blatant unfairness and discrimination [that Defendants] endorsed[.]" (*Id.*) Before doing so, Eischen told OSAA officials that the "security and police presence" around the transgender female athlete and family members, which "created a tense environment," made her "feel[] unsafe and intimidated[.]" (*Id.* ¶ 141.) Like Castaneda and Carpenter, Eischen felt like her competitor received special treatment and "unfair advantages." (*Id.* ¶ 141, 143.) In addition to police and security, officials allowed the transgender female athlete to jump after competitors completed all their jumps, "which violated the event rules and treated [competitors] differently." (*Id.* ¶ 141, 143.)

Eischen's "place in the state rankings" was "already on the edge" but this event further jeopardized her position and there was no "process" or "formal[]" way to "object or seek accommodation without forfeiting her competitive standing." (*Id.* ¶¶ 143-44.) Eischen also experienced emotional distress and a "loss of trust in the fairness of opportunity in her sport." (*Id.* ¶ 145.)

## II.    PROCEDURAL HISTORY

Plaintiffs sued OSAA and the State and District Defendants on July 7, 2025, alleging multiple violations of Title IX, *see* 20 U.S.C. § 1681(a), and Title IX's implementing regulations, and seeking nominal damages, monetary, declaratory, and injunctive relief, and attorney's fees and costs under 42 U.S.C. § 1988. (Compl. at 1, 40-41, 44-45, 47-49, ECF No. 1; *see also* SAC 44-46, 48-49, 52-54, continuing to seek these forms of relief and relying on the same legal theories).

///

PAGE 16 – FINDINGS AND RECOMMENDATION

Section 1681(a) "provides that, subject to certain exceptions, '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 831 (9th Cir. 2022) (quoting 20 U.S.C. § 1681(a)). In the operative second amended complaint, filed on October 15, 2025, Plaintiffs assert three causes of action for alleged violations of Section 1681(a). (*See* SAC at 46, 48-49.)

First, Plaintiffs allege that Defendants violated Section 1681(a) by failing to provide them with "opportunities that are equivalent in the treatment, benefit, and competitive integrity to those provided to male athletes" and enforcing policies that have "no meaningful impact on" and result in "proportionally more" opportunities for male athletes. (SAC ¶¶ 172-89.) A plaintiff may bring a claim under Title IX and its implementing regulations for "unequal participation opportunities in athletic programs," i.e., "failing to provide male and female students with equal opportunities for 'participation' in athletics." *A.B.*, 30 F.4th at 832-33 (first quoting *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 851 (9th Cir. 2014); and then quoting 20 U.S.C. § 1681(a)). Relying on Section 1681(a)'s implementing regulations, the Ninth Circuit has held that "this obligation to provide equivalent participation opportunities requires consideration of 'whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes.'" *Id.* at 833 (quoting *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 964 (9th Cir. 2010)); *cf.* 34 C.F.R. § 106.41(c)(1).

Second, Plaintiffs allege that Defendants violated Section 1681(a) by failing to provide them (and other female student athletes) with "equal treatment, benefits, and opportunities

PAGE 17 – FINDINGS AND RECOMMENDATION

compared to male athletes[.]" (SAC ¶¶ 190-200.) A plaintiff may bring a claim under Title IX and its implementing regulations for "unequal treatment and benefits in athletic programs," i.e., "failing to provide female student athletes . . . with treatment and benefits that are comparable to the treatment and benefits provided to male student athletes." *A.B.*, 30 F.4th at 832 (simplified) (quoting *Ollier*, 768 F.3d at 851). The Ninth Circuit has held that Section 1681(a)'s "prohibition on discriminatory denial of educational benefits, as construed in the [DOE's] implementing regulation governing school athletic programs, 'require[s] equivalence in the availability, quality and kinds of . . . athletic benefits and opportunities provided [to] male and female athletes.'" *Id.* (first quoting *Mansourian*, 602 F.3d at 964; and then citing 20 U.S.C. § 1682); *cf.* 34 C.F.R. § 106.41(c)(2)-(10).

Third and finally, Plaintiffs allege that Defendants violated Section 1681(a) by subjecting them to a hostile environment because of sex that was so severe and pervasive that it deprived them of "equal access to the educational benefits of athletic competition." (SAC ¶¶ 201-11); s*ee generally Parents for Priv. v. Barr*, 949 F.3d 1210, 1226 (9th Cir. 2020) (noting that a Title IX hostile environment claim's requirements include "deliberate[] indifferen[ce]" to "harassment because of sex," which is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the schools" (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999))).

Instead of answering Plaintiffs' complaint, Defendants moved under Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted.[9] (ECF Nos. 40-41, 45.)

---

[9] After Defendants filed their motions to dismiss and before Plaintiffs responded, Defendants consented to Plaintiffs' filing of their second amended complaint and the parties agreed that Defendants did not need to refile their motions because they applied equally to the

PAGE 18 – FINDINGS AND RECOMMENDATION

After the parties completed the briefing, the Court heard oral argument on Defendants' motions to dismiss and took the motions under advisement that same day. (ECF No. 68.)

## LEGAL STANDARDS[10]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Thus, "where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## DISCUSSION

Defendants move to dismiss Plaintiffs' complaint pursuant to Rules 12(b)(1) and 12(b)(6). (State Defs.' Mot. Dismiss Pls.' Compl. ("State Defs.' Mot.") at 1, 23; ECF No. 40; Dist. Defs.' Mot. at 2, 8; Def. OSAA's Mot. Dismiss ("OSAA's Mot.") at 2, 8, ECF No. 45.) Together, Defendants identify four grounds on which the Court should dismiss Plaintiffs' Title IX claims.

---

second amended complaint. (Pls.' Unopposed Mot. Leave File Second Am. Compl. at 2, ECF No. 48.)

[10] The Court discusses the standard that applies to the District Defendants' standing motion in Parts II.A.-B below.

PAGE 19 – FINDINGS AND RECOMMENDATION

First, the District Defendants argue that Plaintiffs fail to allege facts sufficient to establish standing under Article III of the Constitution. (Dist. Defs.' Mot. at 4; Sch. Dist. Defs.' Reply Supp. Mot. Dismiss ("Dist. Defs.' Reply") at 2, ECF No. 63.) Second, Defendants argue that Plaintiffs cannot satisfy the *Pennhurst* "clear notice rule," which derives its name and framework from the Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981).[11] *See Roe*, 137 F.4th at 928-31 & n.12 (applying *Pennhurst*'s "clear notice rule"); *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 373 (2025) (detailing *Pennhurst*'s clear notice standard); *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 42, 51-55 (2d Cir. 2023) (en banc) (referencing the "framework originating from the Supreme Court's decision in *Pennhurst*").

Third, Defendants argue that even if *Pennhurst*'s clear notice rule is satisfied, Plaintiffs fail to allege facts sufficient to state plausible claims for relief under Title IX. (State Defs.' Mot. at 1-2, 11-20; Dist. Defs.' Mot. at 5-6; OSAA's Mot. at 2; Dist. Defs.' Reply at 3-4; OSAA's Reply at 2.) Fourth and finally, the State Defendants argue that both Title IX and Oregon's antidiscrimination laws bar the relief that Plaintiffs seek in this proceeding because granting such relief would constitute discrimination against "student athletes on the basis of gender identity." (State Defs.' Mot. at 22; State Defs.' Reply Supp. Mot. Dismiss ("State Defs.' Reply") at 17-18, ECF No. 62.)

///

///

---

[11] With respect to *Pennhurst*'s clear notice rule and the *Twombly/Iqbal* standard, the District Defendants and OSAA join and adopt by reference the arguments that the State Defendants advance in their motion and reply. (*See* Dist. Defs.' Mot. at 5-6, citing State Defs.' Mot. at 7-20; OSAA's Mot. at 2; Dist. Defs.' Reply at 2-4; Def. OSAA's Reply Supp. Mot. Dismiss ("OSAA's Reply") at 2, ECF No. 61.)

## I.    SEQUENCING

The Court begins by addressing the sequence in which it resolves Defendants' pending motions. The Supreme Court's "decisions make clear that 'standing is not dispensed in gross.'"[12] *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (holding that the lower court "erred by treating the defendants, plaintiffs, and platforms each as a unified whole" (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021))). As a result, Plaintiffs "'must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'"[13] *Id.* (quoting *TransUnion LLC*, 594 U.S. at 431); *cf. Soule*, 90 F.4th at 45-47 (noting that "standing is not dispensed in gross" and the Title IX plaintiffs, a group of cisgender students who competed in girls' high school track, "must separately establish standing for each form of relief sought") (simplified).

///

---

[12] "[T]he Supreme Court has long recognized that in cases seeking injunctive or declaratory relief, only one plaintiff need demonstrate standing to satisfy Article III." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022) (en banc) (first citing *Baggett v. Bullitt*, 377 U.S. 360, 366 n.5 (1964); then citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006); and then citing *Horne v. Flores*, 557 U.S. 433, 446-47 (2009)); *cf. Rumsfeld*, 547 U.S. at 52 n.2 (declining to reach the standing of "numerous other plaintiffs" because the organizational plaintiff had standing to seek a preliminary injunction and limiting the discussion to that plaintiff). The Supreme Court, however, has also "held that each plaintiff must demonstrate Article III standing in order to seek additional money damages[.]" *Olean*, 31 F.4th at 682 n.32 (citing *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439-42 (2017)); *cf. Town of Chester*, 581 U.S. at 439-42 (explaining that because "there must be a litigant with standing" for "all relief sought," a litigant "must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff [with standing] requests," such as a "money judgment of [the litigant's] own running directly against the [defendant]").

[13] As discussed, Plaintiffs bring effective accommodation, equal treatment, and hostile environment claims against each defendant. (SAC ¶¶ 172-211.) Plaintiffs also seek nominal damages and "other monetary," declaratory, and injunctive relief, as well as attorney's fees and costs under Section 1988. (*See id.* at 52-54, prayer for relief; *id.* ¶¶ 163-71, seeking injunctive relief).

PAGE 21 – FINDINGS AND RECOMMENDATION

The Ninth Circuit applied these standing principles in *Martinez v. Newsom*, 46 F.4th 965, 968-70 (9th Cir. 2022). The *Martinez* plaintiffs were a group of students and their parents who sued "hundreds of defendants" under the Individuals with Disabilities in Education Act ("IDEA") and Fourteenth Amendment, seeking declaratory and injunctive relief and "'compensatory education' from the school districts," as well as attorney's fees and costs. *Id.* The plaintiffs' claims concerned state-issued guidance that "encouraged" but "did not require the [state's] school districts to . . . take certain measures" during the COVID-19 pandemic to "accommodate special needs students" who were "receiving remote instruction." *Id.* at 968-71. The named defendants included, but were not limited to, the governor, state officials and departments, the school districts in which the students were enrolled, "hundreds of school districts in which [the students were] not enrolled," and schools that students did not attend. *Id.* at 968-70, 973.

On appeal, the Ninth Circuit reviewed the district court's decision to dismiss the plaintiffs' claims against "all" defendants without leave to amend for failure to exhaust administrative remedies under the IDEA. *Id.* at 970, 973-74. Before analyzing the issue of exhaustion, however, the Ninth Circuit "first address[ed] two jurisdictional issues: (1) whether the plaintiffs had standing to sue schools that they did not attend and school districts in which they were not enrolled, and (2) whether any of the plaintiffs' claims were moot. *Id.* at 970-72 & n.3 (citing *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)); *see also Henderson*, 562 U.S. at 434 (explaining that "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press") (citation omitted).

PAGE 22 – FINDINGS AND RECOMMENDATION

The Ninth Circuit explained that "[t]o have standing to sue a particular defendant, a plaintiff must have experienced an injury in fact that is fairly traceable to the challenged action of that defendant." *Id.* at 970 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The Ninth Circuit emphasized that contrary to these requirements, the plaintiffs did "not allege that the [school] districts in which they [were] not enrolled or the state special[ty] schools, which they do not attend, ha[d] injured them personally." *Id.* (caps omitted). The Ninth Circuit also rejected the plaintiffs' argument that "an exception to the[] ordinary rules of standing" applied because the state-issued guidance "did not set forth a 'common rule' [that] every district was required to follow" and instead "offered suggestions about how to accommodate special needs students during remote instruction." *Id.* at 970-72. For these reasons, the Ninth Circuit held that the plaintiffs "lack[ed] standing to pursue their claims against these defendants in federal court." *Id.* at 972.

Relatedly, the Ninth Circuit explained that "[i]n the district court, the parties appeared to assume that exhaustion [under the IDEA was] a jurisdictional issue, but it is not." *Id.* at 970 n.3 (citations omitted). Given that the "district court lacked jurisdiction to resolve [the p]laintiffs' claims against the school districts in which they [were] not enrolled and the state special schools, which they do not attend," the Ninth Circuit "vacate[d] the district court's judgment dismissing those claims on the merits and remand[ed] with instructions to dismiss them for lack of subject-matter jurisdiction." *Id.* at 976. With respect to the plaintiffs' remaining, non-moot "claims against the school districts in which they [were] enrolled seeking compensatory education, a declaratory judgment, and attorneys' fees and costs," the Ninth Circuit affirmed the district court's dismissal of these claims for failure to exhaust administrative remedies under the IDEA. *Id.* at 973-76.

PAGE 23 – FINDINGS AND RECOMMENDATION

Like *Martinez*, this Court addresses the jurisdictional issue of standing before reaching Defendants' invocation of *Pennhurst*'s clear notice rule. *See id.* at 976 (vacating a judgment to the extent that the district court exceeded the scope of its jurisdiction by reaching the merits); *Soule*, 90 F.4th at 41, 44-51 (analyzing the "jurisdictional" issue of standing at the pleading stage before *Pennhurst*'s clear notice rule and stating that "Supreme Court cases applying *Pennhurst* to Title IX either begin with a merits analysis of whether the challenged conduct was prohibited or weave that analysis into considerations of notice") (simplified); *see also Kumar v. Koester*, 131 F.4th 746, 753-54 (9th Cir. 2025) (holding that the district court erred because it "dismissed a claim at the pleading stage for failing to state a claim" and "[w]ithout deciding standing" and noting that the district "court should not have bypassed standing to decide a non-jurisdictional issue").

## II.     STANDING

### A.     Applicable Law

The Supreme Court's "cases have established that the 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560). Specifically, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (first citing *Lujan*, 504 U.S. at 560-61; and then citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). Courts refer to these elements as the "injury in fact," "traceability" (also known as "causation"), and "redressability" requirements. *See Mecinas v. Hobbs*, 30 F.4th 890, 897-99 (9th Cir. 2022) (using these terms and discussing "standing's injury-in-fact requirement" and "causation/traceability and redressability requirements" (quoting *Townley v. Miller*, 722 F.3d 1128, 1135-36 (9th Cir. 2013))).

PAGE 24 – FINDINGS AND RECOMMENDATION

"As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *TransUnion LLC*, 594 U.S. at 430-31 (citing *Lujan*, 504 U.S. at 561). "When 'deciding standing at the pleading stage, and for purposes of ruling on a motion to dismiss for want of standing, . . . courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Mecinas*, 30 F.4th at 896 (quoting *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000)). To survive such a motion, "the plaintiff must 'clearly . . . allege facts demonstrating' each element [of standing]." *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

In evaluating whether plaintiffs have done so, courts must keep in mind that "standing is distinct from the merits of a claim." *Am. Encore v. Fontes*, 152 F.4th 1097, 1110 (9th Cir. 2025) (simplified) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011)). In fact, "[t]he Supreme Court has long instructed that 'standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.'" *Id.* (quoting *Warth*, 422 U.S. at 500). Accordingly, "[f]or standing purposes, [courts] accept as valid the merits of [a plaintiff's] legal claims." *Id.* (quoting *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 298 (2022)); *see also Wrath*, 422 U.S. at 500 (stating that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"); *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022) ("Viewing the [Spending Clause legislation's p]rovision through [the plaintiff's] eyes, we must accept—for standing purposes—its allegations that the condition is unconstitutionally ambiguous and coercive.").

### B.    Analysis

The District Defendants move to dismiss Plaintiffs' Title IX claims on the ground that they fail clearly to allege facts demonstrating that they satisfy standing's second (traceability)

PAGE 25 – FINDINGS AND RECOMMENDATION

and third (redressability) requirements. (Dist. Defs.' Mot. at 4; Dist. Defs.' Reply at 2.) The Court disagrees.

### 1.    Injury in Fact

Although the District Defendants do not dispute that Plaintiffs satisfy standing's injury in fact requirement (*see* Dist. Defs.' Mot. at 4; Dist. Defs.' Reply at 2), federal courts have an "independent obligation to ensure that they do not exceed the scope of their jurisdiction." *Henderson*, 562 U.S. at 434. The Court therefore considers whether Plaintiffs met their burden of demonstrating that they satisfy the first element. The Court concludes that Plaintiffs have done so at this stage.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). Both tangible and intangible harms may be "concrete" and sufficient to "constitute[] injury in fact." *Id.* at 340. The Supreme Court has explained that "traditional tangible harms, such as physical harms and monetary harms," are the "most obvious" harms that "readily qualify as concrete injuries under Article III." *TransUnion LLC*, 594 U.S. at 425. Thus, "[i]f a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id.*

"For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 340 (quoting *Lujan*, 504 U.S. at 560 & n.1). By comparison, a "generalized grievance" fails to amount to a "particularized" injury. *Mecinas*, 30 F.4th at 897 (quoting *Lujan*, 504 U.S. at 560 & n.1). Harms that are "too generalized for standing purposes [are] . . . characterized by [their] abstract and indefinite nature—for example, harm to the common concern for obedience to law." *Id.* (quoting *Sisley v. DEA*, 11 F.4th 1029, 1034 (9th

PAGE 26 – FINDINGS AND RECOMMENDATION

Cir. 2021)). Finally, to be "actual or imminent," a plaintiff's injury cannot be "speculative[,]" meaning that the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420-22 (2013)).

In this case, Plaintiffs clearly allege facts demonstrating that they suffered an injury in fact. *See Spokeo*, 578 U.S. at 338 ("Where, as here, a case is at the pleading stage, the plaintiff must 'clearly allege facts demonstrating' each element." (simplified) (quoting *Warth*, 422 U.S. at 518)). For example, Plaintiffs allege that (1) they represented the District Defendants' high schools' girls' varsity track and field teams at "federally funded" and OSAA-controlled athletic events, (2) there was at least one instance in which they each competed against and finished behind a transgender female athlete, (3) ODE and OSAA's policies impacted their rankings and event placements, including on state championship podiums, resulted in them being subject to differing rules and treatment and "unequal, distressing environments," and deprived them of opportunities to compete in fair and "equally satisfying and meaningful . . . athletic activities," and (4) OSAA's Executive Board, which is composed of representatives from its dues-paying members like the District Defendants, controls OSAA's policies and regulatory activities. (*See* SAC ¶¶ 16, 97-115, Castaneda's experience competing in the 200- and 400-meter races in 2024; *id.* ¶¶ 17-18, 116-45, Carpenter and Eischen's experience competing in the high jump in 2025; *see also id.* ¶¶ 4, 16-31, 45-60, setting forth allegations regarding ODE and OSAA's policies, federal funding, and the District Defendnats); OSAA HANDBOOK, *supra* note 1, at 1-3, 5-8, 19, 49, 70-71.

///

///

PAGE 27 – FINDINGS AND RECOMMENDATION

Plaintiffs' allegations are very similar to the ones that the Second Circuit described in *Soule* and deemed sufficient at the pleading stage to establish that the plaintiffs suffered an injury in fact:

> In this case, [the p]laintiffs allege that the [Connecticut Interscholastic Athletic Conference ("CIAC")] Policy deprived them of an opportunity to compete in fair and non-discriminatory high school track races, in violation of Title IX. Moreover, the complaint alleges that [the p]laintiffs' results in those races were specifically impacted by the CIAC Policy: "[E]ach [p]laintiff has identified at least one specific instance in which she allegedly raced against—and finished behind—a girl who is transgender." . . . The complaint further alleges that three of the [p]laintiffs have additionally identified races in which they would have qualified to advance to the next level of competition if [the transgender female competitors] had not participated. . . . [The i]ntervenors, [i.e.,] the transgender [female] athletes who would be impacted by an adverse ruling, agree with [the p]laintiffs that this suffices to establish injury in fact. So do we.
>
> First, [the p]laintiffs allege a concrete injury: the denial of "equal athletic opportunities" and loss of publicly recognized titles and placements in track and field competitions, in violation of Title IX. . . . The Supreme Court has identified "discriminatory treatment" as an example of a "concrete, *de facto*, injur[y]." [*TransUnion LLC*, 594 U.S. at 425] (quotation marks omitted). In cases involving claims of discriminatory treatment, the alleged harm is frequently twofold: plaintiffs are discriminated against and that discriminatory treatment results in the denial of certain benefits that they would otherwise have enjoyed. Here, [the p]laintiffs allege that they were denied equal opportunities in track and field competitions and, as a result, they were also denied the publicly recognized titles and placements that would have flowed from those opportunities. And crucially for [the p]laintiffs' request for an injunction to alter the records, the alleged impact of the CIAC Policy on [the p]laintiffs is measurable, not abstract or speculative. [The p]laintiffs' claim is not that they *might* have won placements and titles if [the transgender female athletes] had not competed, but rather that they certainly would have. *See Spokeo*, 578 U.S. at 340 ("A 'concrete' injury must be '*de facto*'; that is, it must actually exist." (quoting BLACK'S LAW DICTIONARY 479 (9th ed. 2009))); *see also Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1017-19 (9th Cir. 2002) (finding standing for injunctive relief because plaintiff alleged "a *plausible* causal connection between her academic performance . . . and the alleged discrimination" (emphasis added)). Though a court considering [the p]laintiffs' claims on the merits might ultimately conclude that competing under the CIAC Policy did not deprive them of equal athletic opportunity and amount to discriminatory treatment under Title IX, standing "in no way depends on the merits of the claim." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (quotation marks omitted).

PAGE 28 – FINDINGS AND RECOMMENDATION

Second, the alleged injury is particularized because [the p]laintiffs are athletes who personally competed in CIAC-sponsored events, rather than, for instance, bystanders who simply wish to challenge the CIAC Policy because they disagree with it on principle. *See, e.g.*, *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (holding that an alleged injury related to the scheduling of girls' soccer was "particularized" because plaintiffs were "soccer players who the parties have stipulated would play soccer for their high schools" if the challenged schedule changed). Finally, the injury is actual because it is alleged to have already occurred.

90 F.4th at 46-47 (simplified).

Consistent with *Soule*, the Court finds that Plaintiffs clearly allege facts demonstrating an injury in fact.

### 2.    Traceability and Redressability

The District Defendants argue that Plaintiffs fail to plead facts sufficient to satisfy standing's traceability and redressability requirements. (Dist. Defs.' Mot. at 4; Dist. Defs.' Reply at 2.) The Court concludes otherwise and thus recommends that the district judge deny the District Defendants' motion to dismiss to the extent they argue that Plaintiffs lack Article III standing.

Standing's traceability and redressability requirements "overlap and are two facets of a single causation requirement." *Mecinas*, 30 F.4th at 899 (quoting *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013)). In other words, traceability and redressability are "often 'flip sides of the same coin[,' because i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 381 (adding that the "two key questions in most standing disputes are injury in fact and causation" (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008))). What makes these requirements "distinct [is] that traceability 'examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection

between the alleged injury and requested relief.'" *Mecinas*, 30 F.4th at 899 (quoting *Bellon*, 732 F.3d at 1146).

Establishing traceability therefore requires a plaintiff to demonstrate "a causal connection between [its] injury and the conduct complained of." *Matsumoto v. Labrador*, 122 F.4th 787, 799 (9th Cir. 2024) (quoting *Lujan*, 504 U.S. at 560). A plaintiff's "injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation are not hypothetical or tenuous and remain plausible." *Id.* (quoting *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021)); *see also Mecinas*, 30 F.4th at 899 (noting that traceable injuries are not the "result of the independent action of some third party not before the court" (quoting *Lujan*, 504 U.S. at 560)).

Redressability, by comparison, is "satisfied so long as the requested remedy 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Mecinas*, 30 F.4th at 900 (quoting *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012)); *Matsumoto*, 122 F.4th at 801 (same). Establishing redressability does not mean that "there is a 'guarantee' that [a plaintiff's] injuries will be redressed by a favorable decision." *Mecinas*, 30 F.4th at 900 (quoting *Renee*, 686 F.3d at 1013). In fact, "[p]artial amelioration of a harm . . . suffices for redressability." *Matsumoto*, 122 F.4th at 801 (noting that "[i]n discussing injury, the Supreme Court highlighted that a plaintiff need only show redress of 'an injury,' not 'every injury'" (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982))).

The District Defendants argue that Plaintiffs fail adequately to allege traceability and redressability, noting that they "did not create," nor would a court order against them change OSAA and ODE's gender identity participation policies or "retroactively [alter] state records."

PAGE 30 – FINDINGS AND RECOMMENDATION

(Dist. Defs.' Mot. at 4.) The District Defendants also argue that they "did not and could not cause" Plaintiffs to compete against transgender female athletes and a court order against them would not "prevent other member schools from deeming transgender athletes eligible to compete" because OSAA's policies provide that its member schools are responsible for making their own eligibility determinations and "OSAA and ultimately the other member schools made . . . [such] determinations." (*Id.*; *see also* Dist. Defs.' Reply at 2, concluding by noting that "[w]hat [P]laintiffs clearly want" is something that the District Defendants cannot provide, i.e., "ODE and OSAA to affirmatively prohibit transgender female athletes from competing against them").

The District Defendants fail to address many material allegations in Plaintiffs' complaint. That is significant because "for purposes of ruling on a motion to dismiss for want of standing, . . . courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Mecinas*, 30 F.4th at 896 (quoting *Desert Citizens*, 231 F.3d at 1178). When accepted and so construed, Plaintiffs' allegations reveal that there is a "causal connection" between their injuries and the District Defendants' complained-of conduct. *See Matsumoto*, 122 F.4th at 799 (quoting *Lujan*, 504 U.S. at 560).

Plaintiffs incorporate OSAA's handbook into their complaint by reference and allege facts suggesting that OSAA's Executive Board is composed of administrators from its member schools and districts like the District Defendants and that OSAA's members fund and possess the ability to control OSAA, which they formed for purposes of organizing, developing, directing, and regulating interscholastic activities, formulating and making related policies, and "foster[ing] uniform[] . . . standards in interscholastic activity competition[.]" (SAC ¶¶ 20-31, 45-60); OSAA HANDBOOK, *supra* note 1, at 1-3, 5-8, 19, 49, 70-71 (noting that OSAA developed its gender

PAGE 31 – FINDINGS AND RECOMMENDATION

identity participation and eligibility policies in "consultation with" ODE). These facts suggest that there is a plausible, not "hypothetical or tenuous," link between Plaintiffs' alleged injuries and the District Defendants' complained-of conduct. *See Matsumoto*, 122 F.4th at 799 (simplified).

It is also "likely" that Plaintiffs' alleged injuries are "redressable both by monetary damages and by the specific injunctive relief sought in the complaint." *Soule*, 90 F.4th at 47 (observing that a plaintiff "must separately establish standing for each form of relief sought" (citing *TransUnion LLC*, 594 U.S. at 431)). The Second Circuit's decision in *Soule* supports this conclusion.

Similar to the situation before this Court, the plaintiffs in *Soule* sued the CIAC and "its member school districts," identified high school track events at which they each competed against and finished behind a transgender female athlete, and challenged a CIAC policy "direct[ing] member school districts to determine students' eligibility to participate on teams 'based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season.'" *Id.* at 40-42. In the course of addressing standing's redressability requirement, the Second Circuit noted that the plaintiffs sought "nominal and compensatory damages and other monetary relief as permitted by law" and recognized that a court's redressability analysis is distinct from and precedes a court's evaluation of *Pennhurst*'s clear notice rule.[14] *See id.* at 47, 51 ("[O]ur jurisdictional injury ends with standing[.]"). The Second

---

[14] In *Uzuegbunam v. Preczewski*, 592 U.S. 279, 283-84 (2021), the Supreme Court held that a "plaintiff who sues over a completed injury and establishes the first two elements of standing (injury and traceability) can establish the third [(redressability)] by requesting only nominal damages." *Id.* at 283-84, 292 (noting as much and that "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed

PAGE 32 – FINDINGS AND RECOMMENDATION

Circuit ultimately held that "'nominal damages provide[d]' at least some 'necessary redress'" to the plaintiffs because their claim was "'based on a completed violation of a legal right'—their Title IX right to equal athletic opportunity and related loss of publicly recognized titles and placements[.]" *Id.* at 47 (quoting *Uzuegbunam*, 592 U.S. at 293). The Second Circuit added that "[s]o too would compensatory damages, if available, which are definitionally 'intended to redress the concrete loss that [a] plaintiff has suffered by reason of the defendant's wrongful conduct.'" *Id.* at 47 (quoting *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 434 (2001)).

Plaintiffs similarly "request that the Court enter judgment against Defendants and grant Plaintiffs . . . [a]n award of nominal damages and other monetary relief as permitted by law[.]" (SAC at 52.) Plaintiffs also base their request on the same "completed violation of a legal right" that the Second Circuit identified in *Soule*: Plaintiffs' "Title IX right to equal athletic opportunity and related loss of publicly recognized titles and placements." 90 F.4th at 47 (quoting *Uzuegbunam*, 592 U.S. at 293); (*cf.* SAC ¶¶ 16-18, 92, 97-145, detailing Plaintiffs' experiences competing). At a minimum, then, Plaintiffs' request for an award of "'nominal damages [would]

violation of a legal right"). In doing so, the Supreme Court rejected the "argument that a claim for compensatory damages is a prerequisite for an award of nominal damages" because it "rest[ed] on the flawed premise that nominal damages are purely symbolic, a mere judicial token that provides no actual benefit to the plaintiff." *Id.* at 290 (simplified). Recognizing that it had previously "held that a person who is awarded nominal damages receives 'relief on the merits of his claim' and 'may demand payment for nominal damages no less than he may demand payment for millions of dollars in compensatory damages,'" the Supreme Court explained that "[b]ecause nominal damages are in fact damages paid to the plaintiff, they 'affec[t] the behavior of the defendant towards the plaintiff' and thus independently provide redress." *Id.* at 291 (citations omitted). The Supreme Court added that unlike a request for attorney's fees or costs, nominal damages are a "form of redressability," not "merely a 'byproduct' of a suit that already succeeded[.]" *Id.* at 292 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).

PAGE 33 – FINDINGS AND RECOMMENDATION

provide' at least some 'necessary redress.'" *Soule,* 90 F.4th at 47 (quoting *Uzuegbunam,* 592 U.S. at 293).

With respect to "other monetary relief," Plaintiffs appear to bring an "equitable action for specific relief" (i.e., an action to "enforce a statutory mandate, which could also happen to be one for the payment of money"), as opposed to an "action at law for damages" (i.e., "an action for 'money damages,'" which is "one 'intended to provide a victim with monetary compensation for an injury to his person, property, or reputation'"). *See Pacito v. Trump,* 169 F.4th 895, 928-29 (9th Cir. 2026) (simplified) (quoting *Bowen v. Massachusetts,* 487 U.S. 879, 893, 900 (1988)); *Sisseton-Wahpeton Sioux Tribe v. United States ,* 895 F.2d 588, 596 & n.7 (9th Cir. 1990) (quoting *Bowen* and referencing its "full discussion on the difference between money damages and other monetary relief") (citation omitted); *see also Franklin v. Gwinnett Cnty. Pub. Schs.,* 503 U.S. 60, 75 (1992) (reflecting that in a Title IX case, the Supreme Court discussed its "traditional approach to deciding what remedies are available for violation of a federal right" and how "a court should determine the adequacy of a remedy in law before resorting to equitable relief"); (*cf.* SAC ¶ 167, alleging that there is "no adequate remedy at law" for certain injuries). Either form of relief, "if available," *Soule,* 90 F.4th at 47, and "permitted by law" (SAC at 52), redresses a concrete loss and completed violation of a legal right. In short, the Court finds that nominal damages and other monetary relief would redress Plaintiffs' alleged injuries.

The Court reaches the same conclusion with respect to injunctive relief. The Court finds that "an injunction could plausibly redress the injury that allegedly resulted from Plaintiffs' loss of publicly recognized titles [or rankings] and placements in specific races at which they

PAGE 34 – FINDINGS AND RECOMMENDATION

competed against and finished behind" transgender female athletes.[15] *Soule*, 90 F.4th at 48.

Significantly, such a loss is "itself an existing and *ongoing* effect of [the] alleged injury."[16] *Id.*

(emphasis added). Although "no court has the ability to rewind time" and a Title IX plaintiff

"cannot rerun different races or compete in championships long past," Plaintiffs are not required

to demonstrate that a "favorable decision will relieve [their] *every* injury." *Id.* (quoting *Larson,*

456 U.S. at 243 n.15). Rather, "Article III only requires that some form of altering the records

'would at least partially redress' the alleged injury." *Id.* (quoting *Meese v. Keene*, 481 U.S. 465,

476 (1987)); *see also Mecinas*, 30 F.4th at 900 (noting that redressability does not require "a

---

[15] Although Plaintiffs' requests are similar to the ones that *Soule* addressed, it appears that Plaintiffs may have attempted to account for *Soule*'s standing holding's "key limitations." *See* 90 F.4th at 47-48, 50 (finding that the plaintiffs lacked standing to seek alteration of private, as opposed to public, "athletic records" or seek updates or changes to records unrelated to their "own athletic achievement," i.e., records related to athletes against whom they never competed or were not parties); (*cf.* SAC at 44-45, 52-54, using direct or indirect qualifiers related to participation, receiving credit, rights, and alleged injuries). For present purposes, the Court assumes that Plaintiffs did as much and seek only relief consistent with *Soule*. The Court also "express[es] no view as to whether the requested relief would be fair or appropriate, even assuming the success of Plaintiffs' claims on the merits." 90 F.4th at 51. Further, at this stage and absent any argument or analysis to the contrary, the Court finds that Castaneda and Carpenter's requests related to future events at which Defendants may enforce or rely on their policies are not moot because they continue to compete in track and field events. *Cf. id.* at 47 n.3 (declining to address the plaintiffs' request prohibiting enforcement "going forward" because it was undisputed that the claim was "now moot" because they had all graduated and were no longer subject to the policy) (simplified).

[16] The "existing and ongoing effect" of this injury is relevant because unlike Castaneda and Carpenter, both of whom are currently competing in track and field, Eischen graduated before Plaintiffs filed this lawsuit on July 7, 2025. (*See* Compl. ¶¶ 16-18, 156, 158-59, 162; SAC ¶¶ 16-18, 163, 165-66, 169); *cf. Soule*, 90 F.4th at 47 n.3 (noting that the plaintiffs were no longer subject to the policy because they had all graduated) (simplified); *Mansourian*, 602 F.3d at 962-63 (stating that the proposed plaintiffs were previously enrolled but had graduated and absent any "current students" "seeking the specific injunctive relief," the request was "moot and so beyond [the Ninth Circuit's] jurisdiction") (simplified); *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007) ("Generally, once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy, and his case is therefore moot." (citing *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (en banc))).

PAGE 35 – FINDINGS AND RECOMMENDATION

'guarantee' that [a plaintiff's] injuries will be redressed by a favorable decision" (quoting *Renee,* 686 F.3d at 1013)); *Matsumoto*, 122 F.4th at 801 (stating that "[p]artial amelioration of a harm also suffices for redressability" and in "discussing injury," the Supreme Court has noted that "a plaintiff need only show redress of 'an injury,' not 'every injury'" (quoting *Larson*, 456 U.S. at 243 n.15)).

### 3.    Conclusion

In summary, the Court finds that Plaintiffs "'clearly . . . allege facts demonstrating' each element [of standing]." *Spokeo*, 578 U.S. at 338 (quoting *Warth*, 422 U.S. at 518). The Court therefore recommends that the district judge deny the District Defendants' motion to dismiss on this ground.

## III.    STATE DEFENDANTS' MOTION

Having resolved the jurisdictional issue of standing, the Court turns to the State Defendants' primary argument under *Pennhurst*, which the District Defendants and OSAA join and adopt by reference. (State Defs.' Mot. at 1, 6-11; State Defs.' Reply at 1-6; Dist. Defs.' Mot. at 5-6; OSAA's Mot. at 2; Dist. Defs.' Reply at 2; OSAA's Reply at 2.) The State Defendants argue that neither Title IX, its implementing regulations, nor Title IX jurisprudence provide federal funding recipients with clear and unambiguous notice that Title IX prohibits policies permitting transgender students' participation in high school athletics corresponding to their consistently asserted gender identity. (State Defs.' Mot. at 7-11; State Defs.' Reply at 1-6.) The Court agrees.

### A.    Applicable Law

### 1.    Spending Clause

As the Supreme Court recently explained, "[t]he Constitution has no 'Spending Clause,' strictly speaking." *Medina*, 606 U.S. at 370. Instead, the Supreme Court "usually trace[s]"

PAGE 36 – FINDINGS AND RECOMMENDATION

Congress's Spending Clause power to Article I, Section Eight, Clause One of the Constitution, "which gives Congress the 'Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States.'" *Id.* (quoting U.S. CONST., art. I, § 8, cl. 1); *see also Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 177 & n.5 (2023) (identifying the same recognized source of Congress's "spending power").

"Unlike other enumerated powers, this provision does not expressly endow Congress with the power to regulate conduct[, n]or does it include 'the power to issue direct orders to the governments of the States.'"[17] *Medina*, 606 U.S. at 370 (quoting *Murphy v. NCAA*, 584 U.S 453, 471 (2018)). Thus, while Congress has "broad power under the Spending Clause . . . to set the terms on which it disburses federal funds," *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022), Congress's spending legislation is merely attempting to "encourage a State to regulate in a particular way" and "tak[e] certain actions that Congress could not require [the State] to take." *Nat'l Fed. of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 576 (2012) (citations omitted).

Given this dynamic, the Supreme Court has "repeatedly characterized Spending Clause legislation as 'much in the nature of a contract.'" *Id.* at 576-77 (simplified) (quoting *Barnes v. Gorman*, 536 U.S. 181, 185-86 (2002)); *see also Medina*, 606 U.S. at 371-73 (describing past use of "contract and treaty analogies"); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 323 (2015) ("Spending Clause legislation . . . offers the States a bargain[.]"). Whereas "ordinary legislation . . . 'imposes congressional policy' on regulated parties 'involuntarily,' Spending

---

[17] By way of comparison, the Commerce Clause "vests Congress with the power to regulate conduct" like "commerce between the States." *Medina*, 606 U.S. at 369-70 (citing U.S. CONST., art. I, § 8, cl. 3); *see also* U.S. CONST., art. I, § 8, cl. 3 (stating that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes").

PAGE 37 – FINDINGS AND RECOMMENDATION

Clause legislation operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Cummings*, 596 U.S. at 219 (quoting *Pennhurst*, 451 U.S. at 16-17).

"For that reason, the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Id.* (quoting *Barnes*, 536 U.S. at 186); *NFIB*, 567 U.S. at 577 (noting the same limitation (citing *Pennhurst*, 451 U.S. at 17)). "Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB*, 567 U.S. at 577.

"Recipients cannot 'knowingly accept' the deal with the Federal Government unless they 'would clearly understand the obligations' that would come along with doing so.'" *Cummings*, 596 U.S. at 219 (simplified) (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). The Supreme Court "therefore construe[s] the reach of Spending Clause conditions with an eye toward 'ensuring that the receiving entity of federal funds had notice that it will be liable.'" *Id.* (simplified) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998)). "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so [clearly and] unambiguously."[18] *Id.* (quoting *Pennhurst*, 451 U.S. at 17).

///

---

[18] The Supreme Court and lower courts often refer to this as "*Pennhurst*'s 'clear notice' requirement." *Arlington*, 548 U.S. at 304-05 (Ginsburg, J., concurring in part and judgment); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246 (2009); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181-84 (2005); *Davis*, 526 U.S. at 641, 650; *see also Hall v. Millersville Univ.*, 22 F.4th 397, 404 (3d Cir. 2022); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 921 (7th Cir. 2012).

### 2.    Title IX

Congress has enacted four Spending Clause statutes "prohibiting recipients of federal financial assistance from discriminating based on certain protected grounds." *Cummings*, 596 U.S. at 217-18 (quoting *Pennhurst*, 451 U.S. at 17). One of these statutes is Title IX. *See id.* at 218; *cf. Roe*, 137 F.4th at 928 ("Title IX funding is distributed to the states pursuant to the Spending Clause of the Constitution." (first citing U.S. CONST. art. I, § 8, cl. 1; and then citing *Davis*, 526 U.S. at 640)).

Title IX's "only express enforcement mechanism . . . is an administrative procedure resulting in the withdrawal of federal funding from institutions that are not in compliance." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (citing 20 U.S.C. § 1682). "Although Title IX contains no express language creating a private cause of action, the Supreme Court has long held that the statute is enforceable through a judicially recognized implied private right of action." *A.B.*, 30 F.4th at 831 (citing *Franklin*, 503 U.S. at 65); *Cummings*, 596 U.S. at 218 ("Congress later 'acknowledged this right in amendments' to [Titles VI and IX], leading us to conclude that it had 'ratified [our] holding' that 'private individuals may sue to enforce' both statutes." (first quoting *Barnes*, 536 U.S. at 185; and then quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001))).

#### a.    Scope of Liability

The Supreme Court has "defined the contours" of Title IX's implied private "right of action." *Jackson*, 544 U.S. at 173. The Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Id.* at 183.

The Supreme Court's decision in *Franklin* established that funding recipients can be held liable in private plaintiff damages actions under Title IX, but the recipient's "liability in *Franklin*

PAGE 39 – FINDINGS AND RECOMMENDATION

did not necessarily turn on principles of imputed liability or constructive notice, as there was evidence [that the recipient] knew about [clear misconduct] but took no action to stop it." *Gebser*, 524 U.S. at 281, 283 (citing *Franklin*, 503 U.S. at 63-64, 74-75). Thus, *Franklin* did not resolve or need or "purport to define" the "contours" of a recipient's liability in damages under Title IX and "made no effort . . . to delimit the circumstances in which a damages remedy should lie."[19] *Id.* at 281, 283-84. The Supreme Court "face[d] that issue squarely" in *Gebser*. *Id.* at 281.

*Gebser* defined the "contours" of a recipient's liability in damages under Title IX by evaluating competing theories: (1) a Fifth Circuit rule that "hing[ed] on actual knowledge by a [recipient] with authority to end" the conduct, (2) the plaintiffs' "expression of *respondeat superior* liability, *i.e.*, vicarious or imputed liability," and (3) the plaintiffs' alternative "theory of constructive notice, *i.e.*, where [the recipient] knew or should have known about [the conduct] but failed to uncover and eliminate it." *Id.* at 280-83 (simplified). Deciding the "scope" of a recipient's liability in damages under Title IX required *Gebser* to "reconcile" the "general rule

---

[19] In resolving generally whether Title IX's implied right of action "support[ed] a claim for monetary damages," *Franklin* merely rejected the recipient's argument that the Supreme Court's "normal presumption in favor of all appropriate remedies should not apply" in the Spending Clause context and regardless of whether an "alleged violation was unintentional" or "intentional." 503 U.S. at 63, 74 (simplified). *Franklin* stated that the "point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award," but such a "notice problem does not arise in a case [like that one], in which intentional discrimination is alleged." *Id.* at 75 (citing *Pennhurst*, 451 U.S. at 17, 28-29); *see also id.* at 63-64, 74-75 (noting that intentional discrimination meant "when a teacher sexually harasses and abuses a student" and recounting that before the plaintiff filed the lawsuit, "administrators" and DOE investigated the teacher's sexual harassment of female high school students and administrators "discouraged" the plaintiff, who alleged that the teacher subjected her to "coercive intercourse," from "pressing charges"); *Pennhurst*, 451 U.S. at 5, 17, 28-29 (describing the background and clear notice rule and holding that it was "not at all clear" that the recipient, which owned and operated the school and hospital, violated the statutes, and noting that because the statutes' "terms" referred only to "programs assisted," which "arguably" did not encompass a school and hospital that did "not receive federal funds," the recipient may not have owed any "obligation" to make assurances that the statutes required).

PAGE 40 – FINDINGS AND RECOMMENDATION

that all appropriate relief is available in an action brought to vindicate a federal right" with the "congressional purpose" underlying Title IX. *Id.* at 281, 284-85 (quoting *Franklin*, 503 U.S. at 68). Reconciliation was necessary to fashion a remedy in line with and avoid "frustrating" Title IX's structure and purposes and involved inferring how Congress would have resolved the issue because Congress "did not expressly create a private right of action" and thus the "statutory text [did] not shed light on [its] intent with respect to the scope of available remedies." *Id.* at 284-85 (simplified).

Applying this framework, *Gebser* rejected the plaintiffs' reliance on "principles of *respondeat superior* or constructive notice, i.e., without actual notice," because such principles were "at odds" with the "basic objective" and would "frustrate the purpose" of Title IX's "express means" of administrative enforcement, which is premised "upon notice to an 'appropriate person' and an opportunity to rectify any violation" and the "assumption[s]" that a funding recipient's official received "actual notice" of the "Title IX violation" and "refuse[d] to take action to bring the recipient into compliance." *Id.* at 280, 285-90 (quoting 20 U.S.C. § 1682). These "important clues" suggested that "Congress did not intend to allow recovery in damages where liability rests solely on principles of vicarious liability or constructive notice." *Id.* at 288. Finding that Title IX's "implied damages remedy should be fashioned along the same lines," *Gebser* held that a "damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* at 290. In other words, a recipient is not liable in damages

absent the "requisite actual notice and deliberate indifference."[20] *Id.* at 292-93 ("Until Congress speaks directly on the subject, . . . we will not hold a [funding recipient] liable in damages under Title IX for a [third party's] sexual harassment of a student absent actual notice and deliberate indifference.").

The following year, in *Davis*, the Supreme Court confronted the question of whether a Title IX "private damages action may lie against [a] school board in cases of student-on-student harassment." 526 U.S. at 633. The Supreme Court held that such a Title IX action "may [lie], but only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities[, and] . . . only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.*

Several years later, in *Jackson*, the Supreme Court considered whether the "private right of action implied by Title IX encompasses claims of retaliation" and held that "it does where the funding recipient retaliates against an individual because he has complained about sex discrimination." 544 U.S. at 171. Following the approach that it employed in past decisions like *Gebser* and *Davis*, the Supreme Court started with and "relied on the text of Title IX." *Id.* at 173. ("[S]ubject to a list of narrow exceptions not at issue here, [Title IX] broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'" (quoting 20 U.S.C. § 1681(a))). The Supreme Court first determined that the funding recipient engaged in "intentional" conduct, as the plaintiff proceeded on a retaliation theory and "[r]etaliation is, by

---

[20] "*Gebser* also noted that when 'a [recipient's] liability rests on [*Gebser*'s] actual notice principles, . . . the knowledge of the wrongdoer himself is not pertinent to the analysis.'" *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 126 (3d Cir. 2020) (quoting *Gebser*, 524 U.S. at 291).

PAGE 42 – FINDINGS AND RECOMMENDATION

definition, an intentional act." *Id.* at 173-74. Tracking Section 1681(a)'s terms, the Supreme Court turned to and found that "retaliation was a form of 'discrimination' because the complainant is being subjected to differential treatment" and that "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint[, i.e.,] an allegation of sex discrimination." *Id.* at 174 (simplified). Putting this together, the Supreme Court held that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.*

### b. Scope of Available Remedies

Given that Title IX's private right of action is "judicially implied," there is "no legislative expression of the scope of available remedies, including when it is appropriate to award monetary damages." *Gebser*, 524 U.S. at 284. The Supreme Court, however, has defined the contours of this implied right and addressed the relief available in such actions.[21]

Supreme Court precedent reflects that plaintiffs may seek "compensatory damages and injunctions" for "intentional violations of Title IX," because these are "forms of relief traditionally available in suits for breach of contract." *Barnes*, 536 U.S. at 187 (simplified) (citing *Franklin*, 503 U.S. at 76); *Fitzgerald*, 555 U.S. at 255 (observing that "injunctive relief and damages are available" under Title IX (citing *Franklin*, 503 U.S. at 76)); *Jackson*, 544 U.S. at 173 (stating that "monetary damages" are available for "intentional violations of Title IX"); *cf. Cummings*, 596 U.S. at 216, 220-21 (noting that spending legislation prohibiting discrimination

---

[21] The Supreme Court has "often stated" that the "question whether a litigant has a cause of action is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." *Franklin*, 503 U.S. at 65-66, 69 (quoting *Davis* v. *Passman*, 442 U.S. 228, 239 (1979)).

PAGE 43 – FINDINGS AND RECOMMENDATION

based on protected characteristics "may be enforced through implied rights of action" for "injunctive or monetary relief" and the Supreme Court has "identified two [traditionally available] remedies[, i.e.,] compensatory damages and injunctions" (citing *Barnes*, 536 U.S. at 185, 187)).

Consistent with these authorities, courts "may presume" in private actions under Title IX that funding recipients are "aware" and "on notice" that they may be "subject to the *usual* contract remedies" of "compensatory damages and injunctions." *Cummings*, 596 U.S. at 221 (simplified); *Doe v. Loyola Univ. Chicago*, 100 F.4th 910, 912 (7th Cir. 2024) (treating *Barnes* and *Cummings* as controlling on "laws based on the Spending Clause" and noting that "Title IX is such a law"); *Party v. Ariz. Bd. of Regents*, No. 18-cv-01623, 2022 WL 17459745, at *4-5 & n.4 (D. Ariz. Dec. 6, 2022) (collecting cases supporting that *Cummings* controls on Title IX damages).

Unlike these usual contract remedies, Title IX plaintiffs may not recover punitive or emotional distress damages. Punitive damages are unavailable because they are a tort-based exception to the general rule in contract cases and in turn fail to "give funding recipients the requisite notice that they could face such damages." *Cummings*, 596 U.S. at 216, 221 (citing *Barnes*, 536 U.S. at 189); *cf. Mercer v. Duke Univ.*, 401 F.3d 199, 202 (4th Cir. 2005) ("Because Title IX is interpreted consistently with Title VI, . . . *Barnes* compelled us to vacate [the plaintiff's] punitive damage award."); *M.M. ex rel. O.M. v. Tacoma Sch. Dist. No. 10,* No. 3:21-cv-05865, 2024 WL 183916, at *12 (W.D. Wash. Jan. 17, 2024) (citing *Barnes* and *Mercer* in holding that punitive damages were unavailable in a Title IX case); *L.O.K. ex rel. Kelsey v. Greater Albany Pub. Sch. Dist. 8J*, No. 6:20-cv-00529-AA, 2022 WL 2341855, at *16 (D. Or. June 28, 2022) (holding the same) (simplified) (first citing *Wilson v. S. Or. Univ.*, No. 06-cv-

PAGE 44 – FINDINGS AND RECOMMENDATION

3016-CO, 2006 WL 2668468, at *1 (D. Or. Sept. 15, 2006); and then citing *Barnes*, 536 U.S. at 188)).

Emotional distress damages are also unavailable to plaintiffs in Title IX actions. Recipients lack the requisite "clear notice" that they "would face such a remedy" in Title IX actions because emotional distress damages are not a remedy traditionally available in breach of contract actions. *See Cummings*, 596 U.S. at 218, 230 (stating as much where the Rehabilitation Act and Affordable Care Act were the two "Spending Clause antidiscrimination statutes" that were "directly at issue") (simplified); *see also S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 718 (6th Cir. 2023) ("*Cummings* leaves little doubt that emotional distress damages are no longer permitted for violations of Title IX."); *Loyola Univ. Chi.*, 100 F.4th at 912 (relying on *Cummings* and *Barnes*).

## B.  Analysis

The State Defendants move under Rule 12(b)(6) to dismiss Plaintiffs' Title IX claims on the ground that they are "barred" and "fail as a matter of law" because Plaintiffs must, but cannot, satisfy *Pennhurst*'s clear notice rule. (State Defs.' Mot. at 1; State Defs.' Reply at 1, 3-5.) Plaintiffs disagree, arguing that the "*Pennhurst* notice requirement does not apply" here. (Pls.' Opp'n State Defs.' Mot. Dismiss ("Pls.' Opp'n State Defs.' Mot.") at 1, 9, ECF No. 51.) The parties' dispute regarding the applicability of *Pennhurst*'s clear notice rule centers on the Ninth Circuit's decision in *Mansourian*, so the Court starts there. (*See id.* at 1, 9, 12; State Defs.' Reply at 3-4.)

### 1.  *Mansourian*

#### a.  Facts and Procedural History

The plaintiffs in *Mansourian* were female student wrestlers who elected to attend the University of California, Davis ("UCD"), because it had an "acclaimed wrestling program,"

PAGE 45 – FINDINGS AND RECOMMENDATION

which was "largely a men's team" but "long provided opportunities for women."[22] 602 F.3d at 961. The plaintiffs "participated in varsity wrestling and enjoyed the benefits associated with varsity status," such as "training, coaching, and laundry services; academic tutoring; insurance; and access to varsity facilities and equipment." Id. at 961-62. UCD later conditioned the plaintiffs' participation in wrestling on "their ability to beat male wrestlers in their weight class, using men's collegiate wrestling rules." Id. at 962. UCD's requirement caused the plaintiffs to lose the "benefits associated with varsity participation, including scholarships and academic credit." Id.

Based on these events, the plaintiffs filed a "class action against UCD and several UCD officials in their individual and official capacities, on behalf of all current and future female UCD students denied equal athletic participation opportunities." Id. The plaintiffs asserted claims under Title IX "against only the university" and "sought damages and injunctive relief." Id. at 962 & n.4. They also asserted equal protection claims under 42 U.S.C. § 1983 against UCD's chancellor, athletics director, associate athletic directors, and associate vice chancellor of student affairs. See id.

On appeal, the Ninth Circuit "refer[red] to the individual defendants and the University collectively as 'UCD'" and separately reviewed and reversed both the district court's grant of UCD's motion for summary judgment on the plaintiffs' Title IX claims and grant of UCD's Rule

---

[22] UCD "dispute[d] the very existence of a women's varsity wrestling program[.]" 602 F.3d at 962 n.2. Viewing the facts in favor of the nonmoving plaintiffs, as it must at summary judgment, the Ninth Circuit "conclude[d] that the plaintiffs were varsity wrestlers for purposes of Title IX." Id. In support, the Ninth Circuit noted that UCD conceded that the plaintiffs "participated in wrestling," that a named plaintiff was on a "wrestling team roster," and that the record revealed that "UCD listed four female varsity wrestlers in its 1999-2000 athletics report pursuant to the Equity in Athletics Disclosure Act [('EADA').]" Id.

12(c) motion with respect to the plaintiffs' equal protection claims under Section 1983. *Id.* at 962-63 & n.4, 973-74.

Importantly, for context and present purposes, the district court's rulings on UCD's motion for judgment on the pleadings also included that the "plaintiffs had adequately pleaded a claim for effective accommodation under Title IX by alleging that UCD 'chooses to make fewer athletic participation opportunities available to female students than to male students.'" *Id.* at 966 (simplified); *cf. Mansourian v. Bd. Regents of Univ. of Cal.*, No. 03-cv-02591, 2007 WL 3046034, at *10-19 (E.D. Cal. May 6, 2004) (ruling on UCD's motion for judgment on the plaintiffs' effective accommodation claims and requests for "monetary . . . damages" under Title IX and the plaintiffs' equal protection claim against the individual defendants under Section 1983), *rev'd in part*, 602 F.3d at 973-74. In finding that the plaintiffs sufficiently stated an effective accommodation claim for monetary damages against UCD, the district court rejected UCD's argument that the plaintiffs failed adequately to allege that they provided UCD with actual notice and that UCD responded with deliberate indifference, and therefore also failed to allege that they provided UCD with a chance to implement corrective measures and remedy its non-compliance. *See Mansourian*, 2007 WL 3046034, at *11-12 (citing *Grandson v. Univ. of Minn.*, 272 F.3d 568, 575 (8th Cir. 2001), *rev'd*, 602 F.3d at 964-69. The district court relied on the plaintiffs' allegation that they filed an administrative complaint in spring 2001 and noted that (1) although UCD requested judicial notice of DOE letters and reports, the district court could not take judicial notice of such matters for the truth of the matters asserted or to resolve factual disputes, (2) UCD failed to include the plaintiffs' complaint, and (3) because the plaintiffs' allegations were sufficiently responsive to UCD's "argument, the [district] court assume[d],

without deciding, that Title IX require[d] that . . . [UCD receive] notice and an opportunity to respond." *Id.* at *12 & n.13.

### b.    Injunctive Relief

Before reaching the merits of the plaintiffs' Title IX claims, the Ninth Circuit assessed its jurisdiction to review the plaintiffs' challenge to the district court's denial of their motion to amend to add female wrestlers and then-current UCD students as plaintiffs capable of seeking injunctive relief. *See id.* at 963. The Ninth Circuit found the issue "moot and so beyond [its] jurisdiction." *Id.*

As background, the Ninth Circuit observed that after staying the underlying proceedings for ten months because of their attorney's "serious illness," the plaintiffs, all of whom had graduated at that point, unsuccessfully moved to amend their complaint to add the three female wrestlers as named plaintiffs and, as a result, stipulated to dismissal of their requests for injunctive relief given the absence of "any named plaintiffs currently attending UCD." *Id.* at 962-63. In explaining why this issue was moot and it lacked jurisdiction to review the district court's denial of leave to amend, the Ninth Circuit explained that the three wrestlers at issue were "no longer . . . appropriate plaintiffs . . . for the purposes of injunctive relief, as the current plaintiffs recognize[d]" on appeal, because these three wrestlers, who filed a separate lawsuit and agreed to and obtained a district court's approval of a settlement agreement that "resolve[d] all class member claims for injunctive relief," had also graduated. *Id.* To the extent that the plaintiffs asserted "current female students" could seek injunctive relief that the settlement did not cover (i.e., restoration of UCD's women's wrestling program), the Ninth Circuit found it unnecessary to reach the issue because there were "no current students in th[e] case seeking that relief; no identified, current students looking to intervene in th[e] case to seek that relief; and no identified,

PAGE 48 – FINDINGS AND RECOMMENDATION

current students whom the plaintiffs seek to add to the case for purposes of obtaining that relief."

*Id.* at 963.

### c.    Title IX Damages Claims

In granting UCD's motion for summary judgment on the plaintiffs' "damages claims" under Title IX, the *Mansourian* district court held that to "perfect their claim," the plaintiffs were required but failed to "give UCD notice in advance of filing suit of the alleged Title IX violation and an opportunity to cure it[.]" *Id.* at 962, 964. The plaintiffs timely appealed that decision. *See id.* at 963.

Describing the district court's Title IX holding as the "central issue" presented on appeal, the Ninth Circuit held that the district court erred in finding that "a university that receives federal funds cannot be held liable in damages for failing effectively to accommodate the athletic interests of both men and women unless the aggrieved women first provide the appropriate university officials with notice of their disadvantageous treatment and an opportunity to cure it." *Id.* at 961. After the jurisdictional question of mootness, the Ninth Circuit turned to the "merits" of the plaintiffs' damages claims against UCD and the statutory and regulatory framework "governing Title IX athletics cases." *Id.* at 963-66 (first citing 20 U.S.C. § 1681(a); and then citing 34 C.F.R. § 106.41(c)).

Against this backdrop, the Ninth Circuit noted that the "district court determined that the plaintiffs had adequately pleaded a claim for effective accommodation under Title IX," but the district court "did not . . . reach the merits" of UCD's argument that it satisfied one of the ways in which a recipient established compliance with the effective accommodation component of "Title IX's equal athletic opportunity requirement." *Id.* at 965-66, 969 (simplified). The district court elected to resolve UCD's motion on a different ground, "concluding that 'money damages cannot be awarded unless a plaintiff has given notice of and an opportunity to rectify the specific

PAGE 49 – FINDINGS AND RECOMMENDATION

violation alleged by a Title IX plaintiff[,' and that] the plaintiffs had failed to provide such notice[.]" *Id.* at 966.

Whether "any such requirement applie[d] in the athletics context" was a question that the Ninth Circuit had not yet addressed. *Id.* The Ninth Circuit "conclude[d] that it [did] not." *Id.* Specifically, and "for the[] reasons" explained and "surveyed" in its decision, the Ninth Circuit found that "pre-litigation notice and opportunity to cure is not necessary in cases alleging unequal provision of athletic opportunities in violation of Title IX" and thus "join[ed] the Fifth Circuit," which "reached the same conclusion," in "holding that *Gebser*'s notice requirement is inapplicable to cases alleging that a funding recipient has failed effectively to accommodate women's interest in athletics." *Id.* at 968-69 (citing *Pederson v. La. State Univ.*, 213 F.3d 858, 882 (5th Cir. 2000)).

Finding "more persuasive" the Fifth Circuit's decision in *Pederson* and the Tenth Circuit's decision in *Simpson*, the latter of which concerned a "different but related issue," the Ninth Circuit also explained the only potential conflicting authority from the Eighth Circuit "assumed, without any analysis, that *Gebser*'s notice requirement applies equally to Title IX cases where plaintiffs allege discrimination in the administration of an athletic program" and that it was "far from clear" that the Eighth Circuit decision even "control[ed]" in its own circuit. *See id.* at 968-69 & n.14 (so stating and proceeding to the extent that the "circuits [were] already split on the issue" (first citing *Pederson*, 213 F.3d at 882; then citing *Grandson*, 272 F.3d at 575 (an Eighth Circuit decision that the *Mansourian* district court addressed at the pleading stage); then citing generally to *Chalenor v. Univ. of N.D.*, 291 F.3d 1042 (8th Cir. 2002) (making no mention of *Grandson*, *Gebser*, or *Gebser*'s notice requirement); and then referring to *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1184 (10th Cir. 2007)).

PAGE 50 – FINDINGS AND RECOMMENDATION

In support of its holding and joinder of the Fifth Circuit's decision in *Pederson*, the Ninth

Circuit explained that UCD's "notice argument," which the district court "adopted," rested on an

"[in]apt" "analogy" between the plaintiffs' case and the "Supreme Court's holding [in *Gebser*]

that notice and an opportunity to cure a violation is an essential precursor to a sexual harassment

suit for damages under Title IX." *Id.* at 961, 966; *cf. Mansourian v. Bd. of Regents of Univ. of

*Cal.*, 617 F. Supp. 2d 1011, 1015-22 (E.D. Cal. 2008) (holding that the "cited evidence [was] not

sufficient to raise a triable issue of fact as to notice and opportunity to cure" and "[g]iven Title

IX's express enforcement scheme, the Supreme Court's analysis in *Gebser*, and the Eighth

Circuit's opinion in *Grandson*, . . . a suit for private damages cannot be sustained until notice and

opportunity to cure are given to an institution allegedly out of compliance with Title IX"). The

Ninth Circuit added that the inaptness of this analogy was apparent from the Supreme Court's

Title IX sexual harassment jurisprudence:

> The starting point for this inquiry is *Franklin* . . . , in which the defendant school district was aware of a teacher's sexual harassment of a student but took no action to stop it. The [Supreme] Court recognized that *Pennhurst*, 451 U.S. at 28-29, precludes the award of damages for unintentional violations of statutes, like Title IX, enacted pursuant to Congress's spending authority. *See Franklin*, 503 U.S. at 74. *Franklin* held, however, that the failure to halt harassment of which a school district is aware constitutes intentional discrimination for which monetary damages are an appropriate remedy. *Id.* at 75-76.
>
> *Gebser* . . . further defined the scope of a school's monetary liability under Title IX for inaction in the face of serious sexual harassment. In *Gebser*, the [Supreme] Court held that principles of *respondeat superior* and constructive notice are inadequate to impose Title IX liability on a school district for a teacher's sexual abuse of a high school student. 524 U.S. at 285. Noting that Title IX's express enforcement scheme, termination of federal funding, requires "an opportunity for voluntary compliance" before suspending or terminating funding, *see* 20 U.S.C. § 1682, *Gebser* held that the judicially implied private right of action similarly should not impose liability "without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* at 289. *Gebser* held that the judicially implied private right of action similarly should not impose liability "without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* at 289. Monetary damages premised on constructive notice or *respondeat superior* for sexual harassment, the [Supreme] Court held in

PAGE 51 – FINDINGS AND RECOMMENDATION

*Gebser*, would entail a risk that "the recipient of funds was unaware of the discrimination." *Id.* at 287. Rather,

> in cases like this one [i.e., *Gebser*] *that do not involve official policy of the recipient entity*, . . . a damages remedy will not lie under Title IX unless an official who has authority to address the alleged discrimination and to institute corrective measures has actual knowledge of discrimination and fails adequately to respond.

*Id.* at 290 (emphasis added).

Critically for present purposes, *Gebser* does not make pre-litigation notice of an alleged violation a prerequisite to recovery in every Title IX case, or even in every sexual harassment case. Proof of actual notice is required only when the alleged Title IX violation consists of an institution's deliberate indifference to acts that "do not involve official policy of the recipient entity." *Id.* In sexual harassment cases, it is the deliberate failure to curtail known harassment, rather than the harassment itself, that constitutes the intentional Title IX violation. *See Davis*, 526 U.S. at 641 (holding that *Gebser* permits the plaintiff "to hold the Board liable for its *own* decision to remain idle in the face of known student-on-student harassment in its schools[]"). The Tenth Circuit has held that a corollary of this principle is that where the official policy is one of deliberate indifference to a known overall risk of sexual harassment, notice of a particular harassment situation and an opportunity to cure it are not predicates for liability. *See Simpson*, 500 F.3d at 1184.

Consistent with the reasoning underlying *Gebser*, the Supreme Court has made clear that no notice requirement is applicable to Title IX claims that rest on an affirmative institutional decision. [In *Jackson*, 544 U.S. at 182,] the Supreme Court] held that a high school athletics coach fired in retaliation for complaining about discrimination in athletics funding had a private right of action under Title IX. The [Supreme] Court held that no pre-litigation notice is required in the retaliation context. In *Gebser* and *Davis*, [as the Supreme Court explained in *Jackson*], "we emphasized that the notice limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute." *Id.* at 182 (quotation omitted). [Recognizing that] retaliation is "easily attributable to the funding recipient and it is always—by definition—intentional," *id.*, the [Supreme] Court [in *Jackson*] allowed [the high school athletics coach's] retaliation claim to proceed without regard to whether adequate pre-litigation notice and opportunity to cure the violation had been provided.

*Mansourian*, 602 F.3d at 966-68 & n.14 (simplified).

Rejecting UCD's and the district court's reliance on *Gebser* and instead relying on

*Jackson* and record evidence, including that UCD's EAJA reports contained "ample data" on its

PAGE 52 – FINDINGS AND RECOMMENDATION

failure to comply with Title IX's equal athletic opportunity requirement, the Ninth Circuit held

that *Gebser* did not apply to the plaintiffs' damages claims because UCD intentionally violated

Title IX:

> Universities' decisions with respect to athletics are even more "easily attributable to the funding recipient and . . . always—by definition—intentional," . . . than the retaliation in *Jackson*. 544 U.S. at 183. Institutions, not individual actors, decide how to allocate resources between male and female athletic teams. Decisions to create or eliminate teams or to add or decrease roster slots for male or female athletes are official decisions, not practices by individual students or staff. Athletic programs that fail effectively to accommodate students of both sexes thus represent "official policy of the recipient entity" and so are not covered by *Gebser*'s notice requirement. *Gebser*, 524 U.S. at 290.
>
> Moreover, a judicially imposed notice requirement would be superfluous in light of universities' ongoing obligations to certify compliance with Title IX's athletics requirements and to track athletics gender equity data. [DOE] regulations require funding recipients to evaluate their policies and certify, as a condition for receiving funds, that they are "tak[ing] whatever remedial action is necessary . . . to eliminate . . . discrimination." 34 C.F.R. § 106.4; *see also id.* § 106.3. UCD and other funding recipients therefore have an affirmative obligation to ensure compliance with at least one prong of the three-part effective accommodation test.
>
> The [EADA] . . . further requires federally funded universities to report to the [DOE] . . . and make available to students the number of undergraduates and athletes, broken down by sex, as well as sex-segregated data on operating expenses, coach salaries, athletic scholarships, recruiting expenditures, and revenues. 20 U.S.C. § 1092(g). UCD's EADA reports contain ample data demonstrating that it could not satisfy the substantial proportionality option and that the trend of increasing female athletic participation reversed after 2001, indicating that UCD may not have had a continuing practice of program expansion. Thus, where the alleged harm is unequal provision of athletic opportunity, the notice requirement would not supply universities with information of which they are legitimately unaware. *See Gebser*, 524 U.S. at 289.

*Mansourian*, 602 F.3d at 966-68 & n.14; *see also id.* at 965-66, 969-73 (proceeding to hold that

"undisputed facts [fell] short of demonstrating UCD's compliance with either facet" of the

relevant three-part test option, which "focus[es] on both the institution's record of adding female

participation opportunities and its current 'plan of program expansion that is demonstrably

responsive to the developing interests and abilities' of women," and citing evidence that "UCD's

PAGE 53 – FINDINGS AND RECOMMENDATION

elimination of women from the varsity wrestling team . . . took place in the context of an overall contraction of female athletic participation opportunities that began in 2000" and the "context of a women's athletics program that was, at best, stagnant," as well as evidence that UCD's Title IX review committee report revealed that it "did not comprehensively review its compliance with Title IX between 1976 and 1991" and that its "record 'cannot be termed a *demonstrably responsive* process of program expansion . . . particularly when female participation relative to male participation has been decreasing over the past three years'").

### d.    Applicability of *Mansourian*

Invoking *Mansourian*'s reliance on *Jackson* and comments on the intentionality of UCD's athletics policies and decisions and conduct attributable to a funding recipient, Plaintiffs argue that *Mansourian* is "directly on point" and supports its position that "*Pennhurst*'s notice requirement does not apply" where, as here, "violations of Title IX are the result of their own intentional acts" and "official policies." (Pl.'s Opp'n State Defs.' Mot. at 1, 9, 12.) The State Defendants respond that Plaintiffs' reading of *Mansourian* is misplaced, as it did not address the "potential for a Title IX lawsuit to fail as a matter of law for lack of a clear provision *in the statute* (or regulations, or case law) prohibiting the complained-of action" and "focused" only on a "Title IX *plaintiff's* pre-suit burden to notify a defendant of alleged violations." (State Defs.' Reply at 3-4.)

The Court agrees with the State Defendants. Plaintiffs' position stretches *Mansourian*'s holding too far and beyond what the Ninth Circuit stated and necessarily decided. Plaintiffs' arguments rest on two flawed premises. One is that *Gebser*'s "actual notice" and "deliberate indifference" requirements are synonymous with or necessarily resolve the same issues as

*Pennhurst*'s clear notice rule. The other is that an "intentional" athletics decision or policy always equates to "intentional" "discrimination" "on the basis of sex."[23]

With respect to *Gebser*'s "actual notice" and "deliberate indifference" requirements, *Pennhurst*'s clear notice rule is materially different and conflating the two would be error. *Mansourian* tracks *Gebser*'s interchangeable use of "actual notice" and "actual knowledge." *See Mansourian*, 602 F.3d at 967 (discussing *Gebser* and "[p]roof of actual notice," quoting *Gebser*'s use of "actual knowledge of discrimination," and later quoting the Fifth Circuit's "same conclusion" on the inapplicability of "actual knowledge" "for purposes of determining whether [a funding recipient] intentionally discriminated on the basis of sex by denying females equal athletic opportunity" (first quoting *Gebser*, 524 U.S. at 290; and then quoting *Pederson*, 213 F.3d at 882)). A recent en banc panel of the Ninth Circuit agreed that *Gebser*'s use of "actual notice" also means "actual knowledge." *Brown v. Arizona*, 82 F.4th 863, 880 (9th Cir. 2023) (en banc) (agreeing with the "Fourth Circuit that 'actual knowledge,' as used . . . in *Gebser*, means either actual knowledge or actual notice" (quoting *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 265-68 (4th Cir. 2021))).

Now consider the source of *Gebser*'s "actual notice" and "deliberate indifference" requirements. Under *Gebser*, an "appropriate" funding recipient official must personally be

---

[23] During oral argument, Plaintiffs argued explicitly that intentional conduct (not intentional discrimination) rendered *Pennhurst* inapplicable. Also illustrative of these points is that Plaintiffs (1) discuss *Pennhurst*'s "notice" rule immediately before arguing that "Title IX's notice requirement" originated in cases involving "misconduct by actors outside the recipients' control," remains limited to situations involving funding recipient's "deliberate indifference" to third parties' misconduct," and does not apply when the alleged "violations stem from a federal funding recipient's own official policies," "especially regarding its athletic programs," (2) proceed on the assumption that Defendants' "intentional acts and policies violate Title IX" because they relate to athletics, and (3) conclude by treating the "*Pennhurst* doctrine" as forms of "actual notice" or "actual knowledge" from third parties. (*See* Pls.' Opp'n State Defs.' Mot. at 1, 11-16.)

PAGE 55 – FINDINGS AND RECOMMENDATION

advised (receive a report, witness an event, etc.) of a pre-enforcement proceeding or litigation

incident or conduct that Title IX proscribes, thus creating an opportunity to remedy a Title IX

violation:

> [W]e deem it significant that *Gebser* used the terms "actual notice" and "actual knowledge" interchangeably. . . .
>
> Given that "knowledge" has several meanings, one of which denotes "notice," the Supreme Court's interchangeable use of those two words in *Gebser* suggests that the more specific term, "notice," is what the [Supreme] Court really meant. Thus, the [Supreme] Court seems to have used both "actual knowledge" and "actual notice" to mean information or notification regarding a fact or condition "given directly to, or received personally by, a party." *Actual Notice*, BLACK'S LAW DICTIONARY.
>
> This reading is reinforced by the Supreme Court's explanation in *Gebser* that to be liable under Title IX, an appropriate school official must be "*advised of*" the alleged misconduct. *Gebser*, 524 U.S. at 290 (emphasis added). To be "advised" of something means to be "inform[ed]" or "give[n] information or *notice*" about it. *Advise*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/advise (emphasis added). Thus, *Gebser* indicates that a [funding recipient] has actual notice or knowledge when it is informed or notified of the alleged harassment—most likely via a report.
>
> The Supreme Court's subsequent decision in *Davis* . . . [only serves to] bolsters this conclusion. . . .
>
> Our understanding of actual notice comports with the nearly unanimous view of our sister circuits. The Seventh Circuit has held that "[t]o have actual knowledge of an incident, school officials must have witnessed it *or received a report of it*." *Doe v. Galster*, 768 F.3d 611, 614 (7th Cir. 2014) (emphasis added). Likewise, nearly all other courts of appeals have found actual notice established where the plaintiff or another interested person reported the alleged sexual harassment to a school official with authority to address the alleged harassment and to institute corrective measures. . . .

*Fairfax Cnty. Sch. Bd.*, 1 F.4th at 265-68 (simplified); *cf. Gebser*, 524 U.S. at 290 ("An

'appropriate person' under [Section] 1682 is, at a minimum, an official of the recipient entity

with authority to take corrective action to end the discrimination. . . . [Section 1682's] scheme

presupposes that an official who is advised of a Title IX violation refuses to take action to bring

PAGE 56 – FINDINGS AND RECOMMENDATION

the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation."); *see also Brown,* 82 F.4th at 880 (quoting *Galster*).

Unlike "actual notice," *Pennhurst*'s rule is based on separation of powers and federalism concerns and requires that *Congress* provide recipient officials with the requisite clear and unambiguous notice:

> Beyond the [*Pennhurst*] rule that Congress must clearly and unambiguously alert States to conditions associated with federal funding, our cases have articulated other limits on spending-power legislation. . . .
>
> . . . .
>
> Separately, the dissent suggests that *amicus* briefs the government filed in other cases might suffice to supply States with notice of a condition attached to federal funding. . . . But, as this case attests, the government's views can shift from administration to administration. And our decisions have never suggested that anything less than clear statutory language can supply States with the unambiguous notice required. Instead, given the separation of powers and federalism concerns we have outlined, our decisions have always "insist[ed] that *Congress* speak with a clear voice." *Pennhurst,* 451 U.S. at 17 (emphasis added).

*Medina,* 606 U.S. at 373 n.4, 383 n.8; *cf. Arlington,* 548 U.S. at 296, 300-01 (applying *Pennhurst*'s clear notice rule, viewing the spending provision "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds," asking "whether such a state official would clearly understand," i.e., whether the provision "furnishe[d] clear notice" "regarding the liability at issue," and declining to find that the provision gave "a State unambiguous notice regarding [the] liability" at issue).

Many other cases are in accord. *See, e.g., Roe,* 137 F.4th at 928-31 (reviewing a Title IX case and applying the "Spending Clause's clear-notice rule," as the Supreme Court did in *Pennhurst* and *Arlington*); *cf. Haight v. Thompson,* 763 F.3d 554, 571-73 (6th Cir. 2014) (Cole, C.J., concurring in part) (stating that *Arlington* was "central" to the "Spending Clause analysis"

PAGE 57 – FINDINGS AND RECOMMENDATION

and the "clear-statement principle has been characterized as a rule of statutory interpretation," but "in effect it operates much like substantive constitutional doctrine by directing how courts should weigh the Constitution's competing values and interests") (simplified); *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 284 (6th Cir. 2009) (en banc) (Sutton, J., concurring) ("The statutory limitation on Congress's spending power . . . lies at the core of this dispute. . . . Even though this clear-statement rule has constitutional roots, it remains a rule of statutory interpretation, one constrained by other canons of statutory interpretation."); *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022) ("[T]he Supreme Court has explained that because Congress can cajole the states to enact policies indirectly . . . that it could never *directly* order them to perform with its other enumerated powers, we must employ a federalism-based clear-statement rule when construing spending legislation as a matter of *statutory* interpretation.") (simplified).

Further, *Gebser* itself effectively recognizes that the *Pennhurst* problem is distinct. *See* 524 U.S. at 282, 291-92 (noting that the plaintiffs did "not contend they can prevail under an actual notice standard" and instead relied on "*respondeat superior* liability, *i.e.*, vicarious or imputed liability" and "constructive notice, *i.e.*, where the district knew or 'should have known' about [conduct] but failed to uncover and eliminate it," both of which were "broader" than a rule "hing[ing] on actual knowledge," and thus asking whether "failure to promulgate a grievance," as the regulation required, "itself constitute[d] 'discrimination' under Title IX," and holding that it did not).

Accepting Plaintiffs' conflation of *Pennhurst*'s clear notice rule and *Gebser*'s "actual notice" (or "actual knowledge") and "deliberate indifference" requirements would be problematic for several reasons. First, it would mean *Pennhurst*'s separation of powers and

PAGE 58 – FINDINGS AND RECOMMENDATION

federalism concerns disappear simply because a Title IX plaintiff alleges an intentional act in an athletics context.

Second, it would ignore the reality that under *Pennhurst*, a court must "ask whether the [statute] furnishes clear notice regarding the liability at issue in th[at] case." *Arlington*, 548 U.S. at 296. This "principle . . . appl[ies] not only the *conditions* a Spending Clause enactment places on participating states, but also . . . the *remedies* the enactment makes available when a state fails to comply," such as whether prevailing parties' are entitled to reimbursement for experts' fees. *See Haight*, 763 F.3d at 571 (Cole, C.J., concurring in part) (first citing *Arlington*, 548 U.S. at 296; and then citing *Arlington*, 548 U.S. at 317 (Breyer, J., dissenting)); *cf. Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 534 (2007) (noting that *Arlington* addressed "whether IDEA required States to reimburse experts' fees to prevailing parties" and held that IDEA failed to "furnish[] clear notice regarding the liability at issue" (quoting *Arlington*, 548 U.S. at 296)).

Third, Plaintiffs' conflation would mean that a finding of intentionality in an athletics case necessarily subsumes Section 1681(a)'s requirements of "discrimination" "on the basis of sex." 20 U.S.C. § 1681; *but cf. Jackson*, 544 U.S. at 179 n.3 ("Because . . . retaliation in response to a complaint about sex discrimination is 'discrimination' 'on the basis of sex,' the statute clearly protects those who suffer such retaliation. The following hypothetical . . . illustrates this point: If the male captain of the boys' basketball team and the female captain of the girls' basketball team together approach the school principal to complain about discrimination against the girls' team, and the principal retaliates by expelling them both from the honor society, then both the female and the male captains have been 'discriminated' against 'on the basis of sex.'").

///

PAGE 59 – FINDINGS AND RECOMMENDATION

Five members of the *Soule* en banc panel rejected comparable arguments regarding *Pennhurst*'s rule:

> [The p]laintiffs invite this [c]ourt to . . . fashion a rule holding that *Pennhurst*'s notice requirement is inapplicable to Title IX claims that rest on a funding recipient's "official policies," which are "always known and intended." . . . But to adopt [the p]laintiffs' argument would run afoul of the very essence of the *Pennhurst* doctrine, and would conflate the requirement that a recipient's actions be *intentional* with the requirement that a recipient have notice of its legal obligations. Indeed, contrary to [the p]laintiffs' argument, a Title IX recipient's liability cannot turn solely on the "intentionality" of its challenged action. Rather, it is intentional action in clear violation of Title IX—that is, *intentional discrimination*—that removes the *Pennhurst* bar. . . .

90 F.4th at 92 (Chin, J., dissenting, joined in full by Carney & Kahn, JJ., and Part III by Lohler & Robinson, JJ.); *cf. id.* at 72-73 (Pérez, J., concurring in part and dissenting in part) ("[I]n this particular case, . . . any requisite notice would likely stem from the text of Title IX itself and the statute's implementing regulations."); *id.* at 60-61 (Menashi J., joined by Park, J., concurring) (agreeing with the dissent that a "recipient's liability cannot turn solely on the 'intentionality' of its challenged action" and explaining that because "there must be intentional conduct as well as knowing acceptance of a funding condition that the conduct violates," the "remaining question" was whether the "intentional conduct" (i.e., the athletics policy) "violate[d] the clear terms of the statute").

The plaintiffs in *Soule* asked the en banc panel to "join the Ninth Circuit in holding that *Pennhurst*'s notice requirement does not apply to Title IX claims based on an official policy," but the panel "decline[d] to reach this question" because they "vacate[d] the district court's *Pennhurst* holding on a different basis." *Id.* at 53-54 & n.7 (quoting *Mansourian*, 602 F.3d at 967-68). As the *Soule* majority later explained, it "vacate[d] that portion of the district court's opinion on narrow grounds, based on the district court's erroneous conclusion that it must resolve the question of notice before reaching the merits of [the] Title IX claims" and concluded,

PAGE 60 – FINDINGS AND RECOMMENDATION

"[a]s to the availability of monetary damages, . . . [that] the district court on remand must resolve the underlying merits question before or in tandem with the *Pennhurst* question."[24] *Id.* at 52, 54; *see also id.* at 55 (Menashi J., joined by Park, J., concurring) (reflecting that two concurring panel members stated that they would join the Fifth (*Pederson*), Ninth (*Mansourian*), and Tenth (*Simpson*) Circuits in "holding that an official policy of a recipient educational institution always qualifies as intentional conduct" and the policy was "not subject to the *Pennhurst* notice requirement").

This Court must address whether *Mansourian* controls. The Court agrees with the dissenting *Soule* panel members that although *Mansourian* resolves the question of intentionality, it is otherwise distinguishable. *Mansourian*, *Pederson*, and *Simpson* "involve[d] official acts and policies, [but] these were acts and policies that involved intentional (or deliberately indifferent) discrimination in clear violation of Title IX." *Soule, 90 F.4th at 92-93 n.16* (Chin, J., dissenting, joined in full by Carney & Kahn, JJ., and Part III by Lohler & Robinson, JJ.) (finding that *Mansourian*, *Pederson*, and *Simpson* were "factually distinguishable" (first citing *Mansourian, 602 F.3d at 962*; then citing *Simpson, 500 F.3d at 1173*; and then citing *Pederson, 213 F.3d at 864*)).

///

---

[24] The Ninth Circuit recently rejected the notion that the "clear-notice rule affects only the availability of retrospective relief—money damages—and does not affect the availability of . . . injunctive relief" (i.e., prospective relief). *Roe, 137 F.4th at 930*. In so holding, the Ninth Circuit explained that such an "argument overlook[ed] that the Supreme Court applied the clear-notice rule in *Pennhurst*, . . . a case involving injunctive relief," that it "read Supreme Court precedent as holding that the clear notice rule applies" to money damages and other traditional remedies, and that it "kn[e]w of no authority limiting Title IX remedies to damages." *Id.* at 930 & n.12 (first citing *Pennhurst, 451 U.S. at 8-9, 17-18, 24-25*; and then citing *Barnes, 536 U.S. at 187*)). Thus, if *Pennhurst*'s clear notice rule is not satisfied, Defendants are entitled to dismissal of this lawsuit.

It is noteworthy that the district court in *Mansourian* "determined that the plaintiffs had adequately pleaded a claim for effective accommodation under Title IX by alleging that UCD 'chooses to make fewer athletic participation opportunities available to female students than to male students.'" 602 F.3d at 966. On appeal, the Ninth Circuit, reviewing the district court's grant of summary judgment and viewing the facts in the plaintiffs' favor, relied on *Jackson* in holding that athletics decisions and policies are "intentional" conduct, but it then appeared to follow *Jackson*'s approach by identifying and linking the "discrimination" (i.e., differential treatment) "on the basis of sex," which the record clearly supported. *See id.* at 962 n.2, 967-73 (quoting *Jackson* only on intentionality and then citing institutional decisions on the allocation of resources between "male and female" athletics teams, adding or eliminating teams or roster slots for "male or female athletes," failing effectively to accommodate students of "both sexes," and being the subject of "reports contain[ing] ample data demonstrating that it could not satisfy the substantial proportionality option and that the trend of increasing female athletic participation reversed").

This interpretation aligns with the quote that the Ninth Circuit drew from the Fifth Circuit's decision in *Pederson*, which "reached the same conclusion" as *Mansourian*: "[A recipient's] actual knowledge of the [proscribed conduct] . . . is not applicable *for purposes of determining* whether an academic institution *intentionally discriminated on the basis of sex* by denying females equal athletic opportunity. . . . In the instant case, it is the institution itself that is discriminating." *Id.* at 968 (quoting *Pederson*, 213 F.3d at 882); *cf. id.* at 967 n.14, 969 (adding that in *Simpson*, the city "[d]istrict [a]ttorney's office had recommended a policy [to the recipient] to curb . . . assaults after a previous incident involving [football] recruits, [but] the policy was not followed and [the recipient] continued to sponsor an 'unsupervised player-host

PAGE 62 – FINDINGS AND RECOMMENDATION

program to show high school recruits a good time,'" and the Tenth Circuit "held this sequence of events satisfied the 'official policy' element of *Gebser* and that a woman assaulted thereafter need provide no separate notice and opportunity to cure before filing suit" (quoting *Simpson*, 500 F.3d at 1184)).

Taking a closer look at *Pederson* reveals that the recipient "ma[de] its mantra the contention that it was either ignorant of or confused by Title IX and thus [could not] be held intentionally to have discriminated," even though there was ample evidence to the contrary, like a DOE investigation "evaluat[ing] the athletics program's compliance with Title IX" and "confirm[ing the athletic director's] . . . ignorance of the actual state of compliance with Title IX by his athletic program." 213 F.3d at 880-82 (simplified). Rejecting the recipient's reliance on *Gebser* and "actual knowledge," the Fifth Circuit held that the "proper test is not whether [the recipient] knew of or is responsible for the actions of others, but is whether [it] intended to treat women differently on the basis of their sex by providing them unequal athletic opportunity[.]" *Id.* Convinced that the recipient had done so, the Fifth Circuit held that the record supported finding "an intent to discriminate, albeit one motivated by chauvinist notions as opposed to one fueled by enmity, drove [the recipient's] decisions regarding athletic opportunities for its female students." *Id.* at 882.

The Court's interpretation of *Mansourian* also aligns with *Jackson*'s textual approach and sequencing. *See Soule*, 90 F.4th at 92 (Chin, J., dissenting, joined in full by Carney & Kahn, JJ., and Part III by Lohler & Robinson, JJ.) (identifying *Jackson* as the "most persuasive" authority on intentionality because *Jackson*'s analysis did not "end[] there" and undermined the plaintiffs' "view . . . that liability sinks or swims on the sole basis of intentionality"). The *Soule* dissent noted that "as compared to [the p]laintiffs' argument that mere promulgation and enforcement of

PAGE 63 – FINDINGS AND RECOMMENDATION

an 'official policy' is sufficient, on its own, to hold a funding recipient liable for damages, the more persuasive reading of *Jackson* . . . is that damages are barred unless a funding recipient *knew* that its policy *violated* Title IX's clear proscription against sex discrimination." *Id.* The Court agrees.

As discussed, the plaintiff in *Jackson* was a high school basketball coach who sought to impose liability in damages under Title IX, on the theory that the recipient "retaliated against him because he had complained about sex discrimination in the high school's athletic program." *Jackson*, 544 U.S. at 171, 173. The recipient argued that a retaliation theory failed as a matter of law and relied on *Alexander*, a Title VI case where the Supreme Court "held that private parties may not invoke Title VI regulations," which Title VI authorized agencies to promulgate, for purposes of "obtain[ing] redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination." *Id.* at 177-78 (citing *Alexander*, 532 U.S. at 281, 285). The recipient argued that like *Alexander*, the plaintiff in *Jackson* was seeking an "impermissible extension" of Title IX by arguing that its "private right of action encompasse[d] retaliation." *Id.* at 178.

The Supreme Court rejected the recipient's argument, emphasizing that it did "not rely on regulations extending Title IX's protection beyond its statutory limits" or "at all" because Title IX "*itself* contain[ed] the necessary prohibition." *Id.* Incorporating its above-described analysis, *see id.* at 173-76, the Supreme Court explained that the "text of Title IX prohibits a funding recipient from retaliating against a person who speaks out against sex discrimination, because such retaliation is intentional 'discrimination' on the basis of sex.'" *Id.* at 178. The Supreme Court further explained that it "reach[ed] this result based on the statute's text" and held, "[i]n step with [*Alexander*], . . .that Title IX's private right of action encompasses suits for retaliation,

PAGE 64 – FINDINGS AND RECOMMENDATION

because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." *Id.*

The Supreme Court also rejected the recipient's argument that the plaintiff was an "'indirect victim' of sex discrimination." *Id.* at 179 (simplified). In doing so, the Supreme Court explained that "where the retaliation occurs because the complainant speaks out about sex discrimination, the 'on the basis of sex' requirement is satisfied." *Id.* That is to say, the "complainant is himself a victim of discriminatory retaliation, regardless of whether he was the subject of the original complaint." *Id.* The *Jackson* majority also rejected related concerns that the dissent raised:

> We agree with [the dissent] that plaintiffs may not assert claims under Title IX for conduct not prohibited by that statute. . . . But we part ways with regard to our reading of the statute. We interpret Title IX's text to clearly prohibit retaliation for complaints about sex discrimination.
>
> . . . .
>
> [The dissent] contends that "extending the implied cause of action under Title IX to claims of retaliation expands the class of people the statute protects beyond the specified beneficiaries." . . . But Title IX's beneficiaries plainly include all those who are subjected to "discrimination" "on the basis of sex." 20 U.S.C. § 1681(a). Because, as we explain above, *see supra* 544 U.S. at 173-76, retaliation in response to a complaint about sex discrimination is "discrimination" "on the basis of sex," the statute clearly protects those who suffer such retaliation. . . .

*Id.* at 178-79 nn.2-3.

After making these points, *Jackson* recognized that *Pennhurst*'s rule "does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Id.* at 183 (quoting *Davis,* 526 U.S. at 642). *Jackson* noted that past precedent put the recipient "on notice" that "Title IX's private cause of action broadly . . . encompass[ed] diverse forms of intentional sex discrimination" and that Title IX's implementing regulations "clearly prohibit[ed] retaliation and ha[d] been on the books for nearly

PAGE 65 – FINDINGS AND RECOMMENDATION

[thirty] years." *Id.* at 182. *Jackson*, however, reiterated that it relied on Title IX's text, "conclud[ing] that retaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of the statute,' [and] . . . Title IX itself therefore supplied sufficient notice . . . that [the recipient] could not retaliate against [an athletics coach] after he complained of discrimination against the girls' basketball team." *Id.* at 183 (quoting *Davis*, 526 U.S at 642).

Given the authorities and observations above, the Court finds unpersuasive Plaintiffs' arguments that *Pennhurst* does not apply, that the State Defendants "misapprehend Title IX's clear notice requirement," and that "Supreme Court and Ninth Circuit precedent makes clear that federal funding recipients do not require notice under *Pennhurst* . . . where violations of Title IX are the result of their own intentional acts and policies[.]" (Pls.' Opp'n State Defs.' Mot. at 1, 9-14.) The Court also notes that despite involving a Title IX claim premised on an official athletics policy and decision (a state statute), a Ninth Circuit decision that postdates *Mansourian* does not mention or cite it and stated that a district court should address *Pennhurst* "if raised in further proceedings." *Doe v. Horne*, 115 F.4th 1083, 1095, 1110-11 (9th Cir. 2024) (advising that the district court "should address" a "colorable" argument under *Pennhurst* "if raised in further proceedings").

For these reasons, the Court concludes that *Pennhurst*'s clear notice rule applies under the circumstances presented here and that *Mansourian* does not compel a conclusion to the contrary.

### 2.    Clear Notice Rule

In applying *Pennhurst*, the Court must begin with the text of Title IX and its implementing regulations. *See Arlington*, 548 U.S. at 298 (statutory text); *Roe*, 137 F.4th at 928-31 (Title IX's text and regulations). After detailing the statutory and regulatory background, the Court turns to other relevant developments in the law and facts. *Cf. Arlington*, 548 U.S. at 300-

PAGE 66 – FINDINGS AND RECOMMENDATION

03 (finding that past decisions rejecting a "very similar" argument about the term "costs" in Rule 54(d) and interpreting "virtually identical" wording under the civil rights fee-shifting provision were "perhaps the strongest support" for the Supreme Court's "interpretation" of a spending provision).

### a.    Statutory and Regulatory Background

Congress enacted Title IX in 1972. *See Ollier*, 768 F.3d at 854. Subject to certain inapplicable exceptions, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." 20 U.S.C. § 1681(a). "Neither Title IX nor its implementing regulations defines the term ['sex']." *Roe*, 137 F.4th at 927.

"Title IX was not specifically targeted at nor does it mention athletic programs." *Parker*, 667 F.3d at 917; *see also Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 95 (4th Cir. 2011) (noting that Title IX does "not specifically address its application to athletics"); *Working v. Lake Oswego Sch. Dist.*, No. 3:16-cv-00581-SB, 2017 WL 2954363, at *1-2 (D. Or. June 29, 2017) (same), *findings and recommendation adopted*, 2017 WL 3083256, at *1 (D. Or. July 19, 2017). In fact, "discrimination against women in education-based athletic programs was only discussed briefly in the congressional debates on Title IX." *Parker*, 667 F.3d at 917 (citing *McCormick*, 370 F.3d at 286).

In 1974, Congress enacted legislation directing DOE's predecessor agency, the Department of Health, Education, and Welfare ("HEW"), to "prepare proposed regulations implementing Title IX, including in the area of intercollegiate athletic activities." *Parker*, 667 F.3d at 917 (simplified); *see also Equity In Athletics*, 639 F.3d at 95-96 (detailing Congress's enactment of the Javits Amendment in 1974 and HEW's "split" into DOE and the Department of

PAGE 67 – FINDINGS AND RECOMMENDATION

Health and Human Services ("HHS") in 1979); *McCormick*, 370 F.3d at 287 (same). After

Congress held hearings and "declined to disapprove" HEW's published regulations, President

Gerald Ford provided the final approval that Title IX required and HEW's regulations went into

effect in 1975.[25] *McCormick*, 370 F.3d at 287 (congressional hearings and review); *Parker*, 667

F.3d at 917 (noting Section 1682's final approval requirement (citing *Equity In Athletics*, 639

F.3d at 95-96)).

Title IX's athletics regulations were originally codified at Part 86 of Title 45 of the Code

of Federal Regulations and DOE later "duplicated" them at Part 106 of Title 34 of the Code of

Federal Regulations, where they continue to reside. *See Parker*, 667 F.3d at 917 (discussing

DOE's inheritance of all of HEW's educational functions and duplication of the regulations);

*McCormick*, 370 F.3d at 288 (recognizing that the "athletics regulations . . . set forth the

standards for assessing an athletics program's compliance with [S]ection 901 of Title IX" (citing

34 C.F.R. § 106.41)); *Cohen v. Brown Univ.*, 101 F.3d 155, 165 n.6 (1st Cir. 1996) (discussing

HEW's "proposed Title IX athletics regulations"). The Ninth Circuit has held that Title IX's

athletics regulations apply to high schools. *See Ollier*, 768 F.3d at 855 (agreeing that Section

106.41 "applies to a high school" and stating that although it "does not explicitly refer to high

schools, it does not distinguish between high schools and other types of interscholastic, club or

intramural athletics").

Paragraph (a) of Title IX's athletics regulations provides that "[n]o person shall, on the

basis of sex, be excluded from participation in, be denied the benefits of, be treated differently

---

[25] Under Section 1682, federal departments and agencies are "authorized and directed to effectuate the provisions of [S]ection 1681 . . . by issuing rules, regulations, or orders of general applicability . . . consistent with achievement of objectives of the statute . . . [, but n]o such rule, regulation, or order shall become effective unless and until approved by the President." 20 U.S.C. § 1682.

from another person or otherwise be discriminated against in any interscholastic . . . athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a). Courts refer to paragraph (a) as Title IX's athletics regulations' "general anti-discrimination rule," as it "establishes a baseline prohibition against sex discrimination in . . . athletics, tracking almost identically the language in the parallel statutory provision prohibiting discrimination by federally funded educational institutions." *Mercer v. Duke Univ.*, 190 F.3d 643, 646-47 (4th Cir. 1999); *cf.* 20 U.S.C. § 1681(a) (setting forth nearly identical terms); *see also Mansourian*, 602 F.3d at 970 n.18 (citing favorably to *Mercer*).

"In addition to generally barring discrimination on the basis of sex in inter[scholastic] athletics, [paragraph] (a) specifically prohibits any covered institution from 'provid[ing] any such athletics separately on [the proscribed] basis.'" *Mercer*, 190 F.3d at 646 (simplified). "Standing alone, then, [paragraph] (a) would require covered institutions to integrate all of their sports teams." *Id.* Seeking "to avoid . . . radically alter[ing] the face of inter[scholastic] athletics" by requiring "covered institutions to integrate all of their sports teams," paragraph (b)'s first sentence includes an "explicit exception" to paragraph (a)'s "baseline prohibition against sex discrimination." *Id.* Specifically, using the permissive "may," rather than the mandatory "must" or "shall," paragraph (b)'s first sentence "allow[s] covered institutions to 'operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.'" *Id.* (quoting 34 C.F.R. § 106.41(b)); *cf.* 34 C.F.R. § 106.41(b) ("Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.").

///

PAGE 69 – FINDINGS AND RECOMMENDATION

By its terms, then, paragraph (b)'s first sentence provides that there are two primary situations in which it permits but does not require recipients to "operate or sponsor separate teams for members of each sex": (1) the underlying activity is a "contact sport," such as "boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact," and (2) team selection is "based upon competitive skill." 34 C.F.R. § 106.41(b) (describing the term "contact sport" in the third and final sentence); *see also Mercer*, 190 F.3d at 646 (recognizing that paragraph (b)'s first sentence "permits" as much in "many sports").

Paragraph (b)'s second sentence addresses what the first sentence "leaves unanswered"; that is, "what, if any, restrictions apply to sports in which a covered institution operates a team for one sex, but operates no corresponding team for the other sex." *Mercer*, 190 F.3d at 646. Using the mandatory "must" and excepting only "contact sport[s]," the second sentence requires recipients operating or sponsoring a "team for one sex" to permit "members of the excluded sex" to "try-out for the team," but only if the excluded sex has historically received limited athletic opportunities:

> However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. . . .

34 C.F.R. § 106.41(b).[26]

---

[26] The applicability of paragraph (b)'s second sentence turns on whether "two predicate" conditions are satisfied: (1) "the institution in question 'operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex,'" and (2) "athletic opportunities for members of that sex have previously been limited." *Mercer*, 190 F.3d at 646 (quoting 34 C.F.R. § 106.41(b)). Neither Plaintiffs nor Defendants argue that both conditions are satisfied here. (*See* State Defs.' Mot. at 2, 9 & State Defs.' Reply at 6, emphasizing only under paragraph (b)'s first sentence, a recipient "may"

PAGE 70 – FINDINGS AND RECOMMENDATION

In addition to paragraph (a) and (b)'s baseline proscription against sex discrimination, team integration clause, and explicit but permissive exception to integration, *see Mercer*, 190 F.3d at 646, paragraph (c) "requir[es] funding recipients to 'provide equal athletic opportunity for members of both sexes.'" *Mansourian*, 602 F.3d at 964 (identifying paragraph (c) as Title IX's athletic regulations' "equal athletic opportunity requirement" (quoting 34 C.F.R. § 106.41(c))). Paragraph (c) includes a non-exhaustive list of factors that DOE's Office for Civil Rights ("OCR") uses to evaluate a recipient's compliance with Title IX's "equal athletic opportunity" requirement. *See* 34 C.F.R. § 106.41(c)(1)-(10); *Mansourian*, 602 F.3d at 962 & n.3 (stating that OCR is "charged with enforcing Title IX"); *McCormick*, 370 F.3d at 289 (OCR considers these factors).

As the Ninth Circuit has explained, paragraph (c)'s "equal athletic opportunity requirement" consists of "two components"—namely, "effective accommodation" and "equal treatment," which are respectively derived from paragraph (c)(1) and paragraph (c)(2) through (c)(10). *Mansourian*, 602 F.3d at 965 (citing 34 C.F.R. § 106.41(c)(1)-(10)). Claims under paragraph (c)(1) (i.e., the effective accommodation component) "concern the opportunity to participate in athletics," whereas claims under paragraph (c)(2) to (c)(10) (i.e., the equal treatment component) "allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics." *Id.* (first citing *McCormick*, 370 F.3d at 299; then citing *Pederson*, 213 F.3d at 865 n.4; and then citing *Boucher v. Syracuse Univ.*, 164 F.3d 113, 115 n.1 (2d Cir. 1999)).

///

---

operate "sex-separated teams"; *see also* Pls.' Opp'n State Defs.' Mot. at 5 n.6, making a similar point.

In 1979, then-HEW's OCR published a "final Policy Interpretation" (the "1979 Policy Interpretation"), clarifying the "meaning of 'equal opportunity' in intercollege athletics" and "obligations which recipients of [f]ederal aid have under Title IX to provide equal opportunities in athletic programs." 44 Fed. Reg. 71413, 71413-71418 (Dec. 11, 1979). The 1979 Policy Interpretation also set forth a three-part test, which the Ninth Circuit adopted, for evaluating a recipient's compliance with paragraph (c)(1)'s "effective accommodation" component. *See Ollier*, 768 F.3d at 854 (citing *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 767-68 (9th Cir. 1999)); *Mansourian*, 602 F.3d at 965-66, 969-73 (evaluating UCD's arguments under the second option).

Nearly twenty years later, in 1996, DOE's OCR issued a "Dear Colleague" letter in which it clarified "each of the test's three prongs," confirming that funding recipients "need to comply only with any one part of the three-part test in order to provide nondiscriminatory participation opportunities," and explaining that "substantial, not exact, proportionality [was] required 'because in some circumstances it may be unreasonable to expect [a recipient] to achieve exact proportionality[.]'" *Balow v. Mich. St. Univ.*, 24 F.4th 1051, 1055 (6th Cir. 2022) (quoting OFF. OF CIV. RTS., U.S. DEP'T OF EDUC., CLARIFICATION OF INTERCOLLEGIATE ATHLETICS POL'Y GUIDANCE: THE THREE-PART TEST (Jan. 16, 1996) [hereinafter 1996 Clarification], https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html [https://perma.cc/CE88-SQWM]); *Mansourian*, 602 F.3d at 964-65 (noting that OCR "further elaborated" on the test in its "1996 Clarification"); *Ollier*, 768 F.3d at 855-56 (describing OCR's clarification of the test's first prong).

///

///

PAGE 72 – FINDINGS AND RECOMMENDATION

In short, OCR's "1996 Clarification is the agency's clarification of its own policy interpretation of its own regulation." *Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 786 (8th Cir. 2021).

### b.    More Recent Developments

On June 14, 2019, the Ninth Circuit decided *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) (per curiam), an appeal from "an injunction against the implementation of a 2017 Presidential Memorandum and Departments of Defense and Homeland Security policies that effectively precluded transgender individuals from serving in the U.S. military." *Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024) (citing *Karnoski*, 926 F.3d at 1189), *cert. granted*, 145 S. Ct. 2871 (2025). "Historically, transgender individuals could not serve openly in the military." *Karnoski*, 926 F.3d at 1187.

In *Karnoski*, the Ninth Circuit "held that heightened scrutiny applies to laws that discriminate on the basis of transgender status, reasoning that gender identity is at least a 'quasi-suspect class.'"[27] *Hecox*, 104 F.4th at 1079 (quoting *Karnoski*, 926 F.3d at 1200-01); *cf. United States v. Skrmetti*, 605 U.S. 495, 600-01 & n.12 (2025) (Sotomayor, J., joined by Jackson, J., and joined in all but part V by Kagan, J., dissenting) (stating that there should be no "serious dispute that transgender persons bear the hallmarks of a quasi-suspect class," as "[m]yriad courts across the country," including this circuit, have "reached the conclusion" (simplified) (citing *Karnoski*, 926 F.3d at 1200-01).

On June 26, 2019, the Supreme Court issued its opinion in *Kisor v. Wilkie*, 588 U.S. 558 (2019). "In *Kisor*, the Supreme Court articulated the circumstances in which a court may defer to

---

[27] "Under heightened scrutiny, a party seeking to uphold government action based on sex must establish an exceedingly persuasive justification for the classification." *Hecox*, 104 F.4th at 1074 (simplified).

an administrative agency's interpretation of its regulation." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 894 (9th Cir. 2025). "*Kisor* was simply a refinement of an existing deference doctrine, commonly called *Auer* deference or *Seminole Rock* deference, which governed when courts defer to agency interpretations of their own regulations." *Id.* at 894 n.12 (referring to the "currently governing scheme as '*Kisor* deference'" (citing *Kisor*, 588 U.S. at 563)).

One year later, on June 15, 2020, the Supreme Court issued *Bostock v. Clayton County*, 590 U.S. 644 (2020), an employment action that the plaintiff filed under Title VII, which makes it unlawful for an employer to, among other things, "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" *Id.* at 649-50 (quoting 42 U.S.C. § 2000e-2(a)(1)). In *Bostock*, the Supreme Court "held that firing a worker based on the worker's transgender status constitutes unlawful sex discrimination under Title VII because 'it is impossible to discriminate against a person for being transgender without discriminating against that individual based on sex.'" *Roe*, 137 F.4th at 928 (quoting *Bostock*, 590 U.S. at 660).

Nearly two years later, on March 10, 2022, the Ninth Circuit decided *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022), a case concerning Section 1681(a)'s requirements, which the Ninth Circuit "construe[d] . . . consistently with those of Title VII," explaining that "[g]iven the similarity in language prohibiting sex discrimination in Titles VII and IX, [it did] not think *Bostock* can be limited in the manner the district court suggested." *Id.* (citing *Bostock*, 590 U.S. at 725-32 (Alito, J., dissenting)). The Ninth Circuit also explained that "[w]hile the language in Title VII is 'because of sex' and the language in Title IX is 'on the basis of sex,' *Bostock* used

PAGE 74 – FINDINGS AND RECOMMENDATION

those phrases interchangeably throughout the decision." *Id.* (citing *Bostock*, 590 U.S. at 649-55, 662-66, 680-81).

By the end of 2022, a circuit split developed on the issue of whether a recipient's denial of gender-affirming bathroom access violates the Equal Protection Clause of the Fourteenth Amendment and Title IX's prohibition of discrimination "on the basis of sex." *See A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 764, 770-71 (7th Cir. 2023) (recognizing that there is "already a circuit split on the issues raised in this appeal" and describing what the plaintiffs had to demonstrate for each claim (first citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021); and then citing *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc))). The Fourth Circuit held that the answer was "resoundingly yes." *See Grimm*, 972 F.3d at 593 (joining a "growing consensus"). The Eleventh Circuit held that it did not. *See Adams*, 57 F.4th at 796 (addressing the "unremarkable—and nearly universal—practice of separating school bathrooms based on biological sex" and "whether separating the use of male and female bathrooms in the public schools based on a student's biological sex violates" the Equal Protection Clause and Title IX and holding that that such separation "passe[d] constitutional muster and comport[ed] with Title IX").

About a year later, on April 13, 2023, DOE "proposed an amendment to Title IX's athletics regulations that would clarify that Title IX does not authorize the categorical exclusion of transgender female students from female sports." *Doe*, 115 F.4th at 1111 n.17 (citing 88 Fed. Reg. 22860 (proposed Apr. 13, 2023) (to be codified at 34 C.F.R. § 106.41(b)(2)); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 611 (6th Cir. 2024) (noting the same). Under DOE's proposal, "restrictions on transgender athletes' eligibility . . . require[d] 'such criteria' to 'be substantially

related to the achievement of an important educational objective and minimize harms to students whose opportunity to participate on a male or female team consistent with their gender identity would be limited or denied.'" *Hecox*, 104 F.4th at 1090 & n.20 (citing 88 Fed. Reg. 22860 (proposed Apr. 13, 2023) (to be codified at 34 C.F.R. pt. 106)).

On June 13, 2023, the Ninth Circuit in *Grabowski* addressed whether discrimination on account of perceived sexual orientation constituted discrimination "on the basis of sex" within the meaning of Section 1681(a) of Title IX. 69 F.4th at 1114 (emphasizing the relevant text (quoting 20 U.S.C. § 1681)). The Ninth Circuit held that "discrimination on the basis of sexual orientation is a form of sex-based discrimination under Title IX." *Roe,* 137 F.4th at 928 (citing *Grabowski*, 69 F.4th at 1116).

By August 1, 2023, "[l]itigation over transgender rights [was] occurring all over the country," prompting the Seventh Circuit to observe that it "assume[s] that at some point the Supreme Court will step in with more guidance than it has furnished so far." *A.C.*, 75 F.4th at 764.

With respect to a recipient's denial of gender-affirming bathroom access, the Seventh Circuit found that it made "little sense for [it] to jump from one side of the circuit split to the other, particularly in light of the intervening guidance in *Bostock*." *Id.* at 771. Thus, the Seventh Circuit adhered to its past precedent and sided with the Fourth Circuit in finding that the denial of gender-affirming bathroom access can constitute discrimination "on the basis of sex," in violation of the Equal Protection Clause and the Fourth Amendment. *Id.* (adhering to *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051-52 (7th Cir. 2017), *abrogated on other grounds*, *Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) (same)); *see also id.* at 775 (Easterbrook, J., concurring in judgment) (finding it

unnecessary to overrule *Whitaker* and expressing the view that *Adams* "better understands how Title IX applies to transgender students" and appeared "closer to the mark in concluding that 'sex' in Title IX has a genetic sense, given that word's normal usage when the statute was enacted," but also expressing uncertainty about the "confidence" that both the majority in *A.C.* and *Adams* described regarding the applicability of *Bostock* and whether "Title IX use[s] 'sex' in the same way").

On October 25, 2023, DOE approved Oregon's plan and funding under the Every Student Succeeds Act ("ESSA"), which included ODE's certifications of compliance with Title IX and its regulations that ODE submitted to DOE less than a month after the Ninth Circuit issued its decision in *Grabowski*.[28] *See* Letter from Adam Schott, DOE Deputy Assistant Secretary, to Dr. Charlene Williams, ODE Director (Oct. 25, 2023), https://www.ed.gov/media/document/or-amendment-approval-letter-108147.pdf [https://perma.cc/3EVL-68ZW]; OR. DEP'T OF EDUC., OREGON'S CONSOLIDATED STATE PLAN UNDER THE ESSA (proposed July 7, 2023), https://www.ed.gov/media/document/or-2024-state-plan-108159.pdf [https://perma.cc/4GZB-L3GC].

---

[28] The parties do not dispute that (1) ODE certified its compliance with Title IX and its implementing regulations on the dates identified herein, (2) pursuant to the doctrines of judicial notice and incorporation by reference, the Court may consider ODE's and DOE's Title IX-related submissions and approvals, an Oregon legislative counsel committee opinion letter that Plaintiffs attached as an exhibit to their opposition, and a letter that Plaintiffs' counsel emailed to DOE on May 5, 2025, and (3) the administrative complaint that Carpenter's mother allegedly filed on April 19, 2025, the day after the Chehalem Classic. (*See* State Defs.' Mot. at 5-6 & n.1; Pls.' Opp'n State Defs.' Mot. at 10 & n.7, 13-16; State Defs.' Reply at 4-5 & n.3; *cf.* SAC ¶¶ 119, 158-60, identifying the correct date of Carpenter's mother's complaint but also listing the incorrect year of "2024"; Compl. Ex. 1 at 1-2, docketing the "May 5, 2025" letter that Plaintiffs' counsel "[s]ent via email" to DOE and incorporated by reference but did not attach to amended pleadings).

PAGE 77 – FINDINGS AND RECOMMENDATION

On May 21, 2024, ODE submitted Oregon's application under Part B of the IDEA to DOE and certified ODE's compliance with Title IX and its implementing regulations. *See* OR. OFF. MGMT. BUDGET, OR. ANNUAL STATE APPL. UNDER PART B OF THE IDEA AS AM. IN 2004, FED. FISCAL YEAR 2025 (May 21, 2024), https://www.oregon.gov/ode/schools-and-districts/grants/SPEDFunding/Documents/idea_partb_stateapps/partbapp2025.pdf [https://perma.cc/MC96-BL85].

On June 14, 2024, the Ninth Circuit in *Hecox* reviewed Idaho's Fairness in Women's Sports Act ("FWSA"), which barred "all transgender girls and women from participating in, or even trying out for, public school female sports teams at every age, from primary school through college, and at every level of competition, from intramural to elite teams." 104 F.4th at 1068. The FWSA also "provide[d] a sex dispute verification process whereby any individual can 'dispute' the sex of any student athlete participating in female athletics . . . and require her to undergo intrusive medical procedures to verify her sex, including gynecological exams." *Id.* The Ninth Circuit held that the FWSA discriminated on its face based on transgender status. *See id.* at 1074-79. In so holding, the Ninth Circuit reasoned that the FWSA's "use of 'biological sex' function[ed] as a form of '[p]roxy discrimination,'" because the record evidence suggested that it was "written with 'seemingly neutral criteria that [were] so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group.'" *Id.* at 1078 (first quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013); and then citing *Lawrence v. Texas*, 539 U.S. 558, 575 (2003)).

///

///

PAGE 78 – FINDINGS AND RECOMMENDATION

Later that month, on June 28, 2024, the Supreme Court "essentially eliminated" *Chevron* deference.[29] *See Bracamonte-Palma v. Blanche*, No. 23-970, 2026 WL 1122115, at *1 (9th Cir. Apr. 24, 2026) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)). The Ninth Circuit "subsequently concluded that when an agency 'has not promulgated a new interpretation of the statute to prompt [it] to reconsider our precedent,' . . . [courts] remain bound by [its] prior precedent 'that relied on the *Chevron* framework.'"[30] *Id.* (quoting *Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024)); *cf. Lopez*, 116 F.4th at 1045 ("[T]he Supreme Court has instructed that *Loper Bright* . . . does not 'call into question prior cases that relied on the *Chevron* framework.'" (quoting *Loper Bright*, 603 U.S. at 412)); *Cascadia*, 153 F.4th at 894 n.1 ("*Loper Bright* . . . did not call *Kisor* into question . . . , so [the Ninth Circuit] continue[s] to apply it.") (simplified).[31]

---

[29] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[30] The Ninth Circuit has previously held that the 1979 Policy Interpretation and 1996 Clarification are entitled to *Auer* and *Chevron* deference. *See Neal*, 198 F.3d at 771 ("OCR's interpretation of Title IX's athletics provisions merits deference under *Martin* and *Chevron*." (first citing *Chevron*, 467 U.S. at 843-44; and then citing *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 150 (1991)); *Mansourian*, 602 F.3d at 965 n.9 (same); *cf. Kisor*, 588 U.S. at 569 ("*Auer* deference (as we now call it) [is] rooted in a presumption . . . that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities." (citing *Martin*, 499 U.S. at 151-53)); *see also Ollier*, 768 F.3d at 854-58 & n.5 (invoking *Chevron* deference and discussing the three-prong test and 1996 Clarification (simplified) (citing *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 93-94 (2d Cir. 2012))); *Biediger*, 691 F.3d at 94 (stating that the 1996 Clarification was "entitled to substantial deference under *Auer*") (simplified).

[31] The Sixth Circuit's chief judge recently stated that "*Loper Bright* and *Kisor* should prompt [that circuit] to revisit the 1979 guidance in an appropriate case" because "many indicators show that Title IX likely 'prohibits only intentional discrimination.'" *Niblock v. Univ. of Ky.*, 165 F.4th 460, 469-70 (6th Cir. 2026) (Sutton, C.J., and Murphy, J., concurring) (first citing *Alexander*, 532 U.S. at 280; then citing *Jackson*, 544 U.S. at 173-74; and then citing *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 240 (6th Cir. 2019)). He also explained that the "fate of these erstwhile deference-to-agency regimes remains linked" because "[o]ne reason that an agency's interpretations of its own rules received deference under *Auer* was that its views of the relevant statute also received deference under *Chevron*." *Id.* Accordingly, "[k]nock out

PAGE 79 – FINDINGS AND RECOMMENDATION

On July 1, 2024, DOE approved Oregon's application under Part B of the IDEA and ODE's receipt of funds. *See* Letter from Valeria Williams, DOE Dir. Special Educ. Programs, to Dr. Charlene Williams, ODE Director (July 1, 2024), https://www.ed.gov/sites/ed/files/2024-11/or-2024b-letter.enclosures.pdf [https://perma.cc/2RAF-JLF2].

On September 9, 2024, the Ninth Circuit in *Horne* held that Arizona's Save Women's Sports Act ("SWSA"), which was "similar" to the FWSA's "transgender ban," discriminated on its face based on transgender status. 115 F.4th at 1092, 1104-05. Applying and reaching the "same conclusion" as *Hecox*, the Ninth Circuit explained that although SWSA's definition did not use the word "transgender," the SWSA's use of "biological sex" amounted to and functioned as a "proxy form of discrimination" because the record evidence suggested that it was "carefully drawn to target transgender women and girls." *Id.* at 1105 (simplified) (quoting *Hecox,* 104 F.4th at 1078).

Like its past precedent addressing state laws defining marriage as between a man and a woman, the Ninth Circuit found that the "challenged laws prohibited *all* same-sex couples from marrying, whether gay or straight, the laws facially discriminated based on sexual orientation because only gay couples were barred from marrying *consistent with their sexual orientation*." *Id.* at 1104. The Ninth Circuit explained that the SWSA similarly discriminated on its face because it "bar[red] all 'students of the male sex' from playing on female teams, but only transgender female students are prohibited from playing on teams consistent with their gender identity, and this distinction is plain from the face of the statute." *Id.* at 1104-05. The Ninth Circuit added that this conclusion was consistent with "common sense" because there was

---

*Chevron*, and the scope of *Auer* deference narrows considerably, if indeed it remains meaningful at all." *Id.*

PAGE 80 – FINDINGS AND RECOMMENDATION

"simply no denying that a transgender sports ban discriminates based on transgender status" and "decisions of other courts, which have held that transgender sports bans like the one challenged [in *Horne*] discriminate on their face against transgender women and girls." *Id.* at 1105 (simplified) (first citing *Hecox*, 104 F.4th at 1078; and then citing *B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 555-56 (4th Cir. 2024), *cert. granted*, 146 S. Ct. 57 (2025)).[32]

Effective December 20, 2024, DOE withdrew the amendment to Title IX's athletics regulations that it had proposed on April 13, 2023, and terminated its rulemaking proceeding. 89 FR 104936-01, 104937, 2024 WL 5201862 (Dec. 26, 2024) (withdrawing DOE's notice of proposed rulemaking as of December 20, 2024, and terminating DOE's related rulemaking proceeding); (Pls.' Opp'n State Defs.' Mot. Ex. 1 ("Pls.' Ex. 1") at 1-2 & n.5, ECF No. 51-1) (simplified).

On January 20, 2025, President Trump promulgated Executive Order 14168 ("EO 14168") directing that "[f]ederal funds shall not be used to promote gender ideology." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 50 (1st Cir. 2025) (quoting Exec. Order 14168, 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025)). EO 14168's stated purpose was to "defend women's rights by," among other things, "using clear and accurate . . . policies that recognize women are biologically female, and men are biologically male." Exec. Order 14168, 90 Fed. Reg. 8615, 8615. Further, EO 14168 expressed the government's "policy of . . . recogniz[ing] two sexes, male and female," and defined "[s]ex" as not including the "concept of 'gender

---

[32] *B.P.J.* "involves a challenge to a law that bars transgender girls from participating in girls' school sports." *Doe ex rel. Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *10 (4th Cir. Aug 15, 2025). The Supreme Court granted certiorari and elected to consider *B.P.J.* alongside *Hecox* because they involve "related issues." *Id.* at *5 n.7. "Barring an unforeseen procedural dismissal, . . . any merits decision [is] likely to be issued" this month or next, with "late June 2026 [as] a reasonable expectation" given the "nature" of the cases consolidated for review. *Id.*

PAGE 81 – FINDINGS AND RECOMMENDATION

identity'" and instead "refer[ring] to an individual's immutable biological classification as either male or female." *Id.*

Relatedly, on February 5, 2025, President Trump also promulgated Executive Order 14201 ("EO 14201") directing DOE to "'prioritize Title IX enforcement actions against educational institutions (including athletic associations composed of or governed by such institutions)' that deny female students 'equal opportunity' by 'requiring them, in the women's category, to compete with or against . . . males.'" *Female Athletes United v. Ellison*, 172 F.4th 1019, 1023-24 (8th Cir. 2026) (quoting Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025)).

On February 20, 2025, Oregon's Legislative Counsel Committee (the "Committee") issued an opinion letter to Representative Bobby Levy regarding the recent "Title IX rule changes." (Pls.' Ex. 1 at 1-5); Or. Legis. Couns. Comm., Opinion Letter on Title IX Rule Changes (Feb. 20, 2025), https://content.govdelivery.com/accounts/ORLEG/bulletins/3d56c0d [https://perma.cc/9JPD-RR9K]. Given that DOE withdrew its proposed amendment to Title IX's athletics regulations and recently issued a notice of its intent to "enforce th[e] understanding of Title IX" set forth in EO 14168 and 14201 the Committee opined that Title IX "prohibit[ed] transgender students from participating on public high school athletic teams in alignment with the gender identity[.]" (Pls.' Ex. 1 at 2-3.) The Committee added that ODE and OSAA's policy for public high school athletics generally "require[d] that students—including transgender students—are allowed to participate in school athletics in alignment with their gender identity." (*Id.* at 3.) For these reasons, the Committee opined that Oregon's athletic participation policies were now inconsistent with the federal government's federal Title IX policies and Oregon

PAGE 82 – FINDINGS AND RECOMMENDATION

schools "could be subject to investigation or sanctions by federal authorities for any violation of Title IX." (*Id.* at 1, 4.)

The Committee also noted that DOE's primary means of enforcement was "voluntary agreements with the recipients," "fund suspension or termination [was] a means of last resort," and DOE's investigations were focused on schools that were allowing "a 'male athlete' to participat[e] in women's athletic competition, not simply the existence of a school policy that conflicts with Title IX." (*Id.* at 4.) The Committee added that it recommended "caution" because "this is a rapidly evolving area of law" and that ODE and OSAA were in contact and reviewing the changes to Title IX and "potential effect" on their policies and state antidiscrimination law. (*Id.* at 1, 4.)

On April 19, 2025, Carpenter's mother emailed OSAA's fifteen board members and lodged a complaint regarding OSAA's policy. (SAC ¶¶ 119, 158.) That same day, Carpenter's mother filed an administrative complaint with DOE's OCR, notifying them about "what had occurred" at the Chehalem Classic and alleging that OSAA and ODE's policies violated Title IX. (*Id.*) Shortly thereafter, Plaintiffs' counsel emailed a letter dated May 5, 2025, to DOE's secretary requesting that she direct DOE's "Title IX Special Investigations Team" to initiate an "urgent[]" investigation into ODE and OSAA's facilitation of "sex-based discrimination." (SAC ¶ 160.)

### c.    Disposition

The Court concludes that *Pennhurst*'s clear notice rule bars Plaintiffs' Title IX claims. The Court therefore recommends that the district judge grants Defendants' motions to dismiss on this ground. *See Roe*, 137 F.4th at 930 & n.12 (holding that *Pennhurst*'s clear notice rule bars not only a claim for "money damages" under Title IX, but also "other remedies" like "injunctive relief" (first citing *Pennhurst*, 451 U.S. at 17-18, 24-25; and then citing *Barnes*, 536 U.S. at 187)).

PAGE 83 – FINDINGS AND RECOMMENDATION

In this context, the Court must view Title IX "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds." *Arlington*, 548 U.S. at 296; *see also Roe,* 137 F.4th at 928 & n.11 (applying this rule and looking to "Title IX and its implementing regulations" from the "time of enactment"). The Court must ask whether Title IX "clearly and unambiguously alert[ed]" such an official to "the liability at issue in this case." *Arlington*, 548 U.S. at 296 (asking whether "such a state official would clearly understand" that the statute "furnishes [such] notice regarding the liability at issue"); *see also Medina*, 606 U.S. at 373 n.4 ("Congress must clearly and unambiguously alert States to conditions associated with federal funding[.]").

As framed by Plaintiffs, the liability at issue in this case is based on ODE and OSAA's policies on students' participation in high school athletics. (Pls.' Opp'n State Defs.' Mot. at 7, relying on ODE and OSAA's policies "permitting" transgender female athletes to "complete in girls' athletic competitions without restriction" and alleging that "[t]hese policies violate Title IX by failing to effectively accommodate the interests and abilities of female athletes, denying them equal treatment and opportunities, and creating a hostile environment" (citing SAC ¶¶ 53-60)). In their operative pleading, Plaintiffs emphasize the following portions of ODE's 2023 athletics provision, ODE's 2025 updated guidance on athletics, and OSAA's handbook's gender identity participation policy:

[ODE's 2023 ATHLETICS PROVISION]

[I]n Oregon, the [OSAA] . . . policies allow gender expansive students to participate in school athletics and activities in accordance with their consistently asserted gender identity. Not allowing students to participate in athletics in alignment with their gender identity may violate Oregon nondiscrimination rules.

. . . .

[ODE's 2025 GUIDANCE]

PAGE 84 – FINDINGS AND RECOMMENDATION

In Oregon, state nondiscrimination law prohibits discrimination on the basis of, among other things, gender identity. In accordance with this law, *schools are prohibited from excluding gender expansive students from participating in school athletics and activities that align with their consistently asserted gender identity* if the basis of such exclusion is the student's gender identity. . . .

. . . .

[OSAA's HANDBOOK]

The OSAA endeavors to allow students to participate [in] the athletic or activity program of their consistently asserted gender identity while providing a fair and safe environment for all students. . . . [R]ules such as this one promotes harmony and fair competition among member schools by maintaining equality of eligibility and increase the number of students who will have an opportunity to participate in interscholastic activities.

. . . .

*For both historical reasons, as well as reasons related to compliance with Title IX, interscholastic athletics and activities have typically been divided by gender, with a few exceptions*. Formulating new processes to address concerns about participation regardless of a student's gender identity *requires a new approach to eligibility*, an approach reflected in these policies. In interpreting these policies, the OSAA recognizes the value of activities and sports for all students and the potential for inclusion to reduce harassment, bullying and barriers faced by certain students.

1.  As is true with all eligibility determinations, the student's member school will be the first point of contact for determining the student's eligibility. When a student registers for athletics or activities the student shall indicate the student's gender during that registration process, consistent with other school enrollment procedures. Athletics and activities personnel should refer to member school processes for registration/enrollment information. Disputes regarding these gender identity determinations will be resolved solely at the member school level; . . . the OSAA will not hear any appeal of a member school's determination made under this section.

2.  Subject to section B(1), *once a transgender student has notified the student's school of their gender identity (boy or girl), the student shall consistently participate as that gender for purposes of eligibility for athletics and activities*, provided that if the student

PAGE 85 – FINDINGS AND RECOMMENDATION

> has tried out or participated in an activity, the student may not
> participate during that same season on a team of the other gender.

(SAC ¶¶ 55-56, 58-59, first quoting ODE 2023 ATHLETICS PROVISION, *supra* note 1, at 33; then quoting ODE 2025 GUIDANCE, *supra* note 1, at 1, replacing ODE's 2023 athletics provision effective March 18, 2025; and then quoting OSAA HANDBOOK, *supra* note 1, at 70-71) (simplified).[33]

In evaluating whether Congress provided states with clear and unambiguous notice of the liability at issue, the Court must begin with Title IX's text. That much is undisputed. (*See* Pls.' Opp'n State Defs.' Mot. at 13, stating that "Plaintiffs' claims are based on Title IX's operative text[,] not on an executive agency's interpretive guidance"; State Defs.' Reply at 5, describing the lack of clear text as an "insurmountable barrier" but relying also on implementing regulations and "case law").

Title IX "broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'" *Jackson*, 544 U.S. at 174 (quoting 20 U.S.C. § 1681(a)). *Jackson* and *Mansourian* make clear that official decisions and policies in the athletics context, such as ODE's 2023 athletics provision and 2025 guidance update on athletics and OSAA's gender identity participation policy, are, by definition, "intentional" and therefore "easily attributable to the funding recipient." *Mansourian*, 602 F.3d at 964 (quoting *Jackson*, 544 U.S. at

---

[33] Plaintiffs also note that OSAA's handbook includes (1) a provision that is very similar to B(2) but concerns a "nonbinary or intersex student [that] has notified the student's school of their gender identity" and the student's "eligibility for athletics and activities that are gender-segregated or gender-specific," and (2) a question and answer section contemplating a scenario in which "OSAA will recognize a school's decision to modify the student's eligibility, consistent with the student's gender identity, subject to B(2)." (SAC ¶ 56, quoting OSAA HANDBOOK, *supra* note 1, at 71) (simplified). Considering that Plaintiffs' claims are based on events in which they compete against transgender female athletes, the Court's analysis focuses only on policy provisions addressing transgender students' eligibility to participate in school athletics and activities.

PAGE 86 – FINDINGS AND RECOMMENDATION

183). Accordingly, there is no meaningful dispute about "intentionality." *See Soule*, 90 F.4th at 92 (Chin, J., dissenting, joined in full by Carney & Kahn, JJ., and Part III by Lohler & Robinson, JJ.) (same).

The next question, then, is whether Congress clearly and unambiguously alerted recipients that official policies like the ones at issue here constituted intentional "discrimination" "on the basis of sex." *See id.* (agreeing that "it is intentional action in *clear violation* of Title IX—that is, intentional discrimination—that removes the *Pennhurst* bar" and that "liability" does not "sink[] or swim[] on the sole basis of intentionality"). The Supreme Court's decision in "*Jackson* is most persuasive on this point." *Id.*; *cf. Jackson*, 544 U.S. at 173-79 & nn.2-3, 183-84 (evaluating whether (1) the "intentional act" at issue (2) constituted "intentional 'discrimination'" (3) "on the basis of sex," and thus (4) "violates the clear terms of the statute," and in doing so, asking whether the "nature" of the act was a "form of 'discrimination,'" i.e., "being subject[ed] to differential treatment," "on the basis of sex," which Title IX "clearly protects") (simplified).[34]

The parties present competing (and at times shifting) positions relevant to this inquiry. (*See* Pls.' Opp'n State Defs.' Mot. at 4-7, 13-14; State Defs.' Mot. at 1, 6-11; State Defs.' Reply at 1-6.) For the most part, the parties focus on the import of cases and regulatory changes predating or postdating the State Defendants' July 2023 and May 2024 certifications of their compliance with Title IX and Title IX's implementing regulations and subsequent acceptance of federal funds. In particular, the parties dispute whether Title IX's undefined use of the word

---

[34] As discussed above and confirmed during oral argument, Plaintiffs argued that no notice was required under *Pennhurst* because of the nature of official policies and decisions in an athletics context, which does not resolve whether such acts were "intentional discrimination" "on the basis of sex."

"sex" unambiguously refers to a "person's immutable biological sex," i.e., "male or female," and the import of the Supreme Court's 2020 decision in *Bostock*, the Eleventh Circuit's 2020 decision in *Adams*, and the Ninth Circuit's 2022 and 2023 decisions in *Snyder* and *Grabowski*. *Compare Grabowski*, 69 F.4th at 1116 & n.1 (holding that "discrimination on the basis of sexual orientation is a form of sex-based discrimination under Title IX" and noting that the Fourth Circuit in *Grimm* "adopted the [same] approach . . . in a similar context," i.e., gender identity (citing *Grimm*, 972 F.3d at 616)), *and Jackson*, 544 U.S. at 173-74 ("Retaliation . . . is a form of 'discrimination' because the complainant is being subjected to differential treatment.") (simplified); *see also Bostock*, 590 U.S. at 660 ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."); *Snyder*, 28 F.4th at 114 ("We construe Title IX's protections consistently with those of Title VII.") (simplified).

In *Roe*, the Ninth Circuit confronted similar competing positions in reviewing a Title IX action and applying *Pennhurst*'s clear notice rule. 137 F.4th at 919, 926-31. The remaining plaintiff in *Roe* was a high school student organization appealing from the district court's denial of its motion for a preliminary injunction. *Id.* at 919-20 n.4. The plaintiff challenged Idaho Senate Bill ("S.B. 1100"), which "require[d] all public-school students in Idaho to use only the restroom and changing facility corresponding to their 'biological sex.'" *Id.* at 919. The plaintiff alleged that S.B. 1100 was "facially unconstitutional" and violated Title IX, the Equal Protection Clause, and Fourth Amendment. *Id.* at 919-21 n.5. The parties' dispute was limited to the "statute's exclusion of transgender students from facilities corresponding to their gender identity," as the plaintiff "did not challenge the State's ability to maintain sex-segregated

PAGE 88 – FINDINGS AND RECOMMENDATION

facilities or to exclude cisgender students from facilities designated for use by students of the opposite sex." *Id.* at 919.

On appeal, the Ninth Circuit explained that given the limited scope of the plaintiff's challenge, the "parties' dispute narrow[ed] to a disagreement regarding the definition of 'sex' as used in Title IX[, which n]either Title IX nor its implementing regulations define[.]" *Id.* at 927. The Ninth Circuit discussed *Bostock* and its subsequent decisions in *Snyder*, *Grabowski*, and *Hecox* but ultimately determined that it was unnecessary to address the parties' dispute regarding the meaning of "sex":

> Circuit precedent establishes that discrimination on the basis of transgender status is a form of sex-based discrimination. *Hecox*, 104 F.4th at 1079. In *Bostock*[,] . . . the Supreme Court held that firing a worker based on the worker's transgender status constitutes unlawful sex discrimination under Title VII because "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 590 U.S. at 660. We applied *Bostock*'s reasoning to Title IX's protections against discrimination on the basis of gender in *Snyder*, 28 F.4th at 114 ("We construe Title IX's protections consistently with those of Title VII."). And we subsequently held in *Grabowski*, 69 F.4th at 1116, that "discrimination on the basis of sexual orientation is a form of sex-based discrimination under Title IX."
>
> Though we have extended *Bostock*'s reasoning to Title IX, *Bostock* did "not purport to address bathrooms, locker rooms, or anything else of the kind," 590 U.S. at 681, and it did not consider whether Title IX or its implementing regulations put states on notice that policies restricting access to these types of facilities on the basis of gender assigned at birth may constitute unlawful discrimination against transgender persons.
>
> [The plaintiff] argues on appeal that Title IX's general prohibition of sex-based discrimination provided notice to defendants that S.B. 1100 unlawfully discriminates on the basis of sex because, viewed in the context of the entire statute, the term "sex" cannot be limited to sex assigned at birth. The Supreme Court in *Bostock* neither adopted nor rejected this argument in the context of Title VII. Consistent with the parties' stipulation, the [Supreme] Court "proceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female." 590 U.S. at 655.
>
> Other circuits have disagreed over whether Title IX's use of the word "sex" unambiguously refers to sex assigned at birth. The Eleventh Circuit concluded in *Adams* that the word "sex," as used in Title IX, unambiguously

PAGE 89 – FINDINGS AND RECOMMENDATION

refers to reproductive function—what S.B. 1100 refers to as "biological sex." 57 F.4th at 812. But the Fourth and Seventh Circuits have rejected the proposition that "sex" refers only to reproductive functions or sex assigned at birth. *See A.C.,* 75 F.4th at 770; *id.* at 775 (Easterbrook, J. concurring) ("[S]ex is such a complex subject that any invocation of plain meaning is apt to misfire."); *see also Grimm,* 972 F.3d at 618. We have never addressed this question directly, and we need not reach it here because [the d]efendants alternatively argue that, "[w]hatever else may be true, Title IX does not 'so clearly' prohibit designating intimate spaces by biology that states could 'fairly . . . make an informed choice' before accepting federal funds." *See Pennhurst,* 451 U.S. at 25, 101. Because we agree that [the plaintiff] did not make this showing, we conclude that the district court did not err by denying preliminary injunctive relief on this claim.

*Id.* at 928-29 (simplified).

Applying *Pennhurst* and the "Spending Clause's clear notice rule," the Ninth Circuit "recognize[d] that 'Congress need not specifically identify and proscribe each condition' in Spending Clause legislation." *Id.* at 929-30 (quoting *Davis,* 526 U.S. at 650). Nevertheless, the Ninth Circuit "agree[d] with the State that [the plaintiff] failed to establish that [the d]efendants had adequate notice, when they accepted federal funding, that Title IX prohibits the exclusion of transgender students from restrooms, locker rooms, shower facilities, and overnight lodging corresponding to their gender identity." *Id.* In support of its holding, the Ninth Circuit explained that "from the time of the enactment of Title IX and its implementing regulations, the scheme has authorized schools to maintain sex-segregated facilities, and contemporary dictionary definitions commonly defined 'sex' in terms that refer to students' sex assigned at birth." *Id.* The Ninth Circuit also "emphasize[d] that [*Roe* presented] an unusual instance in which the statute in question appears to affirmatively authorize conduct the funding recipient has engaged in, not merely a case in which the scope of conduct proscribed by the statute is uncertain." *Id.* at 929 n.11.

///

///

PAGE 90 – FINDINGS AND RECOMMENDATION

To the extent the plaintiff argued otherwise, the Ninth Circuit found unpersuasive the plaintiff's reliance on Section 106.33.[35] *Id.* at 930. The Ninth Circuit rejected the suggestion that it was construing Section 106.33 as "creat[ing] a vast loophole in Title IX's nondiscrimination mandate" and reading an "implementing regulation . . . [as] authoriz[ing] conduct prohibited by a statute—[i.e.,] the antidiscrimination mandate found in [Section] 1681." *Id.* The Ninth Circuit noted that although Section 106.33 required comparable facilities when separately provided, HEW cited Section 1681 as "statutory authority" when it adopted Section 106.33 in 1975 and DOE's reissuance did the same in 1980. *Id.* at 930 n.14. The Ninth Circuit explained that "[i]n this way, [Section] 106.33 extends [Section] 1681's protections against sex-based discrimination rather than expanding the scope of [Section] 1686's carve out." *Id.* at 930. In other words, it "works in tandem with [Section] 1681's antidiscrimination mandate, requiring that equivalent facilities must be provided where funding recipients choose to maintain sex-segregated facilities." *Id.*

Given the regulation's interplay with the statute, the Ninth Circuit agreed that Section "106.33 implements [Section] 1681" but declined to find that Section "1686's carve-out of living facilities from Title IX's general mandate is unambiguously limited to facilities such as dormitories." *Id.* In support, the Ninth Circuit invoked the "doctrine of *expression unius est*

---

[35] Section 106.33 provides that "[a] recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. Section 1686, which is titled "[i]nterpretation with respect to living facilities," sets forth a related exception, also known as a "carve-out," to Section 1681's general antidiscrimination mandate: "Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686; *cf. Roe,* 137 F.4th at 930 (referencing Section "1686's carve-out of living facilities from Title IX's general mandate").

PAGE 91 – FINDINGS AND RECOMMENDATION

*exclusion alterius*," finding that the "absence of an express reference to restrooms, locker rooms, and shower rooms in [Section] 1686 much more likely reflect[ed] . . . that in 1972 the separation of these facilities on the basis of sex was so assumed that it did not merit special mention in the text of the statute." *Id.* (citing *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc)). *Roe* provides useful guidance on applying *Pennhurst*'s clear notice rule in the Title IX context.

The Supreme Court's decision in *Arlington* addressed a different context but is also instructive because it considered what role, if any, persuasive case law may have on a court's inquiry under *Pennhurst*. In *Arlington*, the Supreme Court "granted certiorari . . . to resolve the conflict among the [c]ircuits with respect to whether Congress authorized the compensation of expert fees to prevailing parents in IDEA actions." 548 U.S. at 295. The prevailing parents argued that they were entitled to "recover fees for services rendered by experts in IDEA actions" because the IDEA's fee-shifting provision "provides that a court 'may award reasonable attorneys' fees as part of the costs' to parents who prevail in [such] an action[.]" *Id.* at 293-94 (quoting 20 U.S.C. § 1415(i)(3)(B)). The Supreme Court held that it did not and started "with the text." *Id.* at 294, 296.

The Supreme Court concluded that the IDEA's fee-shifting and "[o]ther provisions" "overwhelmingly support[ed] the conclusion that prevailing parties may not recover the costs of experts or consults" and the IDEA's terms "[c]ertainly . . . fail[ed] to provide the clear notice that would be needed to attach such a condition to a State's receipt of IDEA funds." *Id.* at 297-300. The Supreme Court found it most significant that the IDEA made "no mention of expert fees," "costs" was a term of art that generally did not include expert fees, and attorney's fees were "part

PAGE 92 – FINDINGS AND RECOMMENDATION

of the costs" under 28 U.S.C. § 1920 and, as a result, "strictly limited by" 28 U.S.C. § 1821. *Id.* at 297-99.

After interpreting the IDEA's text, the Supreme Court explained that it derived "perhaps the strongest support for [its] interpretation" from the "reasoning" of two of its previous decisions, neither of which were IDEA actions. *See id.* at 300-03 (first citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439-42, 445 (1987); and then citing *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88-92 & n.5, 102 (1991)). The first decision (*Crawford Fitting*) involved a litigant's "very similar" argument about Rule 54(d)'s use of the word "costs" and turned on the Supreme Court's unwillingness to interpret Rule 54(d) more broadly than Section 1920 and the limitations that Section 1821 imposed on Section 1920. *Id.* at 300-01. In the second (*Casey*) decision, the Supreme Court "interpreted" the civil rights fee-shifting statute, 42 U.S.C. § 1988, the "relevant wording of which was virtually identical to the wording" of the IDEA's fee-shifting provision. *Id.* at 301-02. Accordingly, to resolve the dispute about reimbursement of expert fees in the parents' favor, the Supreme Court needed to find that IDEA's fee-shifting provision had "exactly the opposite meaning" as Section 1988, and that it also "unambiguously mean[t] exactly the opposite of what the nearly identical language in [Section 1988] was held to mean in *Casey*." *Id.*

Given its decisions in *Crawford Fitting* and *Casey*, the Supreme Court was unable to "see how it [could] be said that the IDEA gives a State unambiguous notice regarding liability for expert fees" and noted that these decisions "strongly reinforce[d] the conclusion that the IDEA [did] not unambiguously authorize prevailing parents to recover expert fees." *Id.* at 301-03. The Supreme Court concluded by rejecting the parents' reliance on the IDEA's far "too general" "overarching goal[s] of 'ensur[ing] that all children with disabilities have available to them a free

PAGE 93 – FINDINGS AND RECOMMENDATION

appropriate public education,' . . . [and] 'safeguard[ing] the rights of parents to challenge school decisions that adversely affect their child.'" *Id.* (quoting 20 U.S.C. § 1400(d)(1)(A)). Notably, the Supreme Court also rejected the parents' reliance on a footnote from *Casey*, which "heavily influenced" the Second Circuit, described the IDEA's fee-shifting provision's "legislative history," and stated that the "conferees intend[ed] that the term 'attorneys' fees as part of the costs' include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the case." *Id.* at 302-04 (simplified). Explaining (as it did in the *Casey* decision) that the conferees' statement departed from the ordinary meaning of a term of art, the Supreme Court found that such history failed to "provide the clear notice required under the Spending Clause" where the "key is not what a majority of the Members of both Houses intend but what the States are clearly told regarding the conditions that go along with the acceptance of those funds." *Id.* at 303-04. The Supreme Court added that legislative history alone was not "sufficient to provide the requisite fair notice." *Id.* at 304.

Each of Plaintiffs' claims here is based on their theory that Defendants violated the clear terms of Title IX (Section 1681(a)) and its athletics regulations (Section 106.41) because their policies permit transgender students to participate in high school athletics corresponding to their consistently asserted gender identity.[36] According to Plaintiffs, such policies clearly violate Title IX's equal athletic opportunity requirement (Section 106.41(c)) because they allow transgender female athletes to compete against cisgender female athletes without restriction. (*See* Pls.' Opp'n

---

[36] As discussed above, Title IX was "not specifically targeted at nor does it mention athletic programs." *Parker*, 667 F.3d at 917; *see also Equity In Athletics, Inc.*, 639 F.3d at 95 ("Title IX did not specifically address its application to athletics[.]"); *Working*, 2017 WL 2954363, at *1 ("[Section] 1681(a) does not reference athletic programs[.]").

PAGE 94 – FINDINGS AND RECOMMENDATION

State Defs.' Mot. at 7, "[Defendants] have adopted policies permitting [transgender female athletes] . . . to compete in [cisgender high school] girls' athletic competitions without restriction. . . . These policies violate Title IX by failing to effectively accommodate the interests and abilities of female athletes, denying them equal treatment and opportunities, and creating a hostile environment."; SAC ¶¶ 53-60, 173, 191, 202, setting forth the paragraphs upon which Plaintiffs rely and invoking Sections 1681(a) and 106.41 under each claims). Plaintiffs' theories of liability all depend on the text of Title IX and its athletics regulations (i.e., Section 1681(a) and Section 106.41). (*See* SAC ¶¶ 173, 191, 202, premising each claim on violations of these provisions).

Plaintiffs' operative pleading and response to the State Defendants' motion to dismiss also confirm that their theories of liability under Title IX (and arguments related to *Pennhurst*'s clear notice rule) depend on the Eleventh Circuit's holding in *Adams* that the "word 'sex,' as used in Title IX, unambiguously refers to reproductive function—what [Plaintiffs] refer[] to as 'biological sex,'" which implicates an unresolved circuit conflict and question that the Ninth Circuit declined to reach in *Roe*. *See* 137 F.4th at 928 (simplified) (quoting *Adams*, 57 F.4th at 812); (*see also* SAC ¶ 4 n.1, adopting and relying on *Adams*' definition of "biological sex" at the outset; Pls.' Resp. State Defs.' Mot. at 9-10, 13-14, addressing *Pennhurst* before and after a section devoted to *Mansourian* and how *Pennhurst* notice does not apply; Pls.' Resp. State Defs.' Mot. at 14-16, turning to "actual notice" or actual knowledge, i.e., *Gebser*-like sources other than the text of Title IX and its implementing regulations, which Plaintiffs call the "*Pennhurst* doctrine").

///

///

PAGE 95 – FINDINGS AND RECOMMENDATION

Like the Ninth Circuit in *Roe*, the Court finds it unnecessary to resolve any dispute about Title IX's use of the word "sex."[37] But suffice it to say, conflicting circuit precedent addressing very similar arguments and nearly identical statutory text and unresolved circuit conflicts and areas of Title IX law only lend further support to this Court's determination that Title IX and its implementing regulations do not furnish the requisite clear and unambiguous notice "regarding the liability at issue in this case." *Arlington*, 548 U.S. at 296-304 (determining that previous conflicting authorities, which addressed similar arguments and nearly identical wording, were significant).

Consider the Ninth Circuit's recent decision in *Pritchard v. Blue Cross Blue Shield of Illinois*, 159 F.4th 646 (9th Cir. 2025).[38] In *Pritchard*, the transgender class plaintiffs were participants or beneficiaries of employer-sponsored health insurance plans who unsuccessfully sought coverage for treatment of gender dysphoria and sued their plans' third-party administrator under Section 1557 of the ACA. *See id.* at 653-54 (citing 42 U.S.C. § 18116). The administrator, which was a recipient of federal funding whose parent corporation "promised to comply" with Section 1557's proscription against "sex-based discrimination," allowed sponsors to decide whether their plans excluded gender affirming care. *Id.* at 653-54 & n.1; *see also Cummings*, 596

---

[37] Also like *Roe*, when HEW adopted the original Title IX regulations in 1975, it cited Section 1681 (and Section 1682 and the Javits Amendment), not any exception (i.e., Section 1686), as statutory authority for Section 106.41, and DOE retained that authority when it reissued its own regulations in 1980. *See* 40 Fed. Reg. 24128, 24137, 24141-24143 (June 4, 1975) (addressing former Sections 86.33 and 86.41, which respectively cover "[c]omparable facilities" and "[a]thletics") (simplified); 45 Fed. Reg. 30802, 30955, 30960-30962 (May 9, 1980) (capturing the same provisions now located at Sections 106.33 and 106.41); *cf. Roe*, 137 F.4th at 930 n.14 (making a similar point and citing these sources).

[38] The Ninth Circuit issued its *Pritchard* decision after Plaintiffs responded to Defendants' pending motions but before Defendants replied and a few months prior to oral argument.

PAGE 96 – FINDINGS AND RECOMMENDATION

U.S. at 217-18, 230 (Section 1557 is a Spending Clause antidiscrimination statute). The plaintiffs in *Pritchard* alleged the administrator discriminated based on sex in violation of Section 1557 by refusing to cover treatment for gender dysphoria and relying on "exclusions put in place at the insistence of the employer sponsor." 159 F.4th at 653.

On appeal, the Ninth Circuit agreed with three of the district court's four reasons for granting summary judgment in the class plaintiffs' favor and remanded the fourth, which concerned whether the plan exclusions "discriminated based on sex," for further consideration because of intervening Supreme Court precedent. *Id.* (citing *Skrmetti*, 605 U.S. at 500-26).[39] The Ninth Circuit explained that although *Skrmetti* undermined the district court's "application of *Bostock*," there was still "some possibility that *Skrmetti* may not necessarily foreclose" the plaintiffs' claim under Section 1557's "implied right of action" and "express prohibition against discrimination." *Id.* at 653, 656, 662. Before turning to *Bostock*, the Ninth Circuit determined that the administrator waived and forfeited its argument that "it had insufficient notice, as required by the Spending Clause, that it would be subject to Section 1557 for its third-party administrator activities," as opposed to when it sells health insurance coverage. *Id.* at 660-61. The Ninth Circuit also relied on *Loper Bright* in finding that an agency's regulatory definition lacked the "power to persuade" because it used "invalid reasoning" and conflicted with "at least one later pronouncement." *Id.* at 659-60 (simplified) (citing *Loper Bright*, 603 U.S. at 413).

After resolving these issues and others, the Ninth Circuit identified parts of the relevant analysis that were "unchanged by *Skrmetti*" and thus remanded "two arguments" to the district court for consideration: (1) whether the administrator "adopted a policy that looked to class

---

[39] *Skrmetti* "consider[ed] whether a Tennessee law banning certain medical care for transgender minors violates the Equal Protection Clause of the Fourteenth Amendment." 605 U.S. at 500.

PAGE 97 – FINDINGS AND RECOMMENDATION

members' transgender status rather than their gender-dysphoria diagnoses," and (2) whether the administrator "discriminated based on gender-dysphoria treatment as a pretext/proxy for anti-transgender discrimination." *Id.* at 664 n.11. In doing so, the Ninth Circuit noted that the "legal standard for Title VII and Section 1557 claims is the same" because it "interpret[s] Title VII and Title IX consistently, and the 'grounds' of discrimination prohibited by Title IX are incorporated into Section 1557[.]" *Id.* at 664 n.13, 670 (simplified) (finding that this consistency meant that a Title VII "rule flow[ed] into Title IX and thus into Section 1557" (citing *Snyder*, 28 F.4th at 114)). The Ninth Circuit also observed that Section 1557 prohibits "discrimination" on a "ground" that Title IX prohibits, which is "sex." *Id.* at 669 (first quoting 42 U.S.C. § 18116(a); and then quoting 20 U.S.C. § 1681(a)). The Ninth Circuit added that "[c]ertainly, 'discrimination based on . . . transgender status necessarily entails discrimination based on sex'" and "[t]hat is still true" today. *Id.* at 669 (first quoting *Bostock*, 590 U.S. at 669; and then citing *Skrmetti*, 605 U.S. at 519-21).

The Ninth Circuit first considered whether the plaintiffs could hold the administrator liable for violating Section 1557. *See id.* at 660, 663-64. Proceeding on the assumption that the administrator had not forfeited its intent argument, as opposed to simply denying that it could be held liable for third-party employer sponsors' selection of "plan features" that "it did not design," the Ninth Circuit relied on *Bostock* and rejected the administrator's argument that it lacked any discriminatory intent and the plaintiffs were impermissibly seeking to use "agency principles" to hold it liable:

> Even absent forfeiture, [the p]laintiffs' claim is that [the recipient administrator] facially discriminated. "[B]y its very terms, facial discrimination is 'intentional.'" *Lovell v. Chandler*, 303 F.3d 1039, 1057 (9th Cir. 2002). If [the p]laintiffs succeed in proving facial discrimination, "no greater proof of mental state [is] necessary" because "intentional discrimination" is "synonymous with discrimination resulting in 'disparate treatment,'" as opposed to "disparate

impact." *Id.* (quoting *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 n.9 (4th Cir. 1994)). The contrary authorities [the administrator] relies on involve various types of non-facial discrimination. *See, e.g.*, *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009); *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020).

[The administrator's] response that its intention was to comply with the plan terms, not discriminate, does not alter the analysis. "[I]ntentional discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the employer's ultimate goal of discriminating against homosexual or transgender employees." [*Bostock*, 590 U.S. at 661]. This is because "[r]eframing the additional causes" for the employer's decision does nothing "to insulate the employers from liability." *Id.*

After all, "[i]ntentionally burning down a neighbor's house is arson, even if the perpetrator's ultimate intention (or motivation) is only to improve the view." *Id.* For the same reason, intentional discrimination based on sex violates Section 1557, even if intended only to comply with the terms selected by the plan sponsor.

As a backup, [the administrator] argues that there is no conflict between Section 1557 and [the Employee Retirement Income Security Act] because [the p]laintiffs are seeking to use "agency principles" to hold it liable rather than seeking to hold it liable for its own actions. [The administrator's] agency argument suffers from the same forfeiture problem as its intent argument. Setting that aside, [the administrator's] position is unpersuasive. If [the p]laintiffs only sought to hold [the administrator] liable because plan sponsors insisted on the exclusions at issue, [it] might have a point about agency.

Instead, [the administrator's] own undisputed conduct—agreeing to apply the exclusions at issue and applying them to deny coverage to [the p]laintiffs—is the kind of conduct that could violate Section 1557. "All Title VII has ever demanded to establish liability" is that the defendant "necessarily and intentionally discriminates against the plaintiff in part because of sex." *Bostock*, 590 U.S. at 665. In turn, someone "intentionally discriminates based on sex" who "necessarily and intentionally applies sex-based rules." *Id.* at 667 (emphasis omitted). The key word is "applies."

Here, [the administrator] applied the allegedly sex-based rules. [The administrator's] corporate representative testified that [the administrator] is responsible for "determining whether the care falls under that particular exclusion." [The administrator] had a "standard practice" for these claims[, i.e.,] "look at the diagnosis and service code to determine if it's gender reassignment, and if it is then it is denied." It is [the administrator] that "looks at the diagnostic code and the service code to figure out if the claim is for gender reassignment" and "then looks at the service code in particular to figure out if it is related to surgery." The excluded claims are "denied within [the administrator's] system and the member receives an [e]xplanation of [b]enefits with that denial." This was no

PAGE 99 – FINDINGS AND RECOMMENDATION

> mechanical task[, as the administrator] had to review the claims, including the diagnosis and procedure codes, and assess whether the claim fell within the exclusion. Although plan sponsors chose the rules, [the administrator] applied them.

*Id.* at 664-65 (simplified); *cf. Karasek,* 956 F.3d at 1104-06, 1112-13 (discussing Title IX liability, *Gebser*'s "actual notice" or "acknowledge knowledge" and "deliberate indifference requirements," and claims of "student-on-student or faculty-on-student sexual harassment or assault"); *Lovell,* 303 F.3d at 1057 (discussing *Gebser*'s actual notice and deliberate indifference requirements).

Having found that the administrator could be liable under Section 1557, the Ninth Circuit turned to the administrator's concession that it "exclude[d] treatment for 'gender dysphoria' and 'transgender services'" (i.e., it removed "diagnosis from the range of conditions its insurance plans cover") and the district court's remaining reasons for rejecting the administrator's defense that "discrimination against treatment for gender dysphoria is not discrimination based on transgender status or discrimination based on sex." *Pritchard,* 159 F.4th at 669. Notably, the Ninth Circuit rejected the plaintiffs' attempts to "distinguish" and "cabin[]" *Skrmetti* to the "constitutional context." *Id.* at 670. Finding that *Skrmetti*'s "logic reaches more broadly," the Ninth Circuit explained that although the *Bostock* test "arose in 'the Title VII context'" and *Skrmetti* "did not decide whether '*Bostock*'s reasoning reaches' constitutional claims," *Skrmetti* "assumed without deciding that the standards were identical" and held that "[u]nder the reasoning of *Bostock*," the Tennessee "statute did not discriminate based on sex." *Id.* (quoting *Skrmetti,* 605 U.S. at 512).

Following *Skrmetti*'s approach, the Ninth Circuit found that *Skrmetti* foreclosed the district court's first reason and found the administrator's removal of a "diagnosis from the range of conditions its insurance plans cover" was insufficient under *Bostock*'s but-for causation

PAGE 100 – FINDINGS AND RECOMMENDATION

standard. *Id.* at 669-70. Second, the Ninth Circuit concluded that the "district court erred in focusing on whether the plans referenced sex or a synonym," as the "Supreme Court 'has never suggested that [a statute's] mere reference to sex is sufficient to trigger heightened scrutiny' by showing that the statute discriminates based on sex." *Id.* at 670 (quoting *Skrmetti*, 605 U.S. at 512). Third, the Ninth Circuit deemed it insufficient that the administrator's exclusions made "direct references to transgender status," noting that the *Skrmetti* statute "bristled with references to sex" and the Supreme Court did "not focus on whether anyone refers to transgender status or, equivalently, sex." *Id.* at 670-71 (simplified) (citing *Skrmetti*, 605 U.S. at 510-14). The Ninth Circuit made a similar point with respect to *Skrmetti* undermining a theory of discrimination against the plaintiffs' medical care leading to "gender reassignment," i.e., equating to "transgender status." *Id.* at 671.

Finally, and without "holding that *Skrmetti* favor[ed]" the district court's grant of summary judgment in the plaintiffs' favor or expressing a "view about the appropriate outcome on remand," the Ninth Circuit held that there were two potential ways in which the plaintiffs' case differed from *Skrmetti*. *Id.* at 671-72. The Ninth Circuit provided the following explanation regarding "which questions *Skrmetti* potentially left open and, thus, why remand would not be futile":

> First, some of these [p]laintiffs allegedly had diagnoses (other than gender dysphoria) that entitled them to hormones or other treatment—but [the administrator] still would not treat them. In *Skrmetti*, "changing a minor's sex or transgender status [did] not alter the application of" the statute. 605 U.S. at 519-21. As an example, the Supreme Court envisioned "a transgender boy seek[ing] testosterone to treat his gender dysphoria." *Id.* "The transgender boy could receive testosterone only if he had" "a qualifying diagnosis for the testosterone" like "a congenital defect, precocious puberty, disease, or physical injury." *Id.* "And, if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status." *Id.* It was for this reason that the Supreme Court distinguished *Bostock*. *See id.*

PAGE 101 – FINDINGS AND RECOMMENDATION

Here, one of the [the p]laintiffs [is a transgender girl who] has a different story to tell. S.L. was diagnosed with both gender dysphoria and precocious puberty. She sought puberty blockers to block her precocious puberty. [The administrator] denied coverage. During the appeal process, her mother "was told by [the administrator's] membership services that, had S.L. been diagnosed only with early-onset puberty (i.e., not gender dysphoria AND early-onset puberty), [the administrator] would have likely covered the puberty blocker." Unlike the example patient from *Skrmetti*, S.L. has a qualifying diagnosis other than gender dysphoria, but she still cannot get the puberty blocker. If S.L. had been born a girl instead of a boy, she would not be transgender and would not have gender dysphoria—because only transgender people can have gender dysphoria. But she would still have precocious puberty, and she could have gotten puberty blockers. Because changing her sex, and thus her transgender status, does "alter the application of" [the administrator's] exclusion, sex is a but-for cause of the exclusion's operation. For S.L. and those like her, *Skrmetti* is arguably distinguishable.

Second, *Skrmetti* left [the p]laintiffs another potential opportunity. It noted that no party had "argued that [the statute's] prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals." 605 U.S. at 519. [*Skrmetti*] "decline[d] to find" that the statute discriminated against transgender individuals for that reason. *Id.* Here, however, [the p]laintiffs argue that [the administrator's] justifications for its actions "are a pretext for 'invidious discrimination.'" Their argument is based on a proxy-discrimination theory. *Cf. Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 886 (4th Cir. 2023) (identifying "proxies" as a way to prove "an invidious discriminatory intent"), *cert. denied*, 146 S. Ct. 541 (2024); *Hearne v. Bd. of Educ.*, 185 F.3d 770, 776 (7th Cir. 1999) (distinguishing a case where an "ostensibly neutral classification" was "such a good proxy for the protected characteristic that it is 'an obvious pretext for discrimination'" (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979))).

[The administrator] responds that *Skrmetti* forecloses [the p]laintiffs' proxy theory because it held "there is a 'lack of identity' between transgender status and the excluded medical diagnoses." 605 U.S. at 519. But while a "lack of identity" weakens a proxy-discrimination theory, it is not fatal. "Notably, proxy discrimination does not require an exact match between the proxy category and the racial classification for which it is a proxy." *Davis v. Guam*, 932 F.3d 822, 838 (9th Cir. 2019). Instead, "the crucial question is whether the proxy's 'fit' is 'sufficiently close' to make a discriminatory inference plausible." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 959 (9th Cir. 2020) (quoting *Davis*, 932 F.3d at 838).

[The administrator] counters that no such inference is plausible. At this stage, we do not necessarily agree. The fit between transgender people and people suffering from gender dysphoria is strong. Only transgender people can suffer from gender dysphoria: gender dysphoria comes from "marked incongruence

PAGE 102 – FINDINGS AND RECOMMENDATION

between the patient's experienced/expressed gender and assigned gender." Also, [the administrator] made a key concession that strengthens [the p]laintiffs' pretext/proxy argument. [The administrator's] policy admits that the treatments [the p]laintiffs seek can be medically necessary for treating adolescents with gender dysphoria. Even so, in many of the health plans at issue, [the administrator] categorically excludes those treatments. Because [the administrator] admits those treatments are sometimes necessary, it cannot justify its categorical exclusion by citing medical necessity. Something else may be afoot, and that something may be invidious discrimination against transgender people.

*Id.* at 671-72 (simplified); *see also Hunter v. U.S. Dep't of Educ.*, 115 F.4th 955, 963-64 (9th Cir. 2024) ("Title IX prohibits discrimination 'on the basis of sex.' We have interpreted this provision to prevent federally funded . . . institutions from discriminating against gay or transgender students." (simplified) (first citing *Grabowski*, 69 F.4th at 1116; and then citing *Bostock*, 590 U.S. at 660)).

*Pritchard* poses several problems for Plaintiffs. First, *Pritchard* clearly supports the conclusion that *Pennhurst*'s clear notice rule is not satisfied here. It also undermines nearly all of the authorities upon which Plaintiffs relied in suggesting otherwise, including that "*Bostock* has no bearing on Title IX claims." (*See* Pls.' Opp'n State Defs.' Mot. at 5-7, addressing *Bostock* and Title IX's use of the word "sex" and citing *Skrmetti*, *Adams*, and Fifth and Sixth Circuit decisions, and the Supreme Court's "motions docket" and "unanimous[] accept[ance] that the plaintiffs . . . 'were entitled to preliminary injunctive relief as to . . . *the [previously proposed Title IX] provision that newly redefine[d] sex discrimination to include discrimination on the basis of sexual orientation and gender identity*'" (quoting *Skrmetti*, 605 U.S. at 527 (Thomas, J., concurring), which quoted *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024) (per curiam))) (simplified).

Also significant is that *Pritchard*'s logic and explanation as to why *Skrmetti* was arguably distinguishable shines a light on a faulty premise underlying Plaintiffs' Title IX claims. Namely,

PAGE 103 – FINDINGS AND RECOMMENDATION

that Defendants simply rely on a "misapplication of *Bostock*, a Title VII employment case with no similarity to this case" in arguing that a recipient's "provi[sion of] effective accommodation for cisgender girls cannot require denying effective accommodation for transgender girls." (Pls.' Opp'n State Defs.' Mot. at 23, addressing *Bostock* by incorporating by reference pages one through seven of Plaintiffs' opposition to the State Defendants' motion and quoting State Defs.' Mot. at 14).

Recall that Defendants' policies are "trans-inclusive." "The plain text of Title IX's nondiscrimination mandate does not 'unambiguously' prohibit trans-inclusive policies like those adopted by the [Defendants]; indeed, a substantial body of law suggests that Title IX allows or even requires such policies." *Soule*, 90 F.4th at 93 (Chin, J., dissenting, joined in full by Carney & Kahn, JJ., and Part III by Lohler & Robinson, JJ.) (simplified) (citing *Parents for Priv.*, 949 F.3d at 1227); *see also Parents for Priv.*, 949 F.3d at 1227 ("Nowhere does the statute explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity."). Furthermore, Plaintiffs fail to "cite a single court decision that has interpreted Title IX to prohibit trans-inclusive athletic policies like [those at issue here]." *Soule*, 90 F.4th at 93 (Chin, J., dissenting, joined in full by Carney & Kahn, JJ., and Part III by Lohler & Robinson, JJ.); *cf. Mercer*, 190 F.3d at 646-47 (stating that paragraph (a) of Title IX's athletics regulations, which "require covered institutions to integrate all of their sports teams," "establishes a baseline prohibition against sex discrimination in . . . athletics, tracking almost identically the language" in Section 1681(a), and electing to adopt, in a female athlete, "single-sex contact sports team" context, a "more natural and intended meaning" of paragraph (b)'s exception, which ensured that the "indisputable congressional intent to prohibit discrimination in all circumstances where such discrimination is unreasonable . . . [was] not

PAGE 104 – FINDINGS AND RECOMMENDATION

frustrated"); *see also Mansourian,* 602 F.3d at 970 n.18 (citing favorably to *Mercer*); *Roe,* 137 F.4th at 929 (recognizing that like the situation presented here, *Roe* was an "instance in which the statute in question appears to affirmatively authorize conduct the funding recipient has engaged in").

Other courts have made analogous observations. The Eighth Circuit, for example, recently rejected Title IX effective accommodation and equal treatment claims that the plaintiff, a "non-profit organization founded 'for the purpose of defending women's sports,'" based on a "bylaw that allow[ed] students to participate in athletics or fine arts activities in a manner 'consistent with their gender identity or expression.'" *Female Athletes United,* 172 F.4th at 1023. For reasons consistent with this Court's findings above, the Eighth Circuit invoked both the Fifth Circuit's decision in *Pederson* and the Eighth Circuit's previous decision in *Grandson* (i.e., cases upon which the Ninth Circuit and district court respectively relied in *Mansourian, see* 602 F.3d at 968-69):

> [The plaintiff] first asserts that the district court simply misclassified its claims of intentional discrimination as claims of disparate impact. In the Title IX context, intentional sex discrimination occurs whenever a defendant treats persons less favorably "because" of their sex. *Wells ex rel. Glover v. Creighton Preparatory Sch.*, 82 F.4th 586, 592-93 (8th Cir. 2023). A defendant need not have intended to violate Title IX or acted out of animus, but "need only have intended to treat women differently." *See Pederson*, 213 F.3d at 881. In contrast, a disparate impact claim arises when a defendant adopts policies or practices "that are facially neutral in their treatment of different groups but that in fact fall more harshly on one sex than another." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). [The plaintiff] argues that it has brought claims of intentional discrimination because it has alleged that the Bylaw reflects disparate treatment, specifically a "sex-based choice to allow males on exclusively female teams." Like the district court, however, we struggle to find allegations of that sort in its pleadings. [The plaintiff's] complaint not only concedes the Bylaw's facial neutrality—"the [Bylaw] does not take into account the student's biology or any physiological attributes"—but also disclaims that it reflected a sex-based choice—"at no point prior to [the] adoption of the [Bylaw] did the [League], or any of the [d]efendant [s]chools take into consideration whether the [Bylaw] provided equal opportunity or effectively accommodated female athletes." What

remain are paradigmatic disparate impact allegations, including, for example, that the Bylaw has "a discriminatory impact," "a detrimental effect," a "known negative impact," and a "tangible impact" on female athletes. Therefore, we find no error in the district court's conclusion that [the plaintiff] based its ineffective accommodation and unequal treatment claims on disparate impact allegations.

Even so, [the plaintiff] argues that the district court nonetheless erred because its allegations allow for an inference of [the defendants'] discriminatory intent. [The plaintiff] is correct that a defendant's discriminatory intent "can be inferred from the mere fact of differences in treatment," *see E.E.O.C. v. Dial Corp.*, 469 F.3d 735, 741 (8th Cir. 2006), or established by evidence of "deliberate indifference," which the Supreme Court has characterized as "disregard[ing] a strong likelihood that the challenged action would result in a violation of federally protected rights." *A.J.T. ex rel. A.T. v. Osseo Area Schs.*, 605 U.S. 335, 345 (2025) (citation modified). As such, we accept that a plaintiff could bring a Title IX claim based on allegations of disparate impact that allow an inference of discriminatory intent.

[The plaintiff] has failed to do so. First, [the plaintiff] contends that its allegations concerning male competitive advantage in athletics and the negative impacts of Doe's participation in girls' softball permit the inference that [the defendants] intended to treat female athletes less favorably than similarly situated male athletes. However, as the district court noted, [the plaintiff's] complaint does not allege that [the defendants] enforced the Bylaw because of its disparate impact on female athletes. Nor does [the plaintiff] point to evidence in the record showing that [the defendants] received and disregarded complaints outlining the negative effects of Doe's participation on female athletes. *See Grandson*, 272 F.3d at 575 (affirming denial of leave to amend deliberate indifference claim in complaint that contained "no allegation of prior notice of their complaints to appropriate [school] officials, no allegation of deliberate indifference by such officials, and no allegation they had afforded [the school] a reasonable opportunity to rectify the alleged violations"). Moreover, [the plaintiff] supplies no case law or other legal support for the proposition that [the defendants'] alleged awareness of and failure to prevent a single transgender girl's participation in a team sport speak to an intent to discriminate. Accordingly, we conclude that [the plaintiff] has not brought a claim of intentional discrimination based on inferences stemming from Doe's participation in girls' softball

*Female Athletes United*, 172 F.4th at 1027-29.

Allegations of that nature (or the ones that *Pritchard* described) are also missing in

Plaintiffs' pleadings. Like *Female Athletes United*, Plaintiffs' operative complaint focuses on

Defendants' failure adequately to account for student's biology and physiological attributes and

relies extensively on "paradigmatic disparate impact allegations." (*See* SAC, ¶¶ 89-96, 172-211,

PAGE 106 – FINDINGS AND RECOMMENDATION

alleging that Plaintiffs are "unaware of any [cisgender] *male* athletes performing in [cisgender] male-only athletic events who were adversely impacted by" ODE and OSAA's policies, "ODE and OSAA have effectively told . . . young [cisgender] women that their ambitions, discipline, and identity as [cisgender] female athletes do not merit equal recognition or protection," ODE and OSAA fail to account for the "inescapable differences" and "[m]edical consensus" on the "profound physiological differences between the sexes after puberty," and ODE and OSAA's policies have "no meaningful impact on [cisgender] male athletic opportunities," an "unbalanced, detrimental effect on [cisgender] girls' opportunities," and produce an "athletic climate that is discriminatory in effect" and in which cisgender male athletes receive "proportionally more opportunities" than cisgender female athletes; *cf.* State Defs.' Mot. at 1, "At the very least, there is no unambiguous prohibition on sex- and gender-neutral guidance.").

Also noteworthy is the Eighth Circuit's reliance on sister circuits from which Plaintiffs derive their understanding of "sex" and *Bostock*. See *Female Athletes United*, 172 F.4th at 1027 ("We have not previously defined the scope of the private right of action conferred by Title IX. In line with several of our sister circuits that have reached the issue, the district court held [and we agree] that a private plaintiff may only bring claims of intentional discrimination under Title IX." (first citing *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019); then citing *BlueCross BlueShield of Tenn., Inc.*, 926 F.3d at 240; and then citing *Poloceno v. Dall. Indep. Sch. Dist.*, 826 F. App'x 359, 363 (5th Cir. 2020))); *see also Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 741-44 & n.2 (9th Cir. 2021) (Lee, J., dissenting) (discussing the relevant cases and "domino effect").

Plaintiffs' remaining arguments are not persuasive. Plaintiffs, for example, suggest that *Pennhurst* would not "excuse[]" Defendants' alleged violations of Title IX because of an

PAGE 107 – FINDINGS AND RECOMMENDATION

"ambiguity" and Defendants inconsistently rely on both *Pennhurst* and shifting government views. (*See* Pls.' Opp'n State Defs.' Mot. at 13-16.) The Court disagrees and has identified far more than an ambiguity. *See Medina*, 606 U.S. at 383 n.8 ("[T]he government's views can shift from administration to administration. And our decisions have never suggested that anything less than clear statutory language can supply States with the unambiguous notice required."); *cf. Pritchard*, 159 F.4th at 676 (Rawlinson, J., concurring in large part) ("In the absence of express language in the statute applying the discrimination provisions to it, [the administrator] contends that it lacked 'clear notice regarding the liability' for discrimination in administering health insurance contracts. . . . Notably, [the administrator] points to the varying regulations promulgated by the federal government addressing this issue." (quoting *Arlington*, 548 U.S. at 296)); *see also* Exec. Order 14168, 90 Fed. Reg. 8615, 8618 (Jan. 20, 2025) ("This [EO] is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."); Exec. Order No. 14201, 90 Fed. Reg. 9279, 9280-81 (Feb. 5, 2025) (same).

Plaintiffs also attempt to advance forms of "actual notice" cloaked as the "*Pennhurst* doctrine." (*See* Pls.' Opp'n State Defs.' Mot. at 14-16.) The alleged forms of actual notice either postdate the last conduct of which Castaneda specifically complains by nearly a year or predate the 2025 OSAA state track and field championships of which Plaintiffs complain, and none explicitly refer to anyone other than Carpenter and the 2025 Chehalem Classic (i.e., a complaint that Carpenter's mother filed less than three months before Plaintiffs sued). *See supra*, note 28. Even if relevant, these forms of actual notice or actual knowledge fall well short of supporting any intent to discriminate or satisfying *Gebser*'s actual notice and deliberate indifference

PAGE 108 – FINDINGS AND RECOMMENDATION

requirements. *See Female Athletes United,* 172 F.4th at 1029 (emphasizing that the plaintiff "supplie[d] no case law or other legal support for the proposition that [the defendants'] alleged awareness of and failure to prevent a single transgender girl's participation in a team sport speak to an intent to discriminate").

Finally, Plaintiffs direct the Court's attention to *Loper Bright* (*see* Pls.' Opp'n State Defs.' Mot. at 13), but that proves unhelpful for many of the same reasons. *See Female Athletes United,* 172 F.4th at 1029 ("The problem with this argument is that executive guidance and agency findings, in and of themselves, do not reflect settled law. As such, they cannot independently establish a likelihood that certain policies or conduct violate federal rights. . . . [T]here can be no dispute that whether Title IX requires, permits, or prohibits the participation of transgender athletes in female athletics remains an open question of law. Until it is resolved by the judicial process, the Executive Branch's views on that question may guide its own enforcement approach, but they cannot independently establish a 'strong likelihood' that Doe's participation violates Title IX or its implementing regulations." (citing *Loper Bright,* 603 U.S. at 385)); *cf. Niblock,* 165 F.4th at 469-70 (Sutton, C.J., and Murphy, J., concurring) ("Knock out *Chevron,* and the scope of *Auer* deference narrows considerably, if indeed it remains meaningful at all. *Loper Bright* and *Kisor* should prompt us to revisit the 1979 guidance in an appropriate case. Of most note, many indicators show that Title IX likely prohibits only intentional discrimination.") (simplified).

For all of these reasons, the Court concludes that *Pennhurst*'s clear notice rule is not satisfied here. The Court therefore recommends that the district judge grant Defendants' motions to dismiss Plaintiffs' Title IX claims. *See Hall,* 22 F.4th at 404 ("[I]f the federal funding recipient lacks notice it could be held liable for certain conduct, an implied right of action under Title IX

PAGE 109 – FINDINGS AND RECOMMENDATION

will not lie under *Pennhurst*."); *see also Roe*, 137 F.4th at 930 & n.12 (recognizing that the clear

notice rule affects the availability of monetary damages and "applies to other remedies as well,"

such as "injunctive relief" (first citing *Pennhurst*, 451 U.S. at 8-9, 17-18, 24-25; and then citing

*Barnes*, 536 U.S. at 187)).

## CONCLUSION

For the reasons stated, the Court recommends that the district judge GRANT the State

Defendants' motion to dismiss (ECF No. 40); GRANT IN PART and DENY IN PART the

District Defendants' motion to dismiss (ECF No. 41); and GRANT OSAA's motion to dismiss

(ECF No. 45).

## SCHEDULING ORDER

The Court will refer its Findings and Recommendation to a district judge. Objections, if

any, are due within fourteen (14) days. If no objections are filed, the Findings and

Recommendation will go under advisement on that date. If objections are filed, a response is due

within fourteen (14) days. When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

DATED this 27th day of May, 2026.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 110 – FINDINGS AND RECOMMENDATION